UNITED STATES DISTRICT COURT
DISTRICT OFMASSACHUSETTS


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| VS. | ) | |
| | ) | Crim. No. 16-cr-10137-LTS |
| TIMOTHY SULLIVAN, et. al., | ) | |
| Defendant. | ) | |
| | ) | |


**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
JOINT MOTION TO DISMISS INDICTMENT**

**Timothy Sullivan** (Sullivan) submits the instant *Supplemental Memorandum* to address

whether, in the context of establishing a public official's criminal culpability, the Hobbs Act

requires an allegation (and ultimately proof) that the defendant was the genesis of the victim's

fear of economic harm which was exploited by the defendant's wrongful conduct.  Where the

conduct consists of constituent advocacy, requiring an explicitly extortionate demand is required.

While co-defendant Brissette joins in the argument so far as it is apt, the argument is more

pointed with respect to Sullivan, who was not involved in the Top Chef matter on which the

allegations in ¶s 8-15 of the indictment are based.  With respect to the uncharged series of events

surrounding the filming of Top Chef, statements explicitly linking the release of permits to the

hiring of union labor are alleged.  *See* Indictment ¶s 12, 15.  The same explicitness does not exist

with respect to the defendants' alleged interactions with the Boston Calling Music Festival, and

Sullivan is alleged to have been involved only with respect to that matter. See *Id.*, at ¶s 16-18.

In the charging paragraphs which follow the factual allegations set forth in the margin,

the Indictment alleges that the defendants sought to obtain wages and benefits to be paid through

a labor contract with Local 11, with *Crash Line's* consent induced by the wrongful use of fear of

economic harm. *Indictment, ¶s 20, p. 6 & ¶21, p. 7.*  The Indictment does not allege, nor does the government contend, that either Sullivan or Brissette engaged in, or threatened to use, force or violence against *Crash Line*. That fact matters because the use of actual or threated force or violence to obtain property is inherently wrongful, but there is nothing inherently wrongful about the use of economic fear to obtain property.  *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989)(citing *United States v. Kattar*, 840 F.2d 118, 123-24 (1st Cir. 1988); *United States v. Clemente*, 640 F.2d 1069, 1077-78 (2d Cir. 1981).

Because wrongful use of fear of economic harm is what the Hobbs Act criminalizes, the first question, therefore, is whether a public official asking or demanding that certain actions be taken to benefit a constituent group without an explicit threat of harm constitutes a crime.  And the second question is whether the claim of right defense which originated in *United States v. Enmons*, 410 U.S. 396 (1973) and is discussed in the economic fear context in *Sturm*, is applicable, given the City's legal authority concerning the use of its property and the issuance of entertainment licenses.

## I.    WITHOUT AN EXPLICIT THREAT OF HARM, A PUBLIC OFFICIAL ASKING OR DEMANDING THAT CERTAIN ACTIONS BE TAKEN TO BENEFIT A CONSTITUENT GROUP DOES NOT CONSTITUTE *HOBBS ACT* EXTORTION.

Although the Hobbs Act statute is couched in the disjunctive, the *Indictment* is not.  The only allegation is that Sullivan and Brissette engaged in the wrongful use of fear of economic harm to induce *Crash Line* to hire union labor.  A commonsense reading of the charging language in conjunction with the government's response to *Bill of Particulars* ordered by the Magistrate Judge makes clear that the Grand Jury limited this prosecution to the extortion induced by the wrongful use of "fear of economic harm" theory of the statute.  A Copy of the Magistrate Judge's Order and the Government's Response to the Bill of Particulars are attached

2

respectively as *Exhibits* A & B.

Notwithstanding the *Particulars* provided, the Indictment remains vague as to the source and the manner by which the "fear of economic harm" was generated.  In her Order, the Magistrate Judge noted that "[w]hile certain specific conversations are detailed in the [Indictment] (see, e.g., ¶18), this court finds that further details are necessary in order for the defendants to be able to adequately prepare a defense." *Exhibit* A.

The wrongful conduct, according to the Magistrate Judge's decision, was "evidenced by verbal communications[.]"  *Id*.  The Magistrate Judge stated that "where an indictment is vague, 'it is possible, however unlikely, for a prosecutor to obtain a conviction based wholly on evidence of an incident completely divorced from that upon which the grand jury based its indictment.  The prosecution may not have the power 'to roam at large' in this fashion." *Id*. Linking such a possibility to the case at bar, the Court ruled that "[t]his need for more specificity is especially appropriate in cases such as the instant one where the parties' understanding of the meaning of the statements made may be of critical importance."  *Id*.

