UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 16-cr-10137-LTS |
| | ) | |
| KENNETH BRISSETTE and | ) | |
| TIMOTHY SULLIVAN, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER ON DEFENDANTS' JOINT MOTIONS TO DISMISS (DOC. NOS. 82, 84)

May 2, 2017

SOROKIN, J.

The government has charged defendants Kenneth Brissette and Timothy Sullivan in a First Superseding Indictment ("the FSI") alleging conspiracy and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. The defendants have moved to dismiss the charges pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the Fifth and Sixth Amendments to the Constitution. Doc. No. 82. In their view, the FSI fails as a matter of law to allege the elements necessary to establish a crime under the Hobbs Act, and the government's attempt to extend the Hobbs Act's reach to the conduct described in the FSI raises constitutional concerns. See generally Doc. Nos. 83, 84. Because the defendants' arguments can succeed only if facts outside the FSI are considered and found in their favor, the motion to dismiss is DENIED.

I.  BACKGROUND[1]

Both defendants were residents of, and employed by, the City of Boston ("the City"). Doc. No. 17 ¶¶ 1-2. Sullivan was the Chief of Staff for Intergovernmental Relations and Senior Advisor for External Relations beginning in January 2014. Id. ¶ 1. Brissette was the Director of the Office of Tourism, Sports, and Entertainment ("OTSE") beginning in May 2014. Id. ¶ 2. The OTSE's mission is to promote public events in the City, which involves assisting people and companies wishing to stage events with matters such as securing permits to use public areas. Id.

The International Alliance of Theatrical Stage Employees, Local 11 ("Local 11"), was a labor union representing more than 200 employees in the entertainment industry. Id. ¶ 3. Local 11's primary purpose was to negotiate with employers and administer collective bargaining agreements, pursuant to which employers paid wages directly to the employees. Id. ¶ 4.

Crash Line Productions ("Crash Line") produced Boston Calling, a twice-yearly music festival in the City, and it had to obtain certain permits for each festival. Id. ¶ 5. Local 11 began attempting to get work for its members at Crash Line's festivals beginning in March 2013. Id. ¶ 6. Crash Line had no collective bargaining agreement with Local 11, and told Local 11 that it already had a contract with a non-union company to provide the necessary workers. Id. Before the City's administration changed in January 2014, Crash Line produced music festivals without hiring union workers, and "without labor disturbance or pressure from" City officials. Id. ¶¶ 6-7.

In the spring of 2014, a non-union production company began scouting locations in the City to film the reality television show Top Chef. Id. ¶ 8. The company began filming at

---

[1] The Court presumes the allegations of an indictment are true for purposes of assessing its sufficiency. United States v. Perry, 37 F. Supp. 3d 546, 548 (D. Mass. 2014). Thus, the facts found by the Grand Jury and alleged in the First Superseding Indictment, returned on June 28, 2016, Doc. No. 17, control consideration of the defendants' motion and are described herein.

various City locations in May 2014, having obtained the necessary permits. Id. ¶ 9. At that time, the company "also had received approval for the permits required to conduct further filming" at other City locations. Id. The company was operating with its own employees, and had no collective bargaining agreement with any local labor union. Id. ¶ 10.

On June 5, 2014, Brissette learned from a filming location scout that a labor union was upset because the company filming Top Chef had not hired its members. Id. ¶ 11. On June 6, 2014, Brissette told the scout that no further filming for Top Chef could occur until Brissette spoke with the filming company, and he further instructed the scout not to release previously approved permits to the filming company "until the issue with the union local was resolved." Id. ¶¶ 11-12. Brissette then told a producer for the filming company that the permits would not be released unless the company reached "a deal" with the union. Id. ¶ 12. Brissette later relented, authorizing the scout to release the permits after the filming company agreed to meet with union representatives. Id. ¶ 13. But Brissette also contacted representatives of two locations where Top Chef was to be filmed and "advised them about the situation with the union local." Id. Both locations subsequently revoked their consent for Top Chef to be filmed at their places of business, and the filming company sought new locations outside the City. Id.

In June 2014, in connection with the Top Chef events, a City official advised Brissette that he could not legally "pull" the filming company's permits, and a state official separately told Brissette that the City "could not discriminate on the basis of a production's union or non-union status." Id. ¶ 14. In August 2014, a company shooting promotions for Top Chef appeared before a City special events committee, which included Brissette. Id. ¶ 15. Brissette took the company's representative aside and privately informed him that any filming "had to be 'in a

union environment,'" and that success in the permitting process depended on there being a union contract in place. Id.

