UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Crim. No. 16-CR-10137-LTS |
| | ) |
| | ) Violations: |
| | ) 18 U.S.C. § 1951 (Hobbs Act Extortion/Conspiracy) |
| | ) 18 U.S.C. § 2 (Aiding & Abetting) |
| v. | ) 18 U.S.C. § 981 and 28 U.S.C. § 2461 |
| | ) (Extortion Forfeiture) |
| (1) KENNETH BRISSETTE and | ) |
| (2) TIMOTHY SULLIVAN | ) |
| Defendants. | ) |

## THIRD SUPERSEDING INDICTMENT

The Grand Jury charges that:

At all times material to this Indictment:

1. Starting in or about January 2014, defendant **TIMOTHY SULLIVAN** ("SULLIVAN"), a resident of Boston, Massachusetts, was employed as the Chief of Staff for Intergovernmental Relations/Senior Advisor for External Relations for the City of Boston.

2. Starting in or about May 2014, defendant **KENNETH BRISSETTE** ("BRISSETTE"), a resident of Boston, Massachusetts, was employed as the Director of the Office of Tourism, Sports and Entertainment for the City of Boston. The mission of the Office of Tourism, Sports and Entertainment is to promote all public events in the City of Boston. As part of that mission, the Office of Tourism, Sports and Entertainment assists companies and individuals seeking to stage events in Boston, including music and sports performances, filmmaking, etc., including assistance in securing permits to use at public areas in Boston.

3. The International Alliance of Theatrical Stage Employees ("IATSE"), Local 11 ("Local 11"), was a labor organization that represented over 200 employees including technicians,

artisans, and crafts persons in the entertainment industry, including live theatre, motion picture and television production and trade shows in Boston, Massachusetts.

4. The primary purpose of IATSE Local 11 was to negotiate and administer collective bargaining agreements with employers. Under these collective bargaining agreements, the employer pays wages directly to the employee.

5. Company A was a company that had a licensing agreement with the City of Boston to produce a twice-yearly music festival on City Hall Plaza. The licensing agreement did not require Company A to hire members of any union, including IATSE Local 11. In order to stage its music festivals, Company A was required to apply for and receive permits from the City of Boston for each festival.

6. In connection with these music festivals, beginning in March 2013, IATSE Local 11 attempted to obtain work for its union members from Company A. Company A was not a signatory to any collective bargaining agreement with Local 11. Company A repeatedly explained to a Local 11 representative that it had entered into a contract with a non-union company -- that is, a company that did not employ labor union members -- to perform the work at its music festivals and did not need any additional help. As a result, Company A had previously held music festivals on several occasions on Boston City Hall Plaza without hiring union members and without labor disturbance or pressure from officials from the City of Boston.

7. In January 2014, the administration of the City of Boston changed.

8. Shortly after **BRISSETTE** was hired, beginning in the spring of 2014, Company B, a non-union production company, began scouting locations to film a reality television show in Boston. As with Company A, Company B was required to apply for and receive permits from the City of Boston in order to film in Boston.

9. In May 2014, having obtained the necessary permits from the City of Boston, Company B commenced filming at various locations, including the Museum of Science, Fenway Park, and Cheers. Company B had also received approval for the permits required to conduct further filming in the City of Boston, including at the Omni Parker House Hotel, Menton Restaurant, and Emerson College.

10. Company B was not a signatory to any collective bargaining agreement with any labor union local that represented employees in the transportation, movie and moving and trade show industries. Company B had hired its own employees, including drivers, to produce and participate in the filming of the show and did not need any work performed by members of any such labor union local.

11. On June 5, 2014, **BRISSETTE** learned from a filming location scout ("John Doe A") that a particular labor union local ("the union local") had discovered that Company B was filming in Boston and was upset that Company B had not hired workers from the union local and its members to drive Company B's vehicles. At the time, John Doe A was already in possession of the permits necessary for Company B to film in Boston.

12. On June 6, 2014, **BRISSETTE** sent an email to John Doe A stating that there would be no filming until **BRISSETTE** spoke to Company B. **BRISSETTE** advised John Doe A to hold the permits and not release them to Company B until the issue with the union local was resolved. **BRISSETTE** thereafter instructed a Company B producer to make a deal with the union local regarding the hiring of union labor and said that, unless a deal was made, the permits would not be released.

13. In the days that followed, **BRISSETTE** ultimately relented, giving John Doe A the authority to release the permits to Company B because Company B had agreed to meet with representatives from the union local the following week.

14. In June 2014, in connection with his efforts to pressure Company B to hire union workers, **BRISSETTE** spoke separately with two government officials – the Chief of Operations for the City of Boston and the Director of the Massachusetts State Film Office. The Chief of Operations told **BRISSETTE**, after **BRISSETTE** stated that he had "pulled" the permits, that **BRISSETTE** could not do that because it was not legal. In a separate conversation, the Director of the Massachusetts State Film Office told **BRISSETTE** that the City of Boston could not discriminate on the basis of a production's union or non-union status and that "it was none of our business, being in state government, whether something is union or non-union."

15. In August 2014, a representative from a company shooting a promotion for Company B ("Company C") made a presentation before the City of Boston's special events committee presided over by **BRISSETTE**. The special events committee deals with individuals and companies interested in staging special events in Boston. Despite the warnings from two government officials in June about his actions with regard to Company B, in the middle of the presentation, **BRISSETTE** stopped the meeting and took the representative from Company C into a private meeting where he told the representative that the filming had to be "in a union environment." **BRISSETTE** further indicated to the representative that in order to have success in the permitting process, there had to be a union contract.

16. Likewise, despite the warnings from the government officials outlined above, **BRISSETTE** and **SULLIVAN** made similar demands of Company A during the summer of 2014. Company A was scheduled to conduct another music festival in Boston in September

2014. Between July and September 2014, while Company A was awaiting the issuance of certain permits and approvals from the City of Boston required for that September 2014 music festival, as well as an extension of its licensing agreement, **BRISSETTE** and **SULLIVAN** repeatedly advised Company A that it would need to hire members of IATSE Local 11 to work at the music festival. Company A told **BRISSETTE** and **SULLIVAN** that it had already entered into a contract with a non-union company and hired all of its labor.

17. In August 2014, a representative from IATSE Local 11 emailed to **SULLIVAN** a draft contract between IATSE Local 11 and Company A to work on the September 2014 music festival. The IATSE Local 11 representative asked **SULLIVAN** to forward the contract to Company A.

18. On September 2, 2014, just three days before the September 2014 music festival, **BRISSETTE** and **SULLIVAN** requested a meeting with Company A. At the meeting, **BRISSETTE** and **SULLIVAN** again stated that Company A would need to hire members of IATSE Local 11 to work at the festival. **BRISSETTE** and **SULLIVAN** insisted that half of Company A's labor force consist of union members. Later that afternoon, Company A entered into a contract with Local 11 for eight additional laborers and one foreman as a result of the demands made by **BRISSETTE** and **SULLIVAN**. Shortly thereafter, the City of Boston issued the necessary permits.

## COUNT ONE
### (Hobbs Act Conspiracy)

19. The allegations set forth in paragraphs 1 through 18 are hereby realleged and incorporated as if fully set forth herein.

20. Between on or about May 1, 2014, and continuing through September 30, 2014, both dates being approximate and inclusive, in Boston and elsewhere within the District of Massachusetts, defendants

### (1) KENNETH BRISSETTE and
### (2) TIMOTHY SULLIVAN,

together with others, known and unknown to the Grand Jury, conspired to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendants and their co-conspirators agreed to obtain property of Company A, a production company for a music festival, to wit: money to be paid as wages and employee benefits and as wages and employee benefits pursuant to a contract with IATSE Local 11, with the consent of Company A, its officers and other agents, which consent was induced by the wrongful use of fear of economic harm to Company A and others, in order to obtain such property.

In violation of Title 18, United States Code, Section 1951.

## COUNT TWO
### (Hobbs Act Extortion)

21. The allegations set forth in paragraphs 1 through 18 are hereby realleged and incorporated as if fully set forth herein.

22. Between on or about May 1, 2014, and continuing through September 30, 2014, both dates being approximate and inclusive, in Boston and elsewhere within the District of Massachusetts, defendants

**(1) KENNETH BRISSETTE and
(2) TIMOTHY SULLIVAN,**

together with others, known and unknown to the Grand Jury, obstructed, delayed and affected commerce, and the movement of articles and commodities in commerce, by extortion, and attempted to do the same, in that the defendants and their co-conspirators attempted to obtain and did obtain property of Company A, a production company for a music festival, to wit: money to be paid as wages and employee benefits and as wages and employee benefits pursuant to a contract with IATSE Local 11, with the consent of Company A, its officers and other agents, which consent was induced by the wrongful use of fear of economic harm to Company A and others, in order to obtain such property.

In violation of Title 18, United States Code, Sections 1951 and 2.

## FORFEITURE ALLEGATIONS

The Grand Jury further charges that:

1. Upon conviction of the offenses charged in Counts One and Two of this indictment, defendants

**(1) KENNETH BRISSETTE and
(2) TIMOTHY SULLIVAN,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to such violations.

2. If any of the property described in paragraph 1 above, as a result of any act and omission of defendants --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of this Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 981(b)(1)(A) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property listed in paragraph 1 hereof.

All pursuant to Title 18, United States Code, Section 981(a) (1) (C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

*Glenda Duclos*
FOREPERSON

_____
LAURA J. KAPLAN
KRISTINA E. BARCLAY
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: January 31, 2018
Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk

10:55 am
1-31-18