UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
UNITED STATES OF AMERICA        )
                                )
          v.                    )      No. 16-cr-10137-LTS
                                )
KENNETH BRISSETTE and           )
TIMOTHY SULLIVAN,               )
                                )
          Defendants.           )
_____ )
```

ORDER ON GOVERNMENT'S EMERGENCY
MOTION FOR RECONSIDERATION (DOC. NO. 194)

March 19, 2018

SOROKIN, J.

The government has charged Kenneth Brissette and Timothy Sullivan with conspiracy and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. The Court twice denied the defendants' requests to dismiss the charges against them before trial. Doc. Nos. 106, 192.[1] In the more recent of those decisions, the Court acknowledged the parties' divergent views regarding what it means to "obtain" property for purposes of the Hobbs Act and advised the parties of its anticipated resolution of that dispute by stating its intended jury instruction on that element. Doc. No. 192 at 7.

The government now seeks reconsideration of the proposed instruction, arguing it is "based on an incorrect reading of the law" and "will preclude the government from proving its

---

[1] Citations to "Doc. No. ___" are to documents appearing on the Court's electronic docket. They reference the docket number assigned by CM/ECF, and include pincites to the page numbers appearing in the top right corner of each page within the header appended by CM/ECF.

case beyond a reasonable doubt." Doc. No. 194 at 1. The defendants have opposed the government's motion, Doc. No. 195, and the Court heard oral argument on March 14, 2018 at the government's request, Doc. No. 196. As explained below, the motion to reconsider is DENIED.

I.    BACKGROUND[2]

To understand the context in which the present reconsideration request arises, it is necessary to review the manner in which the government's prosecution of the defendants has shifted since its inception nearly two years ago.

When it first indicted the defendants, the government alleged that Sullivan and Brissette implicitly threatened permits Crash Line needed in advance of the September 2014 Boston Calling music festival and explicitly threatened a union picket of the event in order to exploit Crash Line's fear of economic harm and compel it to hire members of Local 11. Doc. No. 17 at ¶¶ 16-21. The government's theory was that the defendants had acted as agents of the union, that the union members ultimately hired by Crash Line performed actual work (although their services were unwanted), and that the defendants had "obtained" the resulting wages and benefits on behalf of the union. Doc. No. 83-1 at 2-3; Doc. No. 86 at 12-13; Doc. No. 115 at 7.

The defendants moved to dismiss the First Superseding Indictment ("FSI"), advancing various challenges to the charges against them, including an argument that the government had not sufficiently alleged that the defendants had "obtained" the property allegedly extorted. Doc. Nos. 83, 84. The government opposed, arguing the FSI stated a crime. Doc. No. 86. In particular, the government urged the Court not to consider various proffers made by the

_____

[2] The Court has summarized the government's allegations on two previous occasions. Doc. No. 106 at 2-5; Doc. No. 192 at 2-3, 9.

defendants regarding facts beyond the four corners of the FSI, argued evidentiary sufficiency is not appropriately considered on a motion to dismiss, and objected to the Court reaching legal issues that the government believed were appropriately resolved when crafting jury instructions. Id.; Doc. No. 115 at 30, 44, 72-74. The Court did as the government requested and denied the defendants' motion to dismiss based solely on the allegations contained within the FSI. Doc. No. 106; see United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018).

In the course of the briefing and hearing on the first motion to dismiss, the government clearly asserted its primary legal theory: that a defendant could obtain property within the meaning of the Hobbs Act merely by directing the transfer of the property to an identified third party. In addition, the government stated, under questioning from the Court, that if the law also required the government to prove a defendant received a benefit from such a transfer, the government had evidence that Brissette and Sullivan benefitted from Crash Line's payment of wages to Local 11 members and noted at least one form of benefit it might prove. See Doc. No. 115 at 11-12 (representing "that the Government, at trial . . . may very well be able to prove that the defendants did [indirectly] benefit . . . because they perceived that they were advancing Mayor Walsh's agenda, and trying . . . to advance their own agenda and keep their job[s] and keep their reputation[s], and they were doing what they thought was going to help their job[s]").

After this Court's Order denying the defendants' motion to dismiss the FSI, the First Circuit decided United States v. Burhoe, 871 F.3d 1 (1st Cir. 2017), and construed various elements of Hobbs Act extortion relevant to this case. In particular, the First Circuit considered what constitutes "property," as well as what it means to "obtain" property, for Hobbs Act purposes. Id. at 9-10, 26-28. The Circuit issued its decision on September 8, 2017. Trial in this matter was then scheduled to commence on January 8, 2018. Doc. No. 110. The defendants

reacted to Burhoe by renewing their previous motions to dismiss, arguing the First Circuit had clarified the law in a manner which strengthened their original challenges to the FSI. Doc. Nos. 121, 122, 123, 124. The government sought, and the Court granted (in part), two extensions in the time for it to respond to the defendants' motions. Doc. Nos. 127, 128, 130, 133, 135.

Apparently also recognizing that Burhoe had undermined the initial theory supporting the charges against Brissette and Sullivan, the government ultimately responded by obtaining a Second Superseding Indictment ("SSI").[3] Doc. No. 143. With the SSI, the government abandoned its original view that the defendants had acted as union agents; adopted a theory that the defendants—acting solely as City agents, and not as agents of the union—had impliedly threatened to withhold Crash Line's permits and/or deny a desired extension of a licensing agreement; and alleged that the defendants had "obtained" the relevant wages and benefits simply by directing their payment to members of Local 11. Doc. No. 143 at ¶¶ 16-21; Doc. No. 164 at 5-6, 12-13; Doc. No. 179 at 8, 45-47; accord Doc. No. 142 at 14.[4] At all times, the government has expressly represented to the Court that neither the union nor any of its members are unindicted co-conspirators here. E.g., Doc. No. 115 at 6; Doc. No. 179 at 93-94.

The defendants sought a brief continuance in the trial date in light of the new legal theory advanced by the government; the government opposed the defendants' request. Doc. No. 148 at

---

[3] The grand jury returned the SSI on November 29, 2017, nearly three months after Burhoe. Doc. No. 143. The defendants were arraigned on the new indictment on December 4, 2017, thirty-five days before the trial date. Doc. No. 149. Federal law commands that "the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel" absent defendant's consent. 18 U.S.C. § 3161(c)(2).

[4] The government subsequently obtained a Third Superseding Indictment ("TSI"), which corrected minor drafting errors and eliminated confusion in the language of the charging paragraphs. Doc. No. 177. All versions of the indictment concern the same events.

1-2.  The Court rescheduled the trial for March 26, 2018—the earliest date consistent with all lawyers' schedules.  Id. at 2; Doc. No. 156.

The defendants revised their pending motions to dismiss to direct their challenges at the SSI and repeated their previous argument that they had not "obtained" any property within the meaning of the Hobbs Act.  Doc. Nos. 159, 160.  Again, the defendants' argument relied upon facts not contained within the relevant charging document.  Again, the government opposed the motion to dismiss, citing its disagreement with the defendants' view of the law and arguing the Court should confine its analysis of the motion to the four corners of the SSI.  Doc. No. 164. Again, the government articulated its primary legal theory—that a defendant "obtains" property if he directs its transfer to an identified third party.  Again, under questioning from the Court at the hearing on the defendants' motion, the government implied it had evidence suggesting the defendants benefitted here (should such evidence be required), this time describing a statement by a union official "that the union was thrilled that they had gotten this contract and [that he] reported to the union that they had fought very hard for the Walsh administration, and that they should continue to fight hard because . . . they get things in return."  Doc. No. 179 at 37; cf. Doc. No. 164 at 13 (arguing that if the Court determined that the law required the government to show "some personal benefit, whether the defendants received such benefit is a question of fact for the jury").  And again, the Court limited its resolution of the motion to dismiss to an assessment of the explicit allegations in the indictment, both because the government urged it to do so[5] and because the dismissal of a properly returned indictment before trial is warranted only when the

---

[5] Despite describing some, but not all, of its evidence, the government unequivocally urged the Court to confine its analysis to the four corners of the SSI.  At no time did the government proffer or stipulate to a set of facts for the Court's consideration, though defendants urged the government to do so.  Doc. No. 160 at 18.

indictment itself does not allege a crime. Doc. No. 192 at 4-5 (citing <u>Stepanets</u> and Federal Rule of Criminal Procedure 12). The Court was—and remains today—satisfied that each version of the indictment has stated a crime, in that each version alleges "the defendants and their co-conspirators attempted to obtain and did obtain property" as required by the Hobbs Act. Doc. No. 177 ¶ 22. Ordinarily, nothing more is required to survive a Rule 12 motion challenging this element of the crime.

In both of its decisions denying the defendants' motions to dismiss, the Court noted that "courts in other jurisdictions have construed" the Criminal Rules "to permit consideration of information beyond the challenged indictment when assessing a pretrial dismissal request" in certain limited circumstances. Doc. No. 106 at 7-8; Doc. No. 192 at 4. In this case, it has been wholly within the government's control to invoke those circumstances and permit a pretrial (and, if unfavorable to the government, appealable) resolution of the legal question addressed by the Court's proposed instruction. However, in response to both motions to dismiss, the government consciously elected not to pursue that avenue. It declined to proffer or stipulate to a complete set of facts bearing on the "obtain" question, and it refused to agree that the Court could consider and resolve the legal question in the dismissal context.

Nevertheless, the Court perceived from the written and oral arguments on both motions to dismiss a substantial divide between the parties regarding the meaning of "obtain" in the Hobbs Act context, an issue on which the Court would have to craft a jury instruction to provide at the conclusion of this trial. The parties' proposed jury instructions, filed soon after the more recent motion to dismiss was argued, confirmed the divide. <u>Compare</u> Doc. No. 183 at 26, <u>with</u> Doc. No. 185 at 13. With the legal question presented, with the benefit of substantial briefing and argument by all parties, and after reviewing the government's description of its evidence in its

trial brief,[6] Doc. No. 184 at 1-6, the Court crafted a jury instruction explaining what it means to "obtain" property for Hobbs Act purposes, subject to change either if the evidence differed from that outlined by the government in its trial brief or due to further legal argument.  Doc. No. 192 at 7; see Fed. R. Crim. P. 30 (requiring court to inform parties "before closing arguments how it intends to rule" on proposed instructions, and permitting parties to object to instructions anytime "before the jury retires to deliberate").

The government describes the Court's issuance of the jury instruction as having "come[] on the eve of trial."  Draft Tr. Mot. Hr'g at 28, United States v. Brissette, No. 16-cr-10137 (D. Mass. Mar. 14, 2018) [hereinafter "Draft Tr."].  The Court issued the instruction on February 28, 2018, nearly a month before trial is scheduled to begin.[7]  The facts recited by the Court regarding the timing of the crafting of the jury instruction speak for themselves.

The Court's proposed instruction is as follows:

> To prove this element, the government must prove beyond a reasonable doubt that Crash Line was deprived of its property, and that the defendants acquired that property.  A defendant "obtains" property for these purposes when he either: 1) takes physical possession of some or all of the property; 2) personally acquires the power to exercise, transfer, or sell the property; or 3) directs the victim to transfer the property to an identified third party and personally benefits from the transfer of the property.  It is not enough for the government to prove that the defendants controlled the property by directing its transfer to a third party, nor is merely depriving another of property sufficient to show that the defendants "obtained" that property.

---

[6] Notably, the government's trial brief contains no reference whatsoever to any evidence showing any type of benefit to the defendants.

[7] This was a departure from the typical practice of providing proposed instructions to the parties a day or two before submitting the case to the jury.  The parties had extensively argued and explored this important issue.  The Court had considered it carefully and had the benefit of the parties' proposed jury instructions and the government's trial brief.  In these circumstances, early disclosure served interests of fairness and justice by permitting the parties a greater opportunity to respond or shape their presentations at trial, and accounting for the fact that rulings adverse to the government at trial generally are not subject to appeal.

Under the third theory of "obtaining," you must determine, based on all of the evidence before you, whether the defendants personally benefitted from the transfer of the property. Instances in which a defendant personally benefits from the transfer of property could include: when the defendant or an organization of which he is a member receives a thing of value other than the property as a result of the transfer; when the defendant directs the property to a family member or to an organization of which the defendant is a member; and/or when the defendant directs the property to a person or entity to whom the defendant owes a debt, intending that the transfer of property will satisfy that debt. A defendant does not personally benefit from the transfer of property when he merely hopes to receive some future benefit, or when he receives a speculative, unidentifiable, or purely psychological benefit from it.

Doc. No. 192 at 7. The Court specified that this instruction is subject to change depending on the actual evidence offered at trial, or on further legal argument by the parties. Id. at 8 n.6.

Now, the government moves on an emergency basis for reconsideration of the Court's proposed instruction. The defendants opposed the motion within days, Doc. No. 195, and the Court promptly scheduled a hearing, Doc. No. 196. The Court now denies the Motion and here explains its reasoning.

II. DISCUSSION

A. Legal Standard for Reconsideration

Although the Federal Rules of Criminal Procedure "do not expressly contemplate motions for reconsideration," courts in this District and elsewhere have entertained such motions, "generally borrow[ing] standards either from civil cases or from the local rules." United States v. Iacaboni, 667 F. Supp. 2d 215, 216 (D. Mass. 2009). Such standards permit reconsideration only "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009). The First Circuit has encapsulated this standard as follows: "When faced with a motion

for reconsideration, district courts should apply an interests-of-justice test." <u>United States v. Siciliano</u>, 578 F.3d 61, 72 (1st Cir. 2009).

B.     The Government's Challenges to the Court's Proposed Instruction

The government's motion largely reiterates the arguments it has made previously in opposition to the defendants' motions to dismiss.  It does not: (a) propose an alternative instruction; (b) suggest any specific amendments or changes to the Court's proposed instruction; or (c) describe any evidence not set forth in the trial brief that might warrant a change or adjustment to the instruction.

The motion begins with a fundamental misunderstanding of the plain language of the Court's proposed instruction.  The government cites as error "the Court's requirement that a defendant receive a personal benefit to commit Hobbs Act extortion." Doc. No. 194 at 2.  That characterization is simply wrong.  The proposed instruction contains no such blanket requirement.  The Court has identified three manners in which a defendant might "obtain" property within the meaning of the Hobbs Act.  Doc. No. 192 at 7.  The first two options "in no way depend[] upon having a direct benefit conferred on the person who obtains the property." <u>United States v. Green</u>, 350 U.S. 415, 420 (1956).  If a defendant physically receives property, or if a defendant acquires the ownership rights to property such that he has the power to transfer or sell it to a third party (even if he never physically receives the property itself), then he has obtained the property regardless of whether he benefits from it personally.[8]

_____

[8] The government might assume that one who receives property always enjoys a personal benefit from it, but that is not necessarily so.  <u>See, e.g.</u>, <u>United States v. Cerilli</u>, 303 F.2d 415, 420 (3d Cir. 1979) (addressing circumstances in which defendants personally receive money as a result of extortion but then transmit the money to a political party or committee, without evidence proving personal benefit to the defendant).

So, if a victim, in response to extortionate conduct by a defendant, delivers cash to the defendant, that defendant cannot escape Hobbs Act liability under the law—or under the Court's instruction—by demonstrating that he ultimately delivered the cash to another person and derived no personal benefit from the payment.  He "obtained" the property when he took physical possession of it.[9]  It is immaterial whether he retained it or ultimately benefited from it. Several of the cases cited by the government as noting that "Hobbs Act extortion does not depend on the extortionist himself or herself actually receiving the extorted property" presented precisely those facts and, thus, fall squarely within the scope of the Court's proposed definition of "obtain."  See, e.g., United States v. Renzi, 769 F.3d 731, 743 (9th Cir. 2014) (reciting evidence that both co-defendants received portions of the extorted payments); United States v. Haimowitz, 725 F.2d 1561, 1567, 1577 (11th Cir. 1984) (discussing evidence that one defendant received the extorted property and delivered all or some of it to a co-defendant); Cerilli, 603 F.2d at 422-23 (describing evidence that the defendants demanded and received cash payments and checks made out to political committees directly from multiple victims); United States v. Hyde, 448 F.2d 815, 820, 843 (5th Cir. 1971) (stating that extorted payments were "channeled" to the defendants and that at least one defendant received extorted checks); see also United States v. Jacobs, 451 F.2d 530, (5th Cir. 1971) (describing evidence that a defendant received and counted the extorted payment before placing it in a safety deposit box); United States v. Provenzano, 334 F.2d 678, 682-83 (3d Cir. 1964) (recounting evidence of a years-long series of extorted payments, the first several of which involved the victim paying cash directly to the defendant).

---

[9] The same would be true if multiple defendants conspired to commit extortion, but only one defendant actually received the extorted property.  In those circumstances, by virtue of their criminal relationship with one another, all defendants would have "obtained" the property when one of them acquired it.  To the extent the Court's proposed instruction does not make this clear, it is subject to amendment before the Court gives it.

Though it contains no blanket requirement of a personal benefit to prove Hobbs Act extortion, the Court's instruction describes a third manner of proving a defendant "obtained" property which does call for proof of a personal benefit. This method of proof applies only if the government seeks to establish that the defendants "obtained" property that they never personally possessed, received, transferred, or sold. Doc. No. 192 at 7.

The government says the language in the Court's proposed instruction explaining how a "personal benefit" might be established defines "the exclusive means of showing that property is 'obtained'" and "exempts from Hobbs Act liability deprivations for the benefit of friends or acquaintances." Doc. No. 194 at 6. That is untrue for two reasons. First, it ignores the other two methods of proving that the defendants "obtained" property, as explained above. Second, the Court's instruction says, "[i]nstances in which a defendant personally benefits from the transfer of property <u>could include</u>," and goes on to list three general scenarios. Doc. No. 192 at 7 (emphasis added). The plain and ordinary meaning of the quoted phrase—and, in particular, the underlined words—is that what follows is a non-exhaustive list of examples. In other words, other "instances" also could suffice.[10] This format—setting forth a legal principle followed by a non-exhaustive list of examples—is a common mechanism in jury instructions. <u>E.g.</u>, 1st Cir. Pattern Criminal Jury Instructions § 1.06 (regarding how to evaluate a witness's credibility).

Moreover, the government's memorandum cites no language from the proposed instruction exempting any criminal conduct from the reach of the Hobbs Act because there is none. In its brief, the government claims the Court's proposed instruction exempts friends and

---

[10] It bears noting that the examples included in the list do not identify facts which would, as a matter of law, establish the requisite benefit. They are simply examples of scenarios which would present questions of benefit properly resolved by a jury. For example, depending on the evidence, a jury might—<u>or might not</u>—infer that a defendant benefitted by directing a transfer of property to his brother.

acquaintances, apparently because the proposed instruction does not mention those categories specifically. As already noted, however, the examples in the instruction are illustrative, not exclusive. While an example involving other categories of persons may be appropriate in some cases, the government has not proposed such an addition nor proffered facts suggesting such an addition is warranted in this case. In any event, the government has never argued that Brissette and Sullivan directed the property at issue here to their friends or acquaintances. If the evidence suggests they did, the Court will consider amending the instruction to address such evidence.

At oral argument, the government also suggested that the Court's view of the law "would effectively cut the Hobbs Act as we know it in half" by eliminating federal extortion liability for a number of hypothetical situations in which any reasonable person would expect such charges to result. Draft Tr. at 28. The Court's proposed instruction does no such thing. Instead, it explains that jurors would be required to assess whether the defendants benefitted by considering "all of the evidence before" them, provides examples of facts which "could" suggest the requisite benefit, and specifies that the benefit cannot be purely speculative or unidentifiable. Doc. No. 192 at 7.

Furthermore, all four of the government's hypotheticals are within, not outside, the scope of the Court's proposed instruction. The government stated:

> [I]f we take that instruction out of the union context, for example, what if the defendants had required Crash Line to hire nine of the defendants' best friends before the city would give the company the permits, the entertainment license, the long-term lease it needed for financial viability[?] [U]nder your instruction, that's not extortion.

> Next, what if we take that instruction outside of City Hall, for example? Now it's not extortion if someone threatens to publish false and harmful information about a business engaged in interstate commerce unless the business pays $50,000 to the defendants' roommate.

> And, finally, let's take that instruction outside of the fear of economic harm cases and into the violence and threats of violence [and] fear of physical harm cases. It's

not extortion under that instruction if someone threatens to kill the owner of a business engaged in interstate commerce unless the business owner pays the defendant['s] girlfriend $50,000, and it's not extortion if a Mafia soldier demands that a victim pay the head of a family for protection using fear of physical harm.

Draft Tr. at 29-30.

Plainly, none of these "traditional Hobbs Act" "fact patterns," id. at 30, is removed from the realm of extortion by the Court's proposed instruction. As the Court already has explained, "best friends" are not excluded from the categories of people and relationships which might give rise to an inference that the defendants received a personal benefit. The same, of course, is true of a "roommate" or a "girlfriend." Each of these relationships is plainly of a kind with the examples the Court has included in its instruction. And the government's final "Mafia soldier" scenario is squarely within an example articulated in the Court's list. See Doc. No. 192 at 7 (explaining personal benefit could be established where "the defendant directs the property to . . . an organization of which the defendant is a member"). But, of course, the government has never suggested this case concerns best friends, roommates, girlfriends, or Mafia soldiers. If faced with such facts, where the nature of a defendant's relationship with the recipient of the property is such that a jury could reasonably infer that the defendant benefitted from the transfer, the Court could do what it has suggested it would: it could amend the description provided in the proposed instruction to reflect the pertinent circumstances.[11]

---

[11] To the extent the government suggests that "favored constituents" are a category of individuals for whom an inference of benefit should arise, Doc. No. 194 at 6, it has not proffered evidence for the Court's consideration that would establish Local 11 and/or its members who received the property at issue fall within that category, nor has it proposed an amendment to the instruction that would encompass such persons. Similarly, to the extent the government suggests that certain "psychological benefits" might be sufficient to prove this element, id. at 6 n.3, it has not developed an argument supporting such a conclusion, nor has it proposed an amendment to the instruction reflecting it.

With these observations made, the Court will explain how it determined the law as expressed in the proposed instruction it actually provided.

    C.    <u>The Legal Basis for the Instruction</u>

The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of . . . fear," including fear of economic harm.  18 U.S.C. § 1951(b).  Courts instructing juries regarding the legal elements of Hobbs Act extortion routinely explain that the government is obligated to prove several things beyond a reasonable doubt, the first of which is "that <u>the defendant</u> knowingly and willfully <u>obtained</u> property from another person."  Tr. Jury Trial Day 6 at 83, <u>United States v. Deamicis</u>, No. 12-cr-10293-DJC, ECF No. 944 (D. Mass. Nov. 17, 2015) (emphasis added); <u>accord</u> 1st Cir. Pattern Criminal Jury Instructions § 4.18.1951.

Throughout this case, the government has broadly argued that it can meet its burden of proof as to the first element of extortion by simply establishing that the defendants "direct[ed] that the victim's property be given to a third party."  Doc. No. 164 at 11.  In the government's view, so long as some identifiable person or entity "obtained" the property, it is immaterial whether the defendants themselves physically acquired the property or derived any benefit from it.  <u>Id.</u> at 13; Doc. No. 183 at 26.  For a number of reasons, the Court declined to adopt the government's expansive conception of "obtain."

<u>First</u>, the government ignores the common definition of "obtain," a verb which means "[t]o bring into one's own possession; to procure, esp[ecially] through effort."  Black's Law Dictionary 1247 (10th ed. 2014); <u>see</u> <u>Honeycutt v. United States</u>, 137 S. Ct. 1626, 1632 (2017) (listing dictionary definitions of "obtain"); <u>cf.</u> <u>Scheidler v. Nat'l Org. for Women, Inc.</u>, 537 U.S. 393, 402 (2003) ("Absent contrary direction from Congress, we begin our interpretation of

statutory language with the general presumption that a statutory term has its common-law meaning."). "Neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else." Honeycutt, 137 S. Ct. at 1632. Yet that is precisely the conclusion the government urges. See Burhoe, 871 F.3d at 27 (admonishing that the government's view "risks merging the concepts of control and obtention").

Second, the Supreme Court has not construed "obtain" for purposes of the Hobbs Act as broadly as the government urges. In fact, the Supreme Court expressly rejected such a definition in Scheidler. There, the dissent endorsed a definition similar to the one the government urges now. See 537 U.S. at 416 (Stevens, J., dissenting) (excerpting and describing as "manifestly correct" a Second Circuit decision defining "obtain" as including regulating the fate of the property via extortionate conduct). But the majority opinion explicitly rejected that "expansive definition" of the term, stating: "Surely if the rule of lenity, which we have held applicable to the Hobbs Act, means anything, it means that the familiar meaning of the word 'obtain'—to gain possession of—should be preferred to the vague and obscure 'to attain regulation of the fate of.'" Id. at 403 n.8 (citation omitted, emphasis added).[12]

Moreover, Scheidler makes clear that the element of "obtaining" the property is of critical importance in a Hobbs Act prosecution, as it is the difference between extortion (which Congress explicitly included within the reach of the Hobbs Act) and coercion (which Congress

---

[12] The government focuses instead on a different footnote in Scheidler, one in which the Court quoted provisions from the Model Penal Code to demonstrate the settled distinction between extortion and coercion. 537 U.S. at 408 n.13. That reference cannot fairly be viewed as an endorsement of the position the government adopts here, particularly in light of the totality of the Supreme Court's discussion of what it means to "obtain" property (including, and especially, the Court's explicit rejection of such an expansive view in the language quoted above).

intentionally did not include in the Hobbs Act). See id. at 405-09 (discussing this distinction and the legislative history of the Hobbs Act).[13]  A decade later, in Sekhar v. United States, 570 U.S. 729 (2013), the Supreme Court again looked to the common dictionary definition of the word "obtain," emphasized the distinction between extortion and coercion, and reiterated that Hobbs Act extortion "requires that the victim 'part with' his property, and that the extortionist 'gain possession' of it."  Id. at 734 (citation omitted, emphasis added).  In the margin, Justice Scalia admonished against reading the Hobbs Act too expansively:  "Congress's enactment of the Hobbs Act did not, through the phrase 'obtaining of property from another,' suddenly transform every act that coerces affirmative conduct into a crime punishable for up to 20 years."  Id. at 736 n.4.

The government reads Scheidler and Sekhar as having "focused on whether the property at issue was 'obtainable' for purposes of the Hobbs Act," and not whether it was "obtained" by the alleged extorters in those cases.  Doc. No. 164 at 11; Doc. No. 194 at 3-4.  Based on that view, the government urges that neither case provides any guidance for how to define "obtain" in this context.  The government reads these cases with blinders on.  Scheidler explicitly considered—indeed, turned on—what it means to "obtain" property, 537 U.S. at 404-05, and the court in Sekhar likewise "rested its decision . . . on the term 'obtaining,'" 570 U.S. at 736.  In Scheidler, the Court concluded the property at issue had not been obtained; in Sekhar, the Court

---

[13] The Scheidler court cited as an example of common-law coercion—defined as "employ[ing] threats and acts of force and violence to dictate and restrict the actions and decisions of businesses"—a 1934 New York case it described parenthetically as "affirming conviction for coercion where defendants used threatened and actual force to compel a manufacturer to enter into an agreement with a labor union of which the defendants were members."  537 U.S. at 406 (emphasis added).  Were coercion a federal crime, and were that crime charged here, the Court would craft a different jury instruction.

concluded the alleged property <u>could not be</u> obtained.  But in both cases, the Supreme Court discussed the meaning of "obtain" in terms that are at least exceedingly persuasive to this Court.

The government prefers to ignore the careful, recent analyses of <u>Scheidler</u> and <u>Sekhar</u> in favor of a single sentence in a decision rendered by the Supreme Court more than sixty years ago.  In <u>United States v. Green</u>, an official union representative and the union itself were charged with extorting "wages to be paid for imposed, unwanted, superfluous and fictitious services of laborers" who were members of the charged union.  350 U.S. at 417, 420.  In reversing an order arresting the defendants' judgments of conviction, the Supreme Court addressed the manner in which the Hobbs Act applies in the labor union context, rejected the trial court's conclusion that criminal liability arose in that context only if the defendants had sought property for their own personal benefit (rather than for the benefit of the laborers the defendants represented), and explained that "extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property."  <u>Id.</u> at 419-20.  Although the government is correct that neither <u>Scheidler</u> nor <u>Sekhar</u> overrules <u>Green</u>, it is wrong to suggest that <u>Green</u> controls the legal analysis in this case.[14]  Besides providing minimal (if any) analysis of what it means to "obtain" property under the Hobbs Act,[15] <u>Green</u> presents facts that would satisfy this Court's proposed definition of that term.  If a union or its agent, through extortionate threats, caused a company to pay wages to laborers <u>that the union and its agent represent</u> (as was

---

[14] <u>Scheidler</u> acknowledges <u>Green</u> only to say <u>Green</u> does not require a finding that Hobbs Act liability can "be based on obtaining something as intangible as another's right to exercise exclusive control over the use of a party's business assets," 537 U.S. at 402, and <u>Sekhar</u> does not discuss or cite <u>Green</u> at all.  Neither case "reaffirms" <u>Green</u>, as the government has said.  Draft Tr. at 28.

[15] The government argues this Court has erred by failing to apply "the correct definition of 'obtain,' that which the Supreme Court announced in <u>Green</u> and has never abandoned."  Draft Tr. at 30.  Not so.  A model of brevity, <u>Green</u> announces no such definition.

the case in Green), the union and its agent would have "obtained" that property (without any showing of personal benefit). Green's import in this case substantially diminished when the government adopted the view that Brissette and Sullivan were not agents or representatives of Local 11.

Third, the First Circuit, like the Supreme Court, has flatly rejected the government's sprawling view of "obtain." As Burhoe makes clear, "[i]t is not enough that the victims merely have lost something, the defendants have to have that thing as well."[16] 871 F.3d at 26 (emphasis added). Responding to the same arguments made by the same prosecutors, the First Circuit distilled the government's theory into "an argument that the defendants controlled the property and received an unidentifiable benefit from that control." Id. at 27. This, the First Circuit explained, is not enough to satisfy Scheidler, which requires the government "to do more than demonstrate control" in order "to prove that the property was obtained." Id. Furthermore, Burhoe undermines the government's single-minded reliance on Green. The First Circuit explicitly declined to "read [Green] so expansively as to negate the requirement that the defendants 'obtain' the property," noting that cases in which the defendants do not personally or physically acquire the property have demonstrated they nonetheless "obtained" it by showing they "directly benefited from the deprivation of the victims' property." 871 F.3d at 27. In Burhoe, the government had established neither physical acquisition of the property, nor any direct benefit from the deprivation, resulting in a failure to establish that the defendants "obtained" the property (even though they may have controlled its disposition). Id.

---

[16] The government invites the Court to view Burhoe as having been a "very, very narrow" decision, concerned only with a "failure [of proof] on the part of the Government," and not conveying any requirement "that the property must be obtained by the defendants." Doc. No. 179 at 67, 88. The Court will not—indeed, cannot—ignore the First Circuit's explicit and substantial discussion of a pivotal issue in this case.

Fourth, the government has cited no decision of any court in which such a broad definition of "obtain" was applied to extend Hobbs Act liability to facts akin to those presented here. The government's view of the law rests on what it characterizes as "the well-established proposition[s] that a party may commit extortion of a victim's property by directing that the victim's property be given to a third party," and "that a defendant may be found guilty of Hobbs Act extortion even where [he] does not receive a direct benefit from the extorted property." Doc. No. 164 at 11-12. The government is correct that there have been cases in which defendants were charged with and convicted of Hobbs Act extortion where the property at issue was directed to a third party. There also have been cases in which defendants were charged with and convicted of Hobbs Act extortion where there was not proof that the defendants benefitted from the extorted property. Indeed, the proposed instruction explicitly contemplates those possibilities and describes when the first element of extortion is satisfied in each scenario. However, the government has identified no case in which a defendant was charged with and convicted of Hobbs Act extortion where he <u>neither</u> personally acquired the property <u>nor</u> received a demonstrated benefit from the deprivation.[17]

---

[17] In fact, each case cited by the government describes evidence of acquisition or benefit (or both). <u>See</u> <u>United States v. McDonough</u>, 727 F.3d 143 (1st Cir. 2013) (state representative convicted of extortion where he received portion of funds from actual recipient of the funds either as referral fee or a line of credit); <u>United States v. Vigil</u>, 523 F.3d 1258 (10th Cir. 2008) (state treasurer convicted of extortion for requiring company seeking state contract to hire third party as payment for personal debt owed by defendant to third party's husband, who was considering running against defendant if debt was not paid); <u>United States v. Gotti</u>, 459 F.3d 296 (2d Cir. 2006) (members of organized crime family convicted of various extortion charges, each of which involved money paid directly to a defendant or deprivations of property for the direct benefit of a defendant); <u>United States v. Evans</u>, 30 F.3d 1015 (8th Cir. 1994) (manager of state insurance program convicted of extortion for accepting payments from a company seeking approval through the program); <u>Cerilli</u>, 603 F.2d 415 (state department of transportation workers convicted of extortion for conditioning leases of private snow removal vehicles on payments made in cash or via checks made out to local political committees, where defendants personally received the payments); <u>United States v. Santoni</u>, 585 F.2d 667 (4th Cir. 1978) (state lawmaker

The Court has looked beyond the cases cited by the government and has uncovered no

such case.[18] This makes perfect sense, as both the plain meaning of the Hobbs Act's terms and

---

convicted of extortion for requiring and receiving payment of kickbacks from contractors in order to pass inspections and obtain future government contracts); <u>Jacobs</u>, 451 F.2d 530 (lawyer and operator of cab company convicted of extortion for demanding cash payments from operator of a tour bus company in exchange for promises to secure necessary permits); <u>United States v. Tropiano</u>, 418 F.2d 1069 (2d Cir. 1969) (operators of trash removal company convicted of extortion for threatening violence in order to prevent competing company from soliciting clients in a geographic area, effectively obtaining for themselves the exclusive right to solicit business in that region); <u>Provenzano</u>, 334 F.2d 678 (union officer convicted of extortion for demanding continuous series of cash payments from trucking company to resolve labor problems, where defendant himself received some of the cash payments directly); <u>see also</u> <u>Green</u>, 350 U.S. at 417-20 (union and its agent charged with extortion for using threats and violence in an effort to obtain unwanted and fictitious jobs for union members); <u>Renzi</u>, 769 F.3d at 743 (reciting evidence that both co-defendants received portions of the extorted payments); <u>Haimowitz</u>, 725 F.2d at 1567, 1577 (discussing evidence that one defendant received the extorted property and delivered all or some of it to a co-defendant); <u>Hyde</u>, 448 F.2d at 820, 843 (stating that extorted payments were "channeled" to the defendants and that at least one defendant received extorted checks); <u>cf.</u> <u>United States v. Carlson</u>, 787 F.3d 939 (8th Cir. 2015) (defendant convicted under a different statute of mailing extortionate communications for sending letters demanding payments to be delivered to a doctor with whom the defendant was "infatuated" at an animal hospital the defendant frequented); <u>United States v. Lewis</u>, 797 F.2d 358 (7th Cir. 1986) (defendant convicted of attempted extortion for sending threatening letter demanding payment to be wired to bank account of his wife's former employer, whom the defendant hoped "to expose and humiliate" after he failed to pay the defendant's wife wages due to her); <u>United States v. Frazier</u>, 560 F.2d 884 (8th Cir. 1977) (defendant convicted of attempted extortion for thwarted scheme to extort payment from bank using fake explosive belt).

[18] Every Hobbs Act decision the Court has reviewed has referenced evidence of acquisition and/or benefit, as the Court has construed that term. <u>See, e.g.</u>, <u>United States v. Markle</u>, 628 F.3d 58 (2d Cir. 2010) (union worker convicted of extortion for using violence against rival union in order to secure work for his own union); <u>United States v. Collins</u>, 78 F.3d 1021 (6th Cir. 1996) (governor's husband, who served as her fundraiser, convicted of extortion for demanding and receiving campaign contributions in exchange for chances to bid on state contracts); <u>United States v. Garcia</u>, 907 F.2d 380 (2d Cir. 1990) (congressman's conviction for extortion overturned where he and his wife demanded payments and a job for his wife from a company seeking a future government contract, but where evidence showed alleged victim made payments in hope of future benefit rather than out of fear of economic harm); <u>United States v. Kattar</u>, 840 F.2d 118 (1st Cir. 1988) (private investigator convicted of extortion for threatening violence and economic harm to Church of Scientology unless payments were made to him); <u>United States v. Lisinski</u>, 728 F.2d 887 (7th Cir. 1984) (county employee convicted of extortion for demanding payments from a restaurant owner in exchange for help obtaining a liquor license); <u>United States v. Gibson</u>, 726 F.2d 869 (1st Cir. 1984) (union official convicted of extortion for making implicit threats causing a nonunion company to pay him in order to avoid problems on a particular job

common sense dictate that one cannot "obtain" property absent a showing of either actual acquisition thereof (along with the ability to exercise, transfer, or sell the property), or an identifiable benefit therefrom.  Cf. Burhoe, 871 F.3d at 26-27.

Fifth, a vast majority of the authority the government cites in support of its view are not only decades old and from jurisdictions beyond the First Circuit, but they include legal reasoning and conclusions that are of questionable force in the wake of Scheidler and Sekhar.  For example, in 1964 the Third Circuit cited Green and rejected a defendant's argument that extortion requires at least a showing of an indirect benefit to the extorter, in part based on its assessment that "[t]he gravamen of the offense [of extortion] is loss to the victim."  Provenzano, 334 F.2d at 686.  That reasoning, quoted in a number of other decisions upon which the government relies,[19] is at least substantially undermined by Scheidler and Sekhar, both of which more recently emphasize that common law extortion has always required "both a deprivation and an acquisition of property."  537 U.S. at 403-04; accord 570 U.S. at 734.  Thus, the government bases its legal argument largely on decisions that are not controlling legal authority in this case.  Scheidler, Sekhar, and Burhoe—all of which are controlling legal authority here—have undoubtedly clarified the meaning and scope of the Hobbs Act.  Previous decisions from other jurisdictions that are at odds with these controlling precedents cannot dictate the Court's jury instruction in this case.

site); United States v. Porcaro, 648 F.2d 753 (1st Cir. 1981) (defendant with ties to organized crime convicted of extortion for threatening to force massage parlors out of business unless the owners made payments to him); United States v. Sturm, 671 F. Supp. 79 (D. Mass. 1987), vacated, 870 F.2d 769 (1st Cir. 1989) (debtor convicted of extortion for demanding cash payments from bank in exchange for helping to locate collateral securing his loan, but conviction vacated based on error in instructing jury regarding knowledge of wrongfulness).

[19] E.g., Lewis, 797 F.2d at 364; Frazier, 560 F.2d at 887; Hyde, 448 F.2d at 843.

Sixth, and finally, the government states it "can think of no policy rationale that would support a rule that makes it a Hobbs Act violation to use threats to deprive victims of property for the benefit of family members, but exempts from Hobbs Act liability deprivations for the benefit of . . . acquaintances [or a favored constituent]." Doc. No. 194 at 6. Putting aside this misinterpretation of the proposed instruction, the Court need not ponder the question the government raises, for the Supreme Court's Hobbs Act jurisprudence answers it. If the law were as the government urges, the Hobbs Act's reach would vastly exceed any traditional conception of extortion, especially where the defendants are public officials.[20] As the Supreme Court has noted:

> At common law, extortion was a property offense committed by a public official who took "any money or thing of value" that was not due to him under the pretense that he was entitled to such property by virtue of his office. . . . While the Hobbs Act expanded the scope of common-law extortion to include private individuals, the statutory language retained the requirement that property must be "obtained."

Scheidler, 537 U.S. at 402-03 (emphasis added, citations omitted). The government, however, would extend federal criminal liability for Hobbs Act extortion to any scenario in which a public official acting as a regulator requires (or attempts to require) a private entity to hire one or more of a specified category of people or to otherwise spend money in a specified way, knowing there is a civil (i.e., non-criminal) law or rule precluding them from imposing such a requirement. For example, the government unequivocally has taken the position, in response to questioning from the Court, that if state officials enforced a requirement that all oil tankers in Massachusetts waters hire Massachusetts-licensed pilots, despite the contention of the Coast Guard that such a

---

[20] Although extortion "by fear of economic harm," and not "under color of official right," is the theory the government advances here, the defendants' roles as City officials and political appointees remains a salient consideration and implicates concerns cited by both the Supreme Court and the First Circuit in other Hobbs Act extortion prosecutions involving public officials.

rule is preempted by federal law, then these officials would have "obtained" the wages paid to the pilots and, in doing so, committed Hobbs Act extortion. Doc. No. 179 at 40-41, 73-74.

This example is neither fanciful nor academic; it is drawn from a real case.[21] From the Court's understanding of the circumstances of the Buzzards Bay case, there is no set of facts under which any application of the law would have authorized federal prosecution or conviction for Hobbs Act extortion of then-Governor Romney, the Commissioner of the Massachusetts Department of Environmental Protection, or any of the lower-level officials tasked with enforcing the rule, even if they did proceed to enforce the state requirement over the Coast Guard's objection. This is so for two reasons. First, by directing the hiring of identified third parties in the form of Massachusetts-licensed pilots, the state officials in no way "obtained" the wages paid to those pilots. This is a line easily understood and applied by every government official—using a government position to take personal possession of other people's property, or to gain a personal benefit, is obtaining that property and, obviously, is not lawful—and it reflects the plain and ordinary meaning of the words in the statute enacted by Congress. See 18 U.S.C. § 1951(b)(2) (requiring "the obtaining of property from another"). The Supreme Court has made clear that the proper meaning of criminal statutes generally, and the Hobbs Act specifically, is

---

[21] See United States v. Massachusetts, 440 F. Supp. 2d 24 (D. Mass. 2006) (entering permanent injunction), rev'd, 493 F.3d 1 (1st Cir. 2007) (vacating injunction), on remand, 724 F. Supp. 2d 170 (D. Mass. 2010) (granting summary judgment in favor of government and entering permanent injunction), rev'd sub nom, United States v. Coalition for Buzzards Bay, 644 F.3d 26 (1st Cir. 2011) (vacating injunction and remanding based on error in administrative rulemaking process, without reaching preemption question). Indeed, another dispute in this jurisdiction raised similarly complex preemption issues and, under the government's theory, could have exposed public officials to federal prosecution. See Bldg. & Constr. Trades Council of Metro. District v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218 (1993) (regarding union-related bid specification in Boston Harbor clean-up project which spawned several years of litigation but no Hobbs Act prosecutions).

defined by this framework. See Scheidler, 537 U.S. at 403 n.8 (citing the rule of lenity as a basis for applying the ordinary meaning of terms used in criminal statutes).

In addition, the government's position converts many actual or potential violations of civil law by government officials into federal felonies punishable by up to twenty years in prison. Violations of civil laws by government officials, whether arising from a good faith disagreement over the meaning of the law or willful disregard for the requirements of the civil law, ordinarily are resolved in civil litigation, with contempt available in the event a court order declaring the law is disregarded. See note 21, supra (citing two such civil cases arising in this jurisdiction). Criminal liability in the form of Hobbs Act extortion applies, as it traditionally has applied, when a government official uses his or her position to acquire or benefit from property.[22] See Wilkie v. Robbins, 551 U.S. 537, 564 (2007) ("In short, extortion by the public official was the rough equivalent of what we would now describe as taking a bribe." (quotation marks omitted)).

Although the Hobbs Act's reach is broad, Sitrone v. United States, 361 U.S. 212, 215 (1960), the Supreme Court has repeatedly admonished against stretching it beyond its common-law application where the conduct of public officials, acting on behalf of political constituencies, is involved. See McDonnell v. United States, 136 S. Ct. 2355, 2372 (2016) ("The basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns . . . . The government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past . . . . Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from

_____

[22] Congress has drawn the line that separates criminal and civil violations; here, that line depends on whether the defendants "obtained" the property.

participating in democratic discourse."); <u>Wilkie</u>, 551 U.S. at 567 ("It is not just final judgments, but the fear of criminal charges or civil claims for treble damages that could well take the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the Government and the public."); <u>McCormick v. United States</u>, 500 U.S. 257, 272 (1991) (warning against construing the Hobbs Act in such a way that would impose criminal liability on public officials who hear from constituents and act on their behalf simply because the constituents may have supported the official's political campaign).

To accept the government's invitation and essentially read the word "obtain" out of the Hobbs Act, such that any action taken to direct a private entity to spend money in a certain way—regardless whether the defendant himself receives the money or enjoys a personal benefit from it—would invite the precise risks against which the Supreme Court has cautioned, particularly when dealing with conduct by public officials.

For all of the foregoing reasons, the Court denies the government's motion for reconsideration and stands by the proposed instruction it has issued regarding the legal definition of obtaining property subject to: (a) further legal argument; (b) evidence at trial differing from that described in the government's trial brief; (c) objections, revisions, suggestions, or comments by the parties in the ordinary course; and (d) the Court's authority to revise proposed jury instructions prior to delivery to the jury subject to the limitations set forth in Rule 30.

III.  <u>FURTHER PROCEEDINGS</u>

Both in its motion to reconsider and during a lengthy sidebar discussion at the hearing on that motion, the government expressed that it would view a denial of reconsideration as "an effective dismissal" and would seek an immediate appeal, regardless of whether the defendants

actually seek, or the Court actually enters, an order dismissing the charges.[23]  Draft Tr. at 22-24;

Doc. No. 194 at 8.  To be clear, the Court has not dismissed the charges.  The Court has not

determined whether the government can prove beyond a reasonable doubt under the law the

charges in the TSI, because the government has not presented its evidence via proffer or trial.

Nonetheless, the Court appreciates that the government believes it cannot prove its case

under the Court's proposed instruction, and that it seeks the opportunity to present its objections

to the Court's legal rulings to the Court of Appeals.  There is an established mechanism to do so

that was raised at the motion hearings, described in the defendants' papers, referenced in both of

the Court's decisions denying dismissal, offered during the course of the hearing on the

emergency motion, and now arises from the Court's sua sponte decision to release its proposed

jury instruction early.  See United States v. Del Valle-Fuentes, 143 F. Supp. 3d 24, 26-27 (D.P.R.

2015) (collecting cases from various federal courts permitting resolution of challenges to the

legal sufficiency of the government's evidence via a pretrial motion to dismiss "when the facts

are undisputed, the government does not object to the procedure, and the only question is a legal

one").  The Court has invited the government to proffer the admissible evidence of benefit it

possesses in the course of a renewed motion to dismiss, after which the Court would either deny

the motion (thereby making plain the government possesses sufficient evidence, if credited by

the jury, to prevail under the law) or allow it.  If the Court were to allow such a motion and

---

[23] It is far from certain that this interpretation of the Court's ruling, if credited, creates a basis for
appellate jurisdiction now.  The government cites only two cases in support of this proposition;
both deal with rulings potentially or conditionally excluding evidence (not with "effective
dismissal," which implicates a different provision of the relevant appellate jurisdiction statute),
and only one permitted the appeal to proceed.  See Doc. No. 194 at 8 (citing Kane, 646 F.2d at 8,
and United States v. Horwitz, 622 F.2d 1101, 1105 (1st Cir. 1980)).  This question, however, is
for the Court of Appeals to resolve, assuming the Solicitor General grants permission the
government says it needs to pursue an appeal at this time.

dismiss the case, its ruling would permit the government to appeal—and to raise both its primary and alternative legal theories—on a clear record. 18 U.S.C. § 3731. The government has opted not to pursue this approach, instead making plain its intention to pursue an interlocutory appeal of a proposed jury instruction the Court has repeatedly stressed is subject to change, and to do so on a factual record that is devoid of its evidence, if any, of benefit.

It will be for the First Circuit to assess the present record and determine whether an appeal by the government in these circumstances is authorized under the law and, if so, the proper resolution of the legal issues. However, the public, the defendants, and this Court each have significant interests that will be disrupted by the course the government has said it intends to pursue. The long-scheduled trial is a week away. The Court has invested substantial resources in this case and has prepared to summon more than the usual number of prospective jurors, given the publicity attendant to this case. The public and the defendants have important statutory and constitutional rights to a speedy trial. At this stage of the case, after disclosure of witness lists and witness statements, the Court assumes the government has already marshaled the evidence it intends to present at the trial, and the defendants no doubt have prepared to respond to the case as it is outlined in the government's trial brief and discovery disclosures.[24]

---

[24] The shifting sands of the government's legal theory, its persistent resistance to earlier resolution of the legal issues, and its refusal to create a firm factual record could suggest an effort to intentionally delay resolution of this case.

III.    <u>CONCLUSION</u>

In light of the foregoing discussion, the government's motion for reconsideration (Doc. No. 194) is DENIED.  The proposed instruction the Court has crafted remains the operative legal standard subject to change as noted herein.

Trial remains scheduled to commence on Monday, March 26, 2018 at 9:00 a.m., with a final pretrial conference on Thursday, March 22, 2018 at 10:00 a.m.  Should the government file a notice of appeal, this Court will await instruction from the First Circuit before proceeding.

SO ORDERED.


 /s/ Leo T. Sorokin_____
United States District Judge