The government provided the Particulars ordered:

… The substance of the alleged conversations is as follows: The defendants, who were careful choosing the words they used, either explicitly stated or intimated, that they wanted Crash Line Productions to hire members of IATSE for the September Boston Calling event. The defendants *stated* that IATSE was unhappy that they were not part of the Boston Calling Festival. Crash Line Productions made clear to the defendants that they already had a contract … and were happy with the labor they had hired. The defendants *conveyed* that *if* IATSE was not hired, they would picket and come with the blow up rat, which would be a problem for both Crash Line and the mayor. Crash Line told the defendants they would have to fire people to take on members of IATSE. <u>The defendants *stated* that everyone had to get a fair shake and a shot at working this event. They further *stated* that the mayor had a background in working with unions and wanted to find a way to bring everyone to the table to get everyone working together.</u> The defendants *told* Crash Line that half of their crew had to be IATSE members. Crash Line told the defendants that hiring that amount of IATSE members would cripple them financially. An agreement was negotiated between the defendants

3

and Crash Line to hire eight IATSE members.

*Exhibit* B.  (Emphasis supplied.)

The government's *Bill of Particulars* indicates that defendants carefully chose their words and thereby "… either *explicitly stated* or intimated, that they wanted Crash Line Productions to hire members of IATSE for the September Boston Calling event," thus acknowledging that the source of the fear was the conversations between the defendants and Crash Line.  The "relevant conversations" the government sets out in its *Response* explain the demand, but do not set forth the threat that would have created the fear.  None of these statements are direct threats and no other additional facts or conversations are set out from which the alleged *intimation* of a threat could have been generated.

During the course of the arguments on the *Bill of Particulars*, the government suggested either that the defendants may have implicitly threatened *Crash Line*, or, alternatively, that *Crash Line* may have simply inferred that if it did not hire union workers, it might not receive its desired permits.

That articulation of position might implicate a prosecution theory that the defendants "exploited an existing fear of economic harm" rather than they induced it.  Thus, orally and in writing the prosecution has tried to leave open the possibility of proceeding under two theories, but does not completely or clearly embrace either. The government has not otherwise specifically enunciated the theory on which the grand jury indicted or the theory on which the government will proceed to trial.[1]

---

[1] The Supreme Court's recent decision in *Bravo-Fernandez v. United States*, 580 U.S. ___, 137 S. Ct. 352 (2016) illustrates why the inquiry at the motion to dismiss stage should be intense where the prosecution might otherwise "roam at large".  There the Court dealt with a case that had charged violations of 18 U.S.C. §666 and conspiracy to violate that statute.  This indictment charges violations of 18 U.S.C.  §1951 and conspiracy to violate that statute.  The *Bravo-Fernandez* jury was instructed in substantially similar terms on the federal program bribery conspiracy and the substantive count but

The distinction between the respective theories is evidentially important to Sullivan on the "exploitation" theory to the extent that the government intends to argue that the fear of economic harm arose from prior actions related to the Top Chef events -- an existing fear that derives from an external source such as a defendant's reputation for threats or violence, see *United States v. Coppola*, 671 F. 3d 220, 241 (2nd Cir. 2012) or a codefendant's uncharged role in granting or withholding entertainment permits.

In the context of a public official advocating for constituents, the failure to identify the source of the alleged fear renders application of that statutory theory unconstitutionally broad and a violation of free political speech. The mere fear of a private person, without the need to prove an *explicit* threat by the public official – as compared to a perceived or existing fear (possibly unrelated to the defendant) by the private person or business – could cause any request made by a public official on behalf of a constituent a Hobbs Act violation. Such a circumstance would have a chilling effect on the right of public officials to advocate for their constituents.

Without an allegation of an explicit *threat* or act inducing fear, the "use of fear of economic harm" application charged in the Indictment intrudes on a basic tenet of obtaining and maintaining public office, as important and vital to our democratic process as seeking and receiving campaign contributions. See *McCutcheon v. Fed. Election Comm'n*, 572 U.S. ___, 134 S. Ct. 1434 (2014), where the Supreme Court reinforced the proposition that it is a central feature

---

acquitted on the former and convicted on the latter, verdicts the Court characterized as irreconcilably inconsistent. The Court of Appeals for the First Circuit vacated the substantive conviction for instructional error, holding that §666 proscribes only *quid pro quo* bribery and not receiving or providing gratuities and determining that the District Court had erred in instructing on both theories. *United States v. Fernandez*, 722 F. 3d 1, 6, 22-27 (1st Cir. 2013). On remand, the defendants were retried and unsuccessfully sought dismissal of stand alone §666 charges on double jeopardy grounds. *United States v. Bravo-Fernandez*, 988 F. Supp. 2d 191 (D.P.R. 2013). The Court of Appeals and then the Supreme Court affirmed the denial.

Hobbs Act extortion may be prosecuted based on two theories, just as federal program bribery cases. Taking care to be specific at the beginning of the case will avoid problems at its end.

of democracy that constituents support candidates who share their beliefs and interests, and

candidates who are elected can be expected to be responsive to those concerns. *Id*., at 1441; see a

lso, *McCormick v. United States*, 500 U.S. 277 (1993), where the Court ruled that "[s]erving

constituents and supporting legislation that will benefit the district and individuals and groups

therein is the everyday business of a legislator." 500 U.S. 272. As the Court in *McCormick*

noted,

> Whatever ethical considerations and appearances may indicate, to hold that
> [public officials] commit the federal crime of extortion when they act for the
> benefit of constituents or support legislation furthering the interests of some of
> their constituents, shortly before or after [*an accession to a demand for work for
> constituents*] are solicited and received … is an unrealistic assessment of what
> Congress could have meant by making it a crime to obtain property from another,
> with his consent, 'under color of official right.' To hold otherwise would open to
> prosecution not only conduct that has long been thought to be well within the law
> but also conduct that in a very real sense is unavoidable … Cf. *United States v.
> Enmons,* 410 U.S. 396, 411 (1973).

*McCormick*, 500 U.S. 272–73 (bracketed phrases added as analogous substitutes for Sullivan and

Brissette's positions and the thing of value identified in *McCormick* as "campaign

contributions").

Addressing the possible divergent interests between public officials performing

constituent services and law enforcement rooting out corruption, *McCormick* requires proof in

the campaign finance context that "payments are made in return for an *explicit* promise or

undertaking by the official to perform or not to perform an official act", rather than an inference

based on such considerations as timing. The same rule should apply in situations involving

advocacy for constituents in the "fear of economic harm" context. See *McCormick* at 273.

Every candidate who espouses a pro-labor platform while campaigning and, then, when

elected, aggressively advocates for creating work for unions, naturally causes fear in the

management of companies which do not use union labor. Without the check provided by

*McCormick*, every request made by a public employee on behalf of a constituent could conceivably generate fear and thus constitute a potential Hobbs Act violation.  For example – but for this naturally occurring political fear, inherent in the very existence of representative democracy, why else would a manufacturer of air conditioners who planned to move some part of its production force to Mexico, suddenly reverse its planned move after receiving a telephone call from a would-be public official who was elected on a platform of keeping jobs in the United States?  Businesses and people that do business with the government have always tried to maintain a good relationship with candidates and incumbent public officials alike, because those political figures may someday deal with that company's bids to do business or deal with legislation affecting the business.

Sullivan submits that the analysis that was performed by the United States Supreme Court in *McCormick v. United States*, 500 U.S. 257 (1991) should be used in this case.  As in *United States v. Menendez*, 132 F. Supp. 3d 635, 641–45 (D.N.J. 2015), the instant case raises the question: Whether the *McCormick* standard applies beyond campaign contributions to cover payments (in the form of wages) paid to a public official's constituents as a result of requests that a private employer hire union workers?

The Eleventh Circuit has interpreted the *McCormick* standard as serving to protect against convictions that "impact the First Amendment's core values." *United States v. Siegelman,* 640 F.3d 1159, 1169–70 (11th Cir. 2011). It follows that the *McCormick* standard should be interpreted in light of the Supreme Court's First Amendment jurisprudence, and the Supreme Court has explained that "First Amendment standards ... must give the benefit of any doubt to protecting rather than stifling speech." *See Citizens United v. Federal Election Commission,* 558 U.S. 310, 327  (2010).  For these reasons, the *McCormick* standard applies to alleged extortion of

wages paid to constituents.

The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United,* 558 U.S. at 339, 130 S.Ct. 876. Although not technically connected with the mayoral campaign, jobs sought for and obtained for constituents serves the same purpose – to ensure that the administration Sullivan worked for remained in office. There is no principled distinction to be made from which a contribution to a campaign seeking to reelect a candidate is political speech but a request in the form of jobs for candidate's constituents is not protected as free political speech.[2] *See Citizens United,* 558 U.S. at 327 ("First Amendment standards ... must give the benefit of any doubt to protecting rather than stifling speech.").

Outside of the campaign contribution context, the Supreme Court set the requirement in *Evans v. United States,* 504 U.S. 255 (1992), that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268.

The *Evans* Court did not directly state proof of at least an *implicit,* as opposed to an explicit, *quid pro quo* or reciprocity understanding is necessary. However, both Justice Kennedy in a concurrence and three other justices in a dissent recognized that the *Evans* majority's opinion pointed toward such a requirement. *See id.* at 272 (Kennedy, J., concurring); *id.* at 285–86 (Thomas, J., dissenting). Since *Evans,* other circuits, using the language of *quid pro quo* or variations on that term, have held that "a *quid pro quo* [is] required to sustain a conviction in the non-campaign context, but that the agreement may be *implied* from the official's *words and*

---

[2]   Payment of wages may have been the result of Sullivan's alleged actions, but not necessarily the purpose or motivation for his acts.  *Goodwill* was more likely what he sought. Sullivan's willful intent is necessary to support his conviction.  With respect to this distinction between intent and result, the Indictment is unclear.

*actions.*" *United States v. Ganim,* 510 F.3d 134, 143 (2d Cir. 2007).  That the alleged agreement was not express is irrelevant. *Siegelman,* 640 F.3d at 1171 ("[T]he agreement must be *explicit,* but there is no requirement that it be *express.*") (emphasis in original); *United States v. Blandford,* 33 F.3d at 685, 696 (6th Cir. 1994) ("[T]he *quid pro quo* of *McCormick* is satisfied by something short of a formalized and thoroughly articulated contractual agreement."). See *United States v. Menendez*, 132 F. Supp. 3d 635, 641–45 (D.N.J. 2015). That said, there is nothing alleged in this case from which one could infer an unexpressed but explicit connection between the action requested of *Crash Line* and the actions by the defendants.

The concept is the same in a case such as this not involving color of official right.  A public employee such as Sullivan, appointed by an individual elected to a public office such as mayor, who seeks to have a private company assist in achieving his employer's articulated platform, cannot be held to have violated the Hobbs Act without an explicit, if unexpressed threat.  Stating that "the mayor had a background in working with unions and wanted a way to bring everyone to the table to get everyone working together" does not meet that requirement.

## II.   REQUIRING A LESSEE TO HIRE PARTICULAR TYPES OF WORKERS WOULD NOT BE "WRONGFUL" WITHIN THE MEANING OF THE HOBBS ACT.

### A.   The Massachusetts laws applicable to entertainment licensing invest substantial authority in City Administration

On the face of the Hobbs Act, the word "wrongful" modifies the use of each of the enumerated means of obtaining property, including use of fear.  In *United States v. Enmons*, 410 U.S. 396, 399-400 (1973) the majority opinion reasoned that the word does not *only* modify the means used because it would be superfluous when modifying "force" or "violence".  [The word "wrongful" is not superfluous when modifying "fear," however.]  The Court therefore gave the word "wrongful" fuller meaning by applying it to limit the statute's coverage to those instances

9

where the obtaining of the property would itself be "wrongful" and in this case both the "means"
ascribed to the defendants and the "ends" they allegedly sought are both lawful.

At the initial conference before this Court, the government was asked a series of
questions pertaining, in Sullivan's view, to the "wrongful" element in the statute.  They are
pertinent because conduct authorized by law or furthering government's legal interests cannot be
wrongful.  Contrary to the Government's response to the Court's questioning, there are laws that
pertain to the licensing of entertainment events such as the Boston Calling festival that took
place the weekend after Labor Day in 2014.  See M.G.L. c. 140, §§177 *et seq*.  Such laws have
existed for more than a century and since 1821 they have delegated entertainment licensing
authority in the City to the Mayor of Boston.  *G.J.T., Inc. v. Boston Licensing Board*, 397 Mass.
285, 288-289 (1986) (discussing the history of entertainment licensing in Massachusetts
generally and the provisions of Mass. St. 1821, c. 110, §14 dealing with Boston in particular).
Massachusetts' entertainment licensing scheme, as administered in Boston, has been challenged
on constitutional grounds in the state[3] and federal courts[4] and it has been modified to address
infirmities found by this Court.  *Id*., at 293-294 (discussing the enactment of Mass. St. 1981, c.
694 in response to *Benuti v. Riordan*, 521 F. Supp. 1027 (D. Mass. 1981)).  As a result of those
challenges, regulatory standards and procedures for granting entertainment licenses were issued
in Boston in 2006 and were in effect in 2014, when the conduct alleged in the Indictment is said
to have occurred.  Those standards cite to the numerous general laws, session laws, ordinances
and codes that make up the laws applicable to the licensure of events such as Boston Calling.
The exercise of the licensing power conferred on the Mayor's office cannot be "wrongful" within
the meaning of 18 U.S.C. §1951. *Lu v. Menino*, 98 F.Supp.3d 85 (D. Mass 2015).  The

---

[3] See, e.g. *1001 Plays, Inc. v. Mayor of Boston*, 387 Mass. 879 (1983).

[4] See, e.g. *Fantasy Book Shop, Inc. v. Boston*, 652 F. 2d 1115 (1st Cir. 1981).

defendants have a "claim of right defense" in the *Enmons* sense arising from that power such that the Indictment fails to allege a crime.

**B.     The City also had broad discretion as a proprietor to impose conditions on the use of City Hall Plaza.**

As the owner of City Hall Plaza, Boston has broad discretion to impose conditions on leases or licenses, so long as it complies with state and federal laws such as the procurement rules of G. L. c. 30B, case law defining permissible municipal fees, constitutional time, place and manner parameters, and other applicable state and federal statutory and constitutional requirements. In the circumstance presented by the Indictment, no federal or state law would constrain the City's otherwise broad proprietary authority to require a lessee to negotiate with a labor union for work to be done on City property.

*1.   Boston's Proprietary authority over lessees of its property is broad.*

The authority of a Massachusetts municipality to rent out space on public property in the same manner as a private owner is well established. See *Ballantine v. Town of Falmouth*, 363 Mass. 760, 766 (1973) (holding that the power to lease land in a municipality's corporate capacity is expressly and necessarily conferred by G.L. c. 40, § 3, '(a) town[5] . . . may make such orders as it may deem necessary or expedient for the disposal or use of its corporate property' and Section § 4, a town can 'make contracts for the exercise of its corporate powers'). This proprietary authority has long included requiring a renter to employ particular City employees or other people to work at the site. See *Worden v. City of New Bedford*, 131 Mass.23 (1881) (requiring renter to pay city for a janitor); *see also Davis v. Inhabitants of Rockport*, 213 Mass. 279, 283 (1913) ("A municipality has the power to let for profit real estate held for public purposes . . . on reasonable terms and receive the rents). The logic applies fully to the questions

---

[5] G. L. c. 40, § 1 provides that Massachusetts cities have all powers of towns.

posed by the Court pertaining to hiring requests made by city officials.

   2. *As market participants, Boston and its agents could lawfully have required Crash Line to utilize services of union stage hands.*

Although state law confers broad initial authority upon municipalities to lease their property and set conditions or requirements for lessees, in doing so they must conform with state, local, and federal law, and the state and federal constitutions.  Of particular relevance to the Court's question to the government concerning applicable laws when leasing or licensing City land for the exclusive use of a renter, Boston must comply with: public procurement statutes (G. L. c. 30B, § 16, G. L. c. 30, § 39M, and G. L. c. 149, § 44A-44H); case law concerning permissible municipal fees (*Emerson College v. City of Boston*, 391 Mass. 415 (1984)); municipal finance laws (G. L. c. 44); and federal constitutional time, place and manner parameters.  None of those provisions would preclude a requirement that *Crash Line* negotiate with a union.[6]  At worst, the indictment alleges that the defendants sought to impose such a requirement.  The evidence, if the case proceeds, will show less.

To be sure, in scenarios requiring private parties such as *Crash Line* to negotiate with a labor union such as Local 11, states and municipalities can be preempted by the National Labor Relations Act,   See *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959) and *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976), *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode*

---

[6] In *Callahan v. City of Malden*, 430 Mass. 124 (1999), the Supreme Judicial Court determined that a municipality can require use of a project labor agreement consistent with G. L. c. 149, § 44A-44H even though that is a low bid statute where the requirement of the PLA advanced the underlying purposes of the bidding statute to save the City money and allow it to complete work on time.  The animating principle of that case was that where the requirement to negotiate with a union serves an important operational imperative for the government, the requirement is permissible. Here, an agreement by *Crash Line* to use union labor would have functioned as shorthand for supplying trained personnel who collectively have the power to ensure the work could be performed in compliance with safety or wage regulations, and would have promoted public safety by avoiding the "blow up rat" protest.

*Island, Inc.*, 507 U.S. 218 (1993) informs the preemption analysis.  There the Court stated:

> "When a State owns and manages property, for example, it must interact with private
> participants in the marketplace. In so doing, the State is not subject to pre-emption by
> the NLRA, because pre-emption doctrines apply only to state *regulation.*"

*Id*. at 227 (emphasis supplied).  The case involved a requirement imposed by the Massachusetts

Water Resources Authority that contractors seeking work on the Boston Harbor clean-up project

enter into a project labor agreement which in essence guaranteed union members that work.

The key for determining whether Boston, like the MWRA, would be able to insist upon

the use of unionized employees is whether it would do so as a market participant to help promote

the efficient operation of the municipal corporation itself.  *Id*. at 232-233.  In this case, the

*Particulars* provided by the Government indicate that if *Crash Line* had proceeded to construct

its stage on City Hall Plaza without negotiating with the union, there were likely to be protests on

adjacent roads or property utilizing a blowup rat.  Those protests would impose costs on the City

in terms of increased security personnel, increased congestion and disorder at the entrance to

City Hall, and increased public safety risks at the protest site.  Of relevance to this Court's

questions to the government at the initial conference, safety issues at *Crash Line's* stage

construction site on the Plaza justified a legitimate, not wrongful, desire to ensure the presence of

adequately trained personnel, thereby reducing the City's potential liability for knowingly

allowing a lessee to proceed with unsafe work on the City's property.  This proprietary interest is

independent of, but reinforces the defendants' *Enmons* claim of right defense.

## CONCLUSION

In this case, unlike the typical case involving alleged Hobbs Act extortion by a public

official, the defendants are not accused of seeking anything for themselves, their families or their

friends.  Instead, the accusation is that through such words as "Everyone has to get a fair shake

and a shot at working at this event," they sought to attain for union stage hands a portion of the production jobs for the September 2014 Boston Calling music festival held on City Hall Plaza. The indictment fails to state a violation of the Hobbs Act because the alleged conduct was rightful advocacy for a constituency represented by the City administration in which they served and because the City administration was acting as a market participant with ownership rights in the City Hall plaza where the event was to be held.  Attaining a place at the table for a constituency group, whether it is IATSE Local 11, the NAACP or NOW, is a legitimate political activity at least as deeply engrained in the American political scene as campaign contributions and just as a Hobbs Act indictment related to political contributions requires an explicit *quid pro quo*, so does an indictment of these defendants.  Because it is lacking, the Indictment should be dismissed.

Respectfully submitted,

TIMOTHY SULLIVAN,
By his attorneys,

/s/ *William J. Cintolo*

/s/ *Thomas R. Kiley*
_____
William J. Cintolo (BBO # 084120)
Thomas R. Kiley (BBO # 271460)
COSGROVE EISENBERG & KILEY
One International Place, Suite 1820
Boston, MA 02110
617.439.7775 (tel)
617.330.8774 (fax)
wcintolo@ceklaw.net
tkiley@ceklaw.net

Respectfully submitted
so far as applicable,

KENNETH BRISSETTE,
By his attorneys,

/s/ *William H. Kettlewell*

/s/ *Sara E. Silva*
_____
William H. Kettlewell (BBO # 270320)
Sara E. Silva (BBO #645293)
COLLORA  LLP
100 High Street, 20th Floor
Boston, MA  02110
617-371-1000 (tel)
617-371-1037 (fax)
wkettlewell@collorallp.com
ssilva@collorallp.com

## CERTIFICATE OF SERVICE

I, William J. Cintolo, certify that on January 24, 2017, I caused a copy of the Defendants' *Supplemental Memorandum in Support of Motion to Dismiss* to be served on Laura J. Kaplan, Assistant U.S. Attorney and Kristina E. Barkley, Assistant U.S. Attorney by filing this document through the ECF system which will then be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: January 24, 2017                    /s/ *William J. Cintolo*

                                               _____
                                               William J. Cintolo