It is in this context that the defendants allegedly "made similar demands" of Crash Line leading up to the September 2014 Boston Calling festival. Id. ¶ 16. Between July and September of 2014, while Crash Line "was awaiting the issuance of certain permits and approvals required for" the September festival, the defendants "repeatedly advised" Crash Line that it "would need to hire members of" Local 11 to work at the festival. Id. Crash Line explained to the defendants that it already had a contract with a non-union company and had hired all necessary labor. Id.

In August 2014, a Local 11 representative sent Sullivan a draft contract for the September 2014 festival and asked Sullivan "to forward the contract to" Crash Line. Id. ¶ 17. On September 2, 2014 – three days before the festival was to begin – the defendants requested a meeting with representatives of Crash Line. Id. ¶ 18. During the meeting, the defendants "again stated" that Crash Line "would need to hire members of" Local 11 "to work at the festival," specifically "insist[ing] that half of" Crash Line's "labor force consist of union members." Id. After the meeting and "as a result of the demands made by" the defendants, Crash Line "entered into a contract with Local 11 for eight additional laborers and one foreman." Id. "Shortly thereafter," the City "issued the necessary permits." Id.

> Count I of the FSI charges a Hobbs Act conspiracy as follows:
>
> Between on or about May 1, 2014, and continuing through September 30, 2014 . . . [the defendants], together with others, known and unknown to the Grand Jury, conspired to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendants and their co-conspirators agreed to obtain property of [Crash Line], a production company for a music festival, to wit: money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services and wages and benefits to be paid pursuant to a labor contract with Local 11, with the consent of [Crash Line], its officers and

4

> other agents, which consent was induced by the wrongful use of fear of economic
> harm to [Crash Line] and others, in order to obtain wages for such imposed,
> unwanted, unnecessary and superfluous services and wages and employee
> benefits to be paid pursuant to a labor agreement with Local 11.

Id. ¶ 20.[2]  Count II charges Hobbs Act extortion in nearly identical terms.  See id. ¶ 21 (containing the same language, but eliminating the phrase "conspired to" and adding the phrase "and attempted to do the same").

The defendants sought a bill of particulars, which Magistrate Judge Dein ordered in part on October 26, 2016.  Doc. No. 65.  The government "confirmed" before Judge Dein the nature of the property at issue by pointing to wage and benefit information produced in discovery, id. at 7-8, and provided the additional information required by Judge Dein's Order via letter shortly thereafter, see Doc. Nos. 70, 71 (explaining a reference to "and others" in both Counts; identifying the participants, dates, location, and substance of "conversations during which the government contends the wrongful conduct took place"; describing facts the government contends show Sullivan's knowledge of the wrongfulness of his alleged conduct; and explaining the alleged connection between Sullivan and the Top Chef events).

On January 24, 2017, the defendants jointly moved to dismiss all charges against them, with Brissette filing the principle memorandum on behalf of both defendants, and Sullivan filing a supplemental memorandum.  Doc. Nos. 82, 83, 84.  The government opposed the motion, Doc. No. 86, the defendants jointly replied, Doc. No. 90, and the Court heard oral argument on April 13, 2017, Doc. No. 100.  Both parties filed post-argument letters expanding on discrete legal issues discussed during the hearing.  Doc. Nos. 101, 102.  The motion is now ripe for disposition.

---

[2] The FSI contains two paragraphs numbered 20.  All citations in this Order are to the first of those paragraphs, which appears on page 6 of the FSI.

5

## II. LEGAL STANDARDS

The question presented by a motion seeking dismissal of a lawfully returned criminal indictment "is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Savarese, 686 F.3d 1, 7 (1st Cir. 2012). "Defendants challenging the sufficiency of an indictment bear a heavy burden." Perry, 37 F. Supp. 3d at 550 (citing United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010)). Because dismissal of an indictment "directly encroaches upon the fundamental role of the grand jury," the circumstances under which a trial court properly may invoke its authority in this regard are "extremely limited." Whitehouse v. U.S. Dist. Court, 53 F.3d 1349, 1360 (1st Cir. 1995); cf. Costello v. United States, 350 U.S. 359, 364 (1956) (declining to permit "defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence," as doing so "would run counter to the whole history of the grand jury institution").

"At the indictment stage, the government need not 'show,' but merely must allege, the required elements" of the offenses charged. United States v. Stewart, 744 F.3d 17, 21 (1st Cir. 2014). "The indictment should be specific enough to notify the defendant of the nature of the accusation against him and to apprise the court of the facts alleged." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002). Generally, an indictment is sufficient if it "describes all of the elements of the charged offense using the words of the relevant criminal statute." United States v. Wells, 766 F.2d 12, 22 (1st Cir. 1985) (citing Hamling v. United States, 418 U.S. 87, 117 (1974)); see United States v. Sepulveda, 15 F.3d 1161, 1192 (1st Cir. 1993) (explaining that "indictments need not be infinitely specific").

The charges in this case arise under the Hobbs Act, which provides in relevant part:

6

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section – . . . (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of . . . fear [of economic harm] . . . .

18 U.S.C. § 1951.

III. <u>DISCUSSION</u>

Most of the defendants' passionate memoranda – including central points made in support of each of their vehement attacks on the FSI – hinge on viewing this case through the lens provided by the defendants and considering an array of facts not contained within the four corners of the FSI. The defendants urge the Court to accept their arguments based on their interpretation of information contained in the bill of particulars, <u>e.g.</u>, Doc. No. 83 at 3 (describing what the bill of particulars "did <u>not</u> allege"), select statements made by the government's counsel in discovery letters, <u>e.g.</u>, <u>id.</u> at 4 (citing "the absence of" allegations about Crash Line's fear and quoting a single sentence from a June 2016 letter), and concessions made by the government's counsel in court hearings, <u>e.g.</u>, <u>id.</u> at 2-3 (citing a fact which "the government confirmed" at oral argument related to the bill of particulars motion). Consideration of such information, however, generally is impermissible in resolving a motion to dismiss in a criminal action, which is not a forum which permits a broad assessment of the government's evidence. <u>United States v. Kilmartin</u>, 99 F. Supp. 3d 180, 183-84 (D. Me. 2015) (discussing <u>Ngige</u>, 780 F.3d at 501-03).

Although some courts recognize a "narrow exception" to the rule that the sufficiency of an indictment is to be determined solely on the basis of the indictment's allegations, <u>United States v. Martinez-Mercado</u>, 145 F. Supp. 3d 150, 151 (D.P.R. 2015), the circumstances under

7

which those courts have considered information beyond the charging document are not present in this case. The parties have not offered an agreed-upon set of undisputed facts, the government has not consented to the Court's consideration of information beyond the FSI, and the issues presented by the defendants' motion are not purely legal ones capable of resolution without a trial on the merits. See id.; see also Fed. R. Crim. P. 12(b)(1). Accordingly, the Court's review of the defendants' motion is limited to an assessment of "the facial validity of the indictment." Ngige, 780 F.3d at 502.

The defendants urge the Court to dismiss the charges against them for five reasons. In light of the legal standards set forth above and the limitations they place on the scope of the Court's review at this juncture, none of the defendants' arguments merit the extraordinary remedy of dismissal. In short, the Court may not grant the relief the defendants seek without intruding on the role of the Grand Jury that returned the FIS, the petit jury that will evaluate the evidence and find the facts at trial, or both. Each of the defendants' points will be taken in turn.

First, the defendants argue the FSI does not sufficiently allege that they "obtained" Crash Line's property, as the Hobbs Act requires, because "it is undisputed that neither defendant sought or acquired any money in the course of this alleged extortion." Doc. No. 83 at 6. The government, however, does not agree with this "undisputed" fact.[3] According to the government

---

[3] The government has conceded, and the FSI arguably states, that the property at issue here went to third parties (i.e., the union members) and not to the defendants themselves. However, the government contends that the defendants directed this disposition of the property, and that they personally benefitted from it – factual determinations within the language of the FSI. Whether the defendants exercised sufficient control over the property, and whether they benefitted from the alleged extortion (to the extent such a benefit is required), are issues that are not appropriately resolved now. Cf., e.g., United States v. Gotti, 459 F.3d 296, 326 (2d Cir. 2006) (denying motion to dismiss extortion charge where "the defendants tried to force their victim to relinquish a property right so that they could transfer that right . . . to a third party of their choice").

– and to the plain language of the FSI – "the defendants and their co-conspirators agreed to obtain" the wages and benefits at issue. Doc. No. 17 ¶¶ 20, 21; see Doc. No. 86 at 8-9 (reiterating that the defendants "used threats of economic harm to demand and obtain" the property, and urging that "whether the defendants received [some personal] benefit is a question of fact for the jury"). That language describes an element of Hobbs Act conspiracy and extortion "using the words of the relevant criminal statute." Wells, 766 F.2d at 22. Nothing more is required at this stage of the proceedings.

Second, the defendants assert that the FSI also is deficient in failing to allege an actual threat by the defendants "to do or refrain from doing something." Doc. No. 83 at 13; see also Doc. No. 84 at 2-9 (arguing that where the defendants are public officials, in particular, explicit threats are required). The FSI need not plead with specificity the ways in which the defendants threatened economic harm or exploited a known fear of economic harm. See United States v. Lisinski, 728 F.2d 887, 892 (7th Cir. 1984) (contemplating that wrongful use of fear may be proven through actual threats, implicit threats, or exploitation of the victim's fear of economic loss); see also United States v. McDonough, 727 F.3d 143, 155 n.4 (1st Cir. 2013) (rejecting view that proof of explicit promises or threats is required in all extortion cases involving public officials, as is required in context of cases involving campaign contributions). It is enough that the FSI alleges the defendants wrongfully used Crash Line's fear of economic harm in order to obtain the relevant property. Doc. No. 17 ¶¶ 20, 21; see Wells, 766 F.2d at 22. Failure to identify an explicit threat does not justify dismissal of the FSI.[4]

---

[4] The information provided by the government in response to Judge Dein's order for a bill of particulars further illuminates the ways in which the government intends to prove that representatives of Crash Line feared economic harm, and that the defendants allegedly exploited such fear. Consideration of this information generally is improper when resolving a motion to

Third, the defendants urge that, even if the FSI were deemed to adequately allege an implicit threat to withhold permits, such a threat would not be "wrongful" for Hobbs Act purposes, because Crash Line had no "pre-existing statutory right to obtain a permit to use public property without conditions, including conditions that the permittee employ certain workers." Doc. No. 83 at 16; see also Doc. No. 84 at 9-13 (arguing the defendants, representing the City as a proprietor, had broad discretion to dictate terms to potential lessees of City property). This argument depends on the Court finding that the defendants were acting as proprietors on behalf of the City, rather than as regulators advancing City policy. See Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 226-29 (1993) (discussing this distinction and its implications with respect to preemption and the NLRA). The government vigorously disputes the defendants' claim that they acted solely as proprietors during the events at issue here. Doc. No. 86 at 15-20. The allegations in the FSI simply do not permit the Court to decide this issue now; its resolution will depend on the evidence offered at trial and, thus, is a question properly reserved for the jury.

Fourth, the defendants fault the FSI for failing to allege that Crash Line "was actually placed in fear of economic harm by the defendants or that any such fear was reasonable." Doc. No. 83 at 17. Once more, the defendants' characterization of the allegations is directly contrary to the plain language of the FSI, which explicitly charges that Crash Line's surrender of the identified property "was induced by the wrongful use of fear of economic harm." Doc. No. 17 ¶¶ 20, 21. Whether Crash Line actually was placed in fear of such harm, whether such fear was reasonable, whether the defendants knew of such fear and intended to exploit it, and whether

---

dismiss. Martinez-Mercado, 145 F. Supp. 3d at 151. In any event, the Court's resolution of the defendants' motion does not depend on whether such information is factored into the analysis.

such fear caused Crash Line to enter into the relevant contract with Local 11 all are disputed factual issues that will require resolution by a jury at trial.

Finally, the defendants suggest that application of the Hobbs Act to the conduct at issue (as the defendants urge the Court to view that conduct) is unconstitutional. Doc. No. 83 at 18. Because this argument can succeed only if the defendants' view of the facts is accepted – and because, as explained in the preceding paragraphs, the allegations in the FSI do not permit the Court to adopt the defendants' view at this time – the constitutional challenge fails.

IV. CONCLUSION

Because the allegations contained in the FSI "are sufficient to apprise the defendant[s] of the charged offense[s]," Savarese, 686 F.3d at 7, the defendants' motion to dismiss (Doc. No. 82, 84) is DENIED.

On or before Tuesday, May 9, 2017, the parties shall file a status report stating their joint or separate positions regarding: 1) a schedule for the remainder of the pretrial period of this case, including proposed dates for the filing of any other anticipated pretrial motions, the nature of such motions, and any other outstanding issues that may require the Court's attention; 2) possible dates for the trial in this case and an estimate of the length of the trial; and 3) the status of the period of time between January 17, 2017 and the date of this Order, and the time from this Order until the proposed trial date, for purposes of the Speedy Trial Act.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge