**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                          )
UNITED STATES OF AMERICA                  )
                                          )
        v.                                )   Case No. 16-cr-10137-LTS
                                          )
KENNETH BRISSETTE and                     )
TIMOTHY SULLIVAN                          )
_____ )

**MEMORANDUM IN SUPPORT OF DEFENDANT SULLIVAN'S MOTION FOR A**
**JUDGMENT OF ACQUITTAL**

Defendant Timothy Sullivan submits the following memorandum of law in support of his

motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a) on Counts One and Two of

the Third Superseding Indictment because the evidence presented by the prosecution at trial was

wholly insufficient to convict him of the charges.  The memorandum incorporates by reference

arguments made by his co-defendant that are not based on a lack of evidence specific to

Brissette.

**FACTUAL RECORD**

**I.    The Indictment**

The Third Superseding Indictment ("Indictment") alleges that from May 2014 through

September 2014, Timothy Sullivan conspired with Kenneth Brissette to wrongfully use fear of

economic harm to obtain property owned by Crash Line Productions ("Crash Line").  The

indictment charges Sullivan with one count of conspiracy to commit Hobbs Act extortion and

one count of Hobbs Act extortion.  The indictment alleges the following:

- Between July and September 2014, Crash Line was awaiting the issuance of
  "certain permits and approvals from the City of Boston" required to put on the
  Boston Calling concert, "as well as an extension of its licensing agreement."  Ind.
  at ¶ 16.

1

- During this time, Sullivan and Brissette "repeatedly advised" Crash Line that it would "need to hire members of IATSE Local 11 to work at the music festival." *Id.*

- Crash Line told Sullivan and Brissette that it had already entered into a contract with a non-union company and "hired all of its labor." *Id.*

- In August 2014, a representative from IATSE Local 11 emailed Sullivan a draft contract for work at Boston Calling and asked Sullivan to forward the contract to Crash Line Productions. *Id.* at ¶ 17.

- On September 2, 2014, "just three days before the September 2014 music festival," Sullivan and Brissette requested a meeting with Crash Line. *Id.* at ¶ 18.

- At the September 2, 2014, meeting, Sullivan and Brissette stated that Crash Line Productions "would need to hire members of IATSE Local 11 to work at the festival." Sullivan and Brissette then "insisted" that half of Crash Line's labor force consist of union members. *Id.*

- Later that afternoon, Crash Line entered into a contract with IATSE Local 11 to hire nine people "as a result of the demand." *Id.*

- "Shortly thereafter, the City of Boston issued the necessary permits." *Id.*

## II.   The Trial

The trial in this matter began on July 22, 2019, and belies all of the allegations made against Sullivan in the indictment except that Sullivan received a draft contract from IATSE Local 11.  The prosecution called 18 witnesses, including three principals of Crash Line and five former and current City of Boston officials. In addition to revealing that the allegations regarding Sullivan's conduct were untrue (e.g. that he repeatedly advised Crash Line that it would have to hire union labor to work at the festival), the evidence presented at trial showed that there was much more to the story than suggested by the indictment.  In particular, the indictment omitted information about the reason that the request to hire workers through IATSE Local 11 was made: to avoid a disruptive labor demonstration on City Hall Plaza during the Boston Calling concerts.

Contrary to the sinister insinuations in the indictment, the Crash Line witnesses testified that at the September 2, 2014, meeting, Brissette merely expressed a concern that IATSE Local 11 was threatening to picket the event and blow up a giant inflatable rat on City Hall Plaza and conveyed that the Mayor likes to bring everyone together to solve disputes.[1]  (4 Tr. 13:15:-13:8.) Prior to trial, the government conceded that it is not extortion for the defendants to simply tell Crash Line's principals that there will be problems from IATSE Local 11 that if they do not hire union labor without personally threatening Crash Line's permits.  *See* Dkt #179 at 49.  As demonstrated by the evidence at trial, that is exactly what happened.

According to the testimony of Crash Line principal Mike Snow, Crash Line was asked, not demanded, to hire union labor at the meeting on September 2, 2014, in order to avoid a labor demonstration.   The other Crash Line principal, Brian Appel, testified that he responded to that request by asking "how many jobs are we talking about;" that Brissette said "half;" that Appel balked at the number and said it was "too much for us to bear;" that Brissette said he would have a conversation and get back to them; and that Brissette later called and said the union would be satisfied with eight jobs. (4 Tr. 139:19-146:22.)  Although the indictment implies that Brissette and Sullivan implicitly threatened Crash Line's permits, Appel testified that he did not believe that Brissette or Sullivan had any involvement in the permits at City Hall.  (5 Tr. 110:8-20.)

The testimony at trial also affirmed that Sullivan had little role in the charged events. The government's first three witnesses testified only as to events relating to the filming of Top Chef. Because Sullivan had no involvement with Top Chef, these witnesses offered no testimony about him.   Nor did the government offer evidence to show that the Top Chef evidence could have any

---

[1] IATSE Local 11 International Vice President Colleen Glynn confirmed that her members wanted to picket the September 2014 concert and bring the rat and that she told Sullivan that they were angry and "chomping at the bit."

bearing on Sullivan's knowledge and intent.  In addition to the Top Chef witnesses, both Jesse

Du Bey and Bill Kenney testified that they did not know Sullivan.  And although the indictment

charges Sullivan with *repeatedly* advising Crash Line between July and September that it "need

to hire members of IATSE Local 11 to work at the music festival," *see* Ind. at ¶ 16, the Crash

Line witnesses testified that they did not interact with Sullivan at all during that time period

except for the meeting on September 2, 2014.   The totality of the evidence presented against

Sullivan was as follows:

- City of Boston's Chief of Policy Joyce Linehan asked Sullivan to find out the cost to add union labor to Boston Calling.

- Sullivan called Glynn and asked her to give him Local 11's best deal that they could possibly strike for stagehands at Boston Calling.

- Glynn sent Sullivan a draft contract with Boston Calling/Bill Kenney Productions. *See* Ex. 30.

- Brissette sent an email to Sullivan asking Sullivan to give him a call around 11 AM on September 2, 2014, and calls between phones ascribed to both individuals were made thereafter.  *See* Ex. 58.

- Sullivan attended a meeting with Crash Line on September 2, 2014.

  - Appel did not recall Sullivan saying very much at the meeting.  (4 Tr. 141:20-21.)
  - Snow could not recall who did most of the talking at the meeting and thought that Sullivan was not an employee from the City of Boston but rather a representative of the union.  He stated that Sullivan "participated" in the discussion but did not specifically testify as to anything that Sullivan said.

- A phone ascribed to Sullivan texted a phone ascribed to Colleen Glynn after the meeting.  *See* Ex. 58.

# ARGUMENT

On a defendant's motion for a judgment of acquittal under Rule 29, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A "judgment for acquittal. . . is an important safeguard to the defendant. It tests the sufficiency of the evidence against a defendant, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt." *United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996), citing 2 Charles A. Wright, Fed. Prac. & Proc. Crim. § 461 (West 1982).

In deciding a motion for acquittal, the court must examine the evidence in the light most favorable to the prosecution and determine "whether a rational jury could find guilt beyond a reasonable doubt from the evidence presented." *United States v. Guzman-Ortiz*, 365 F.Supp.3d 215, 218 (D. Mass. 2019). "While all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994). The prosecution is not permitted to "stack inference upon inference" in order to prove a defendant's guilt. *United States v. Valerio*, 48 F.3d 58, 64 (1st Cir.1995). "Where . . . the trier of fact would have . . . to rely on attenuated inferences [to make a finding] . . . the finding . . . cannot stand." *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010). In addition, a defendant is entitled to a judgment of acquittal where "the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged because in such circumstances a reasonable jury *must necessarily entertain* a reasonable doubt." *United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cr. 1995)(internal quotation and citation omitted)(emphasis in original).

Sullivan is entitled to a judgment of acquittal on both counts against him because the government did not introduce evidence at trial that proves *any* of the essential elements of the crime. *See United States v. Perez-Melendez*, 599 F.3d 31, 46-47 (1st Cir. 2010). With regard to the extortion charge, the prosecution failed to present sufficient evidence to prove that Sullivan obtained property himself or directed Crash Line to transfer property to individuals he identified; that Sullivan knew that Crash Line feared that it would not receive its permits or a future exclusive long-term license agreement and intentionally exploited that fear; that Crash Line reasonably feared that Sullivan would cause it economic harm (i.e. by withholding its permits or denying it a fair opportunity to compete for a future exclusive long-term license agreement); and that Sullivan used wrongful means to achieve wrongful ends. The charge of conspiracy to commit extortion likewise fails because the prosecution did not prove that a criminal conspiracy existed or that Sullivan participated in a criminal conspiracy. Thus, as set forth more fully below, the prosecution did not present legally sufficient evidence of guilt at trial.

## I.   The Prosecution Failed to Prove that Sullivan Obtained Crash Line's Property.

To prove Hobbs Act extortion, the government must establish beyond a reasonable doubt that the defendant knowingly and willfully obtained the victim's property. "[E]xtortion under the Act requires not only that a victim be deprived of his or her property, but also that the perpetrator acquire it." *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 403-404 (2003). *See Sekhar v. U.S.*, 570 U.S. 729, 734 (2013)("Obtaining property requires that the victim part with his property and that the extortionist gain possession of it.")(internal quotations and citations omitted). The government presented no evidence at trial that Sullivan gained possession of Crash Line's property. Indeed, the government conceded that it could not do so

when it told the jury in its opening statement that it would hear that the defendants did not receive anything financially or otherwise personally benefit.

The First Circuit held that the element of obtaining property is satisfied where the defendant directed the transfer of property from the victim to identified persons. *See United States v. Brissette*, 919 F.3d 670, 678 (2019). Even under this more flexible interpretation of the element of obtaining property, the government still did not satisfy its burden beyond a reasonable doubt. Crash Line principal Brian Appel testified at trial that he only interacted with Sullivan at the September 2, 2012, meeting, where Sullivan did not say very much and Snow similarly could not remember anything that Sullivan specifically said.[2] (4 Tr. 141:20-21.) In addition, while the government introduced evidence of an email showing that IATSE Local 11 International Vice President Colleen Glynn sent Sullivan a draft contract with Crash Line, it did not present any evidence that Sullivan actually forwarded that contract to Crash Line or that Crash Line ever received it. Indeed, the government conceded in its opening that it had no evidence that the draft contract was ever forwarded to Crash Line. Accordingly, a reasonable jury could not find that Sullivan directed Crash Line to transfer its property to IATSE Local 11 members.

## II.  The Prosecution Failed to Prove That Sullivan Knowingly and Willfully Used Crash Line's Fear of Economic Harm.

The government must prove that Sullivan "knowingly and willfully created or instilled fear, or used or exploited existing fear with the specific purpose of inducing another to part with

---

[2] Furthermore, Appel and Snow's testimony of what they could remember about the "thrust of the conversation" was that the defendants wanted to bring everyone to the table and were asking Crash Line if something could be worked out with IATSE Local 11 in order to avoid a labor demonstration at the festival. Such statements do not constitute a direction by either defendant for Crash Line to transfer wages and benefits to specific individuals. No specific individuals were identified as workers in the contract ultimately signed between Crash Line and IATSE Local 11. Instead, the testimony at trial by Bill Kenney and Colleen Glynn was that the majority of the individuals who received wages and benefits to work at Boston Calling were identified by Kenney himself with the remainder identified by Glynn. Glynn also testified that Local 11's hiring hall is open to individuals who are not union members.

property.'" *United States v. Burhoe*, 871 F.3d 1, 9 (1st Cir. 2017), *quoting United States v. Coppola*, 671 F.3d 220, 241 (2nd Cir. 2012). *See United States v. Abelis*, 146 F.3d 73, 83-84 (2d Cir. 1998)(affirming jury instruction that Hobbs Act extortion requires proof that defendant "aware of the victims' fear did or said something in an attempt to exploit that fear" because it adequately advised jury that "a defendant must knowingly and willfully create or instill fear, or use or exploit existing fear").  The government articulated two theories of economic loss created or exploited by the defendants: (1) that Crash Line would be denied the necessary permits and approvals for the concert; and (2) that Crash Line would not receive the exclusive long-term licensing agreement that it desired (also referred to as an "extension" of Crash Line's license agreement).  *See* Dkt #249 at 10-11.  It is plain from the record at trial that the government did not carry its burden of proving that Sullivan knowingly and willfully exploited Crash Line's fear under either theory.

    A.  *There is Insufficient Evidence to Prove That Sullivan Knowingly and Willfully Exploited Crash Line's Fear That it Would Not Receive its Permits and Approvals.*

       A reasonable jury could not conclude that Sullivan knowingly and willfully exploited Crash Line's fear that it would not receive its permits and approvals.  No evidence was presented that Sullivan knew that Crash Line believed that there was a chance it would not receive its liquor license or entertainment license.  To the contrary, the testimony at trial was that Sullivan had no contact with Crash Line during the summer of 2014 until he attended the meeting on September 2, 2014. By that time, Crash Line had received all of the permits necessary to receive its final entertainment license, including a liquor license.  No evidence was presented that Sullivan had any knowledge of the licensing process or any role in it.  In the absence of such knowledge, he could not have intentionally exploited Crash Line's fear that it would not receive its permits.

Indeed, the government presented no evidence that Sullivan intentionally exploited Crash Line's fear that it would not receive its permits.  No testimony was presented as to anything Sullivan said or did at the September 2, 2014, meeting that would exploit Crash Line's fear.  Rather, Appel testified that Sullivan did not say very much and Snow testified that he could not remember who did most of the talking but that he thought Sullivan did the talking for the "negotiation piece."  Even if Sullivan answered Appel's questions about how many workers were being requested by IATSE Local 11, there is nothing to indicate that Sullivan could be exploiting Crash Line's fear that it would not receive its permits for the festival by having such a discussion.

Faced with a complete absence of evidence, the government will presumably rely on Appel's testimony that he had "general concerns" that he would not receive his permits or would receive "inferior permits" if he did not agree to hire union labor.  (4 Tr. 141:2-5).  First, a "general concern" that is not specific to Sullivan and not based on Sullivan's conduct is plainly insufficient to prove beyond a reasonable doubt that Sullivan knowingly and willfully exploited Appel's fear.  This is especially true given that Appel testified that he did not think that Sullivan was trying to harm him.  (5 Tr. 179:14-21.)  Again, there is no evidence whatsoever that anyone from Crash Line ever expressed to Sullivan that they thought they might not get their entertainment license, causing the Boston Calling concert to be cancelled, and so it was not possible for Sullivan to have been willfully exploiting that fear.

As for the issue of "inferior permits," Appel testified that he "believed there was a world in which" he would not receive his desired curfew and that he would be subject to significant alcohol restrictions and restrictions around capacity.  (4 Tr. 141:6-11).  Setting aside the fact that Appel had no right to receive a permit without restrictions, Appel never testified that he believed that Sullivan himself was implicitly threatening to deny his permits or to place restrictions on his

permits.[3]  In the end, the record is completely devoid of any evidence that Sullivan had any knowledge that Crash Line feared it would not get its permits or would get "inferior permits" and that Sullivan exploited such fear through his words or conduct.

> B.  *The Evidence is Insufficient to Support a Verdict Based on Sullivan's Knowing and Willful Exploitation of Crash Line's Fear That it Would Not Receive an Exclusive Long-Term License Agreement.*

As an initial matter, the government cannot prove Hobbs Act extortion through evidence that Sullivan exploited Crash Line's fear it would not receive an "extension" of its license agreement (which would, in reality, constitute a new agreement for an exclusive long-term license) because Crash Line was not entitled to such an agreement.  *See United States v. Garcia*, 907 2d 380, 385 (2d Cir. 1990).  To support a conviction for Hobbs Act extortion, the fear used by the defendant must be of "a particular economic loss, not merely the loss of a potential benefit."  *United States v. Rivera Rangel*, 396 F.3d 476, 483 (1st Cir. 2005) (internal quotations and citations omitted).

In any case, even if Crash Line's desired-for "extension" could satisfy the required element of use of fear of economic harm, the government cannot prove that Sullivan knowingly and willfully exploited that fear because there is no evidence that he even knew that Crash Line had a licensing agreement that it was looking to extend.  (4 Tr. 104:7-10.)  *See United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995)("[T]he defendant must at least know of the potential harm.").  No Crash Line witnesses testified about any communications they had with Sullivan regarding its desire for such an agreement.  No evidence of any kind from City Hall witnesses was introduced to show that Sullivan was told about Crash Line's desire for an

---

[3] In fact, Favour Jones, the Festival Director for Boston Calling, testified that she did not believe that the debate between Boston Police Department and Crash Line about conditions on the sale of alcohol had anything to do with Sullivan.

exclusive long-term license agreement. It is impossible for a person to exploit another's fear of not receiving an agreement that one does not even know is being sought.  The government also failed to present any evidence that would show that Sullivan did anything to intentionally convey a threat to Crash Line that it would not receive its desired-for extension.

### III.    The Prosecution Failed to Prove That Crash Line Reasonably Feared That Sullivan Would Cause it Economic Harm.

"To establish extortion through fear of economic loss, the government must show that the victim believed that economic loss would result from his failure to comply with the alleged extortionist's terms, and that the circumstances rendered that fear reasonable." *United States v. Rivera Rangel*, 396 F.3d 476, 483 (1st Cir. 2005) (internal quotations and citations omitted). "The proof need establish that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987).  *See Rivera Rangel*, 395 F.3d at 483.  In addition, "the loss feared must be a particular economic loss, not merely the loss of a potential benefit." *Id.* (internal quotations and citations omitted).

There is no evidence that Crash Line reasonably believed that Sullivan had the power to harm it and would exploit that power to Crash Line's detriment.[4]  Crash Line principal Mike Snow admitted at trial that he did not think that there was anything Sullivan could do to affect Crash Line's permits or any future Request for Proposal because he did not know Sullivan was an employee of the City of Boston.  As for Appel, he testified to his knowledge that Crash Line's application for an entertainment license was submitted on August 29, the last business day before

---

[4] Nor was there sufficient evidence that Crash Line agreed to hire workers through IATSE Local 11 out of fear of economic harm as opposed to in an effort to "play nice in the sandbox," as Snow testified, or to use it as a "bargaining chip" to get Crash Line's hoped-for extension, as Appel testified. (4 Tr 172:4-173:9.)

September 2, and that Patricia Malone was in charge of approving the license.[5] (5 Tr. 77:19-78:16.) Appel testified that Sullivan did not say very much at the September 2 meeting and that he believed that Sullivan was not involved in the permit process.[6] Appel never testified that he believed Sullivan was to be involved in the evaluation of RFPs, and so that cannot be the basis for any reasonable fear by him that Sullivan would not fairly consider any future RFP for a long-term exclusive license agreement proposed by Crash Line.

Appel and Snow's testimony on direct examination that they could "potentially" have trouble operating the event if they did not agree to hire workers from IATSE Local 11 does not make Sullivan guilty of extortion. (5 Tr. 169:11-23.) The evidence presented by the government's witnesses at trial was that the problems that Crash Line was worried about stemmed from the Commissioner of Consumer Affairs & Licensing and the Boston Police Department, neither of whom is a co-conspirator in this case. Any actions that could have taken by those departments to cause economic harm to Crash Line actions cannot be imputed to Sullivan (even assuming, arguendo, that those actions would meet all the other necessary evidentiary requirements for extortion). Brian Appel's testimony that he felt he had no choice but to hire union workers because the City of Boston was his "landlord" does not show that it was reasonable for him to believe Sullivan had the power to cause him economic loss and that

---

[5] Boston Calling's festival director, Favour Jones, testified that it was not unusual to receive an entertainment license on the day of the event.

[6] Lisa Lamberti-Menino's speculation that because Sullivan worked for the Mayor he could withhold permits does not translate into evidence that Appel or Snow believed that Sullivan could and would do so. Ms. Lamberti-Menino's view of the influence a city staffer might have is undoubtedly affected by the fact that she is the daughter-in-law of the former Mayor. And even if it did, speculation by a third party—particularly that which was not conveyed to the victim—could certainly not make Crash Line's fear reasonable.

Sullivan would exploit that power to Crash Line's detriment.[7]  (5 Tr. 169:1-23.)  In addition, Snow's testimony that union issues were lingering refutes any claim to the government that Crash Line reasonably believed that Sullivan was conveying an implicit threat to its permits through the timing of the September 2, 2014, meeting.[8]  This is especially true given Snow's testimony that by the time that he walked into the meeting on September 2, 2014, he had already talked to Kenney about putting union people to work at Boston Calling and how to do it.

## IV.    The Prosecution Failed to Prove That Sullivan Used Wrongful Means to Induce Crash Line to Part with its Property.

"A violation of the Hobbs Act requires the use of wrongful means to procure the property." *United States v. Kattar*, 840 F.2d 18, 123 (1st Cir. 1988).  Because "there is nothing inherently wrongful about the use of economic fear to obtain property," *see United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989), courts must "differentiate between legitimate use of economic fear—hard bargaining—and wrongful use of such fear—extortion." *United Bhd. Of Carpenters & Joiners of Am.*, 770 F.3d 834, 838 (9th Cir. 2014).

In the context of civil RICO cases, the First Circuit has held that the use of economic fear can qualify as a wrongful means where "the plaintiff has a pre-existing statutory right to be free from the defendants' demand for the property." *Sanchez v. Triple-S Management*, 492 F.3d 1, 12 (1st Cir. 2007). "The decisive question [is] whether the victim had a pre-existing statutory or

---

[7] Nor does Mike Snow's testimony that Sullivan "caused" him to hire workers from IATSE Local 11 because he was "put in a position to make a decision" prove that he reasonably believed that Sullivan had the power to harm him by denying Crash Line permits or a long-term exclusive license agreement and that Sullivan would exploit that power to Crash Line's detriment.  As Snow acknowledged, it would not have been possible to believe this because he did not think that Sullivan was an employee of the City of Boston.

[8] In addition, the government's witnesses consistently testified at trial that the permitting process began with a Special Events meeting where the proposed event was presented to various city department heads. There was no testimony that Sullivan ever attended that meeting or that there was any other involvement by him with the various departments in charge of permits.  Boston Calling's festival director Favour Jones testified that she had never seen a permit signed by Sullivan's department.

contractual right to the *consideration* offered by the defendant in return for the victim's property" so that "the resulting transaction would have been an illegitimate sham." *United Bhd. Of Carpenters & Joiners of Am.*, 770 F.3d at 840 (emphasis added). Cf. *Sanchez v. Triple-S Mgmt. Corp.*, 446 F. Supp. 2d 48, 60-61 (D.P.R. 2006), aff'd, 492 F.3d 1 (1st Cir. 2007)("Plaintiffs have no pre-existing statutory right to be Triple–S network providers or to receive Triple–S' referrals, and hence have no property interest on which to base their claims."); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 522-526 (3rd Cir. 1998)(holding that U.S. Healthcare's threat to exclude self-insured pharmacy from its provider network unless it entered into contract with U.S. Healthcare subsidiary was not extortion because pharmacy had no right of access to network). There is no evidence that Sullivan offered any such consideration to Crash Line in return for Crash Line's property.

Even assuming for the sake of argument that Sullivan could have threatened Crash Line's hoped-for "extension" of its licensing agreement, there was no evidence that Crash Line had a pre-existing statutory or contractual right to such an agreement. The evidence is entirely to the contrary. In order for Crash Line to obtain the long-term agreement that it desired, it would have been required to satisfy the procedures required by G.L. c. 30B, § 16, and the 2012 City Ordinance, *see* Ex. 173. Any contractual right Crash Line had under the Irrevocable License Agreement bestowed no rights beyond the years specified within it. *See* Ex. 7. The government also failed to elicit evidence that Crash Line possessed a pre-existing statutory or contractual right to receive an entertainment license or liquor license with its desired hours of operation and curfew times. Thus, the government could not introduce the necessary proof to satisfy the test that it relies on to establish the wrongfulness of Sullivan's alleged actions. As a result, the government has set forth four alternate theories as to why Sullivan's alleged "use of economic

fear" was wrongful.  *See* Dkt #249.  None of these theories find support in Hobbs Act extortion

case law.  And even if the government's theories could support a finding of wrongful means,

there is no evidence that Sullivan had knowledge of its wrongfulness.

A.  *The Government Cannot Prove That Sullivan's "Use of Economic Fear" Was Wrongful*
    *by Alleging a Breach of the Irrevocable License Agreement.*

The government's first theory of wrongful means is that it is wrongful to pressure Crash

Line to hire union labor because the licensing agreement did not require union labor.  *See* Dkt

#249 at 5.  As Crash Line principal Brian Appel testified at trial, the Irrevocable License

Agreement gave Crash Line only the right to hold certain dates for its concert.  (5 Tr. 166:1-4.)

The Irrevocable License Agreement was silent as to the use of union labor.[9]  While the

Irrevocable License Agreement did not require Crash Line to hire union labor, it also did not

prohibit it from doing so.   Nor did it prohibit the City from asking Crash Line to hire union

labor.

As Brian Appel and Maribeth Cusick testified, the Irrevocable License Agreement

provided only that Crash Line has the responsibility to build the sets and hire labor, and

responsibilities are not rights.  (4 Tr. 174:15-17.)  In addition, Maribeth Cusick testified that she

removed language in a draft agreement created by Crash Line that would have given it a right to

operate exclusively using non-union labor and would have prohibited the City from imposing or

encouraging the imposition of any requirement that the event use unionized workers.  *See* Ex.

251.  Because the executed Irrevocable License Agreement omitted Crash Line's requested

language prohibiting the City of Boston from encouraging a requirement to use union workers, it

cannot be construed to impose such a prohibition.  Therefore, contrary to the prosecution's

claim, the Irrevocable License Agreement did not prohibit the City of Boston from asking Crash

---

[9] This is clear both from the Irrevocable License Agreement itself and the testimony of Maribeth Cusick.

Line to hire union labor.  Indeed, Mike Snow testified that he understood that it was okay to ask

to hire union labor and that "you can ask anybody anything."  Moreover, economic pressure is

not wrongful merely "because it happened to include, incidentally, tortious conduct or simple

breach of contract."  *United Bhd. Of Carpenters & Joiners of Am.*, 770 at 840.  If the City of

Boston were to breach its contract with Crash Line, "[t]he proper remedy for such a breach

[would be] a claim under state law," not a criminal prosecution.  *Id.* at 841.

B.  *The Government Cannot Prove That Sullivan's "Use of Economic Fear" Was Wrongful by Relying on the Doctrine of Preemption.*

The government's second theory of wrongful means is that it is wrongful for a public

official to require a private party to hire union worker as a condition to use public property.  As

authority for this claim of wrongfulness, the government has cited "Machinists pre-emption,"

which "prohibits states and municipal regulation of areas have been left to be controlled by the

free play of economic forces." *Building & Constr. Trades Council*, 507 U.S. 218, 225 (1993).

"Machinists pre-emption" is derived from the Supreme Court case *Lodge 79 Intern. Ass'n of*

*Machinists and Aerospace Workers, AFL-CIP v. Wisconsin Employment Relations Commission*,

427 U.S. 132 (1976), where it held that a state labor relations board could not enjoin union

members from refusing to work overtime while the union negotiated with the employer over a

collective bargaining agreement.  The Court concluded that "[r]esort to economic weapons

should more peaceful measure not avail is the right of the employer as well as the employee and

the State may not prohibit the use of such weapons." *Id.* at 147 (internal quotation and citation

omitted).

"Machinists pre-emption" does not apply, however, "[w]hen a state owns and manages

property" and therefore "must interact with private participants in the marketplace." *Building &*

*Constr. Trades Council*, 507 U.S. 218, 225 (1993)("*Boston Harbor*").  "In so doing, the State is

not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*." *Id.* (emphasis in original).  The Supreme Court has "held consistently that the NLRA was intended to supplant state labor *regulation,* not all legitimate state activity that affects labor." *Id.* at 227 (emphasis in original). "To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." *Id.* at 231 (emphasis in original).

At trial, Chris Cook testified that the Boston Planning and Development Agency or Boston Redevelopment Authority owns City Hall Plaza and that it is managed from within City Hall.  Accordingly, the City of Boston must necessarily interact with private participants in the marketplace.  *See Building & Constr. Trades Council*, 507 U.S. at 225.  Indeed, Lisa Lamberti-Menino testified that her job in the Property Management Division of City Hall requires her to work with "clients" on events they are seeking to produce on City Hall Plaza.  Because Crash Line was seeking to use public property to hold its event, the City's actions with respect to its vendors and their workforce were not preempted by the NLRA.

Regardless, even if the "use of economic fear" was preempted under the Supremacy Clause, that does not make it a crime under the Hobbs Act.  The proper remedy of such a violation is an injunction, not a criminal prosecution.  In addition, legal scholars have noted that the *Boston Harbor* decision has led to "widely disparate approaches for determining when government acts as a regulator versus market participant."  *See* Roger C. Hartley, *Preemption's Market Participant Immunity—A Constitutional Interpretation: Implications for Living Wage and Labor Peace Policies*, U. Pa. J. Lab. & Emp. L. 229, 230 (2003).[10]  As the Supreme Court

---

[10] *See also*  Lauren Kadish, *"Speak, Go Ahead, Speak, Speak": Chamber of Commerce v. Brown's Effect on Employer Speech Regarding Unionization*, 29 J. Nat'l Ass'n Admin. L. Judiciary 165, 211 (2009)("[T]he NLRA has remained the same, leaving the states to regulate what they can and creating a complicated system of labor law for employers and unions to follow").

recently acknowledged in *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 651

(2013), "the line between regulatory and proprietary conduct has soft edges."  Accordingly,

should the essential element of wrongfulness turn on correctly interpreting the "Market

Participant Exception" to "Machinists pre-emption," the Hobbs Act would become

constitutionally vague as applied to Sullivan.

    C.  *The Government Cannot Prove That Sullivan's "Use of Economic Fear" Was Wrongful Because There Was No Support From a Majority of Bill Kenney Production's Employees.*

    The government's third theory of wrongful means is that it is wrongful to pressure Crash

Line to hire workers through IATSE Local 11 without the support of a majority of existing non-

union employees.  *See* Dkt #259 at 5.  The government claimed that the defendants could not

ask Crash Line to hire a few individuals through IATSE Local 11 without the support of a

majority of Kenney's "employees," citing a civil RICO case brought against an organization that

attempted to unionize a production company where its employees did not want the union's

representation.  The government offered no evidence at trial that IATSE Local 11 was seeking to

organize Bill Kenney Production's employees.

    The contract Crash Line and IATSE Local 11 pertains to a single event and does not

require that only union members are hired for the jobs.  *See* Ex. 14.  In addition, Bill Kenney

testified at trial that he only has approximately twenty full-time employees and that he hired at

least thirty other people as independent contractors to work at Boston Calling, some of whom he

labeled "casuals."  The government offered no support for its proposition that hiring a few union

members for a particular job requires majority support from existing employees.  Nor did the

government offer any evidence that switching from one hiring entity open to both union and non-

union employees to another hiring hall open to both union and non-union employees cannot be

done without majority support.  Accordingly, this theory cannot satisfy the government's burden of providing beyond a reasonable doubt that Sullivan used wrongful means.

D. *The Government Cannot Prove That Sullivan's "Use of Economic Harm" Was Wrongful by Alleging a Violation of the State Ethics Law.*

Approximately three years after Sullivan was indicted, the government asserted for the first time that it would satisfy the element of wrongfulness by proving that he violated a provision of the state ethics law.  *See* Dkt #249 at 9.  The government specifically relies on Section 23(b)(2) of the General Laws Chapter 268A, which prohibits a state employee from using his official position to secure for himself or others "unwarranted privileges or exemptions which are of substantial value and which are not properly available to similarly situated individuals."  A violation of Section 23(b)(2) is a civil offense punishable by a civil penalty unless performed with a "fraudulent intent."  If an individual violates Section 23(b)(2) with a fraudulent intent, it becomes a crime under Section 26.  *See* G.L. c. 268A, § 26.  There has been no allegation of fraud in this case.

The prosecution cannot transform a potential state law ethical violation into a matter for federal criminal enforcement.  "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States."  *United States v. Bass*, 404 U.S. 336, 349 (1971). The United States Supreme Court has therefore declined to adopt expansive interpretations of federal criminal statutes that would "render traditionally local criminal conduct a matter for federal law enforcement."  *Id.* at 349-350.  *See Jones v. United States*, 529 U.S. 848, 849-850 (2000)(declining to adopt interpretation of 18 USC s. 844(j) that would "render the traditionally local criminal conduct in which Jones engaged a matter for federal enforcement") *Rewis v. United States*, 401 U.S. 808, 812 (1971)(declining to adopt interpretation of Travel Act that would "transform relatively minor state offenses into federal felonies"); *United States v.*

*Hersom*, 588 F.3d 60, 67 (1st Cir. 2009)(declining to adopt interpretation of 18 USC s. 844(f)

that "would transform a broad swathe of traditionally local criminal conduct into a matter for

federal enforcement").

"[U]nless Congress conveys its purpose clearly, it will not be deemed to have

significantly changed the federal-state balance in the prosecution of crimes." *Jones*, 529 U.S. at

858. *See U.S. v. Bass*, 404 U.S. 336, 337 (1971)("Because its sanctions are criminal and

because, under the Government's broader reading, the statute would mark a major inroad into a

domain traditionally left to the States, we refuse to adopt the broad reading in the absence of a

clearer direction from Congress."). In regards to the Hobbs Act specifically, "[n]either [its]

language... nor its legislative history can justify the conclusion that Congress intended to

work...an unprecedented incursion into the criminal jurisdiction of the States." *United States v.*

*Enmons*, 410 U.S. 396, 411 (1973).  As the court held in *United Bhd. of Carpenters & Joiners of*

*Am.,* 770 F.3d at 840, to hold that an economic pressure is wrongful under the Hobbs Act

because it involves a "violation of state law" would "transform innumerable state crimes and

torts into federal crimes."[11]

In any case, to prove a civil violation of Section 23(b)(2), the government was required to

introduce evidence at trial that the jobs received through IATSE Local 11 were an "unwarranted

privilege" and that the privilege was "not available to similarly situated individuals."  The

government seeks to add a novel theory of state law to a novel theory of Hobbs Act extortion.

The government essentially argues that Section 23(b)(2) makes it illegal for public officials to

---

[11] "The Supreme Court has reminded us just recently that we should refrain from interpreting federal statutes to "'alter sensitive federal-state relationships'" by "convert [ing] an astonishing amount of 'traditionally local criminal conduct' into 'a matter for federal enforcement.'" *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 840 (9th Cir. 2014), *citing Bond v. United States*, 134 S. Ct. 2077, 2091 (2014).

help political supporters get jobs, even where the person is eminently qualified for the position. Simply put, that cannot be the case. The government's expansive construction of Section 23(b)(2) would represent a radical departure from the way that public officials operate and would criminalize otherwise legal conduct. Absent clear legislative intent, the state ethics law should not be read to accomplish such a result. *See Commonwealth v. G.F.*, 479 Mass. 180, 202 (2018)(internal quotation and citation omitted)("It is not to be lightly supposed that radical changes in the law were intended where not plainly expressed.").

To prove that the privilege of a job was "unwarranted," the government would be required to show that the individuals who received the jobs through IATSE Local 11 were not qualified to work as stagehands. But the government introduced no such evidence because in fact the individuals hired by Crash Line through IATSE were qualified to for the position. Even Bill Kenney testified that there was no difference between his employees who were stagehands and the stagehands provided by IATSE Local 11. Accordingly, the government has failed to prove the required element of an "unwarranted" privilege.

The government also failed to prove that the privilege was not available to similarly situated individuals. That is demonstrated not only by Bill Kenney's testimony but by Colleen Glynn's testimony that anyone, whether a member of the union or not, can go IATSE Local 11's hiring hall and sign up for access to work. The Boston Calling stagehand jobs that were run through Local 11's hiring hall would have been available to all takers. That fact is not obviated by Bill Kenney's request for a list of specific individuals with whom he had prior experience. That Kenney sought particular individuals to perform the job cannot be imputed to Sullivan.

Even if the government could prove a violation of Section 23(b)(2), the evidence that it presented at trial is not sufficient to prove Sullivan's knowledge of the violation. The

government introduced evidence that Sullivan completed the state's online ethics training program and that he received the conflict of interest law, *see* Ex. 51 & 52, but it did not prove that the training or text of the law would have informed Sullivan of the government's novel theory that it is an ethics violation to help a political supporter get a job even where the supporter is qualified for the position. Similarly, even if there was evidence that Sullivan reviewed the ethics PowerPoint created by Maribeth Cusick, it would not have informed Sullivan of the government's strained interpretation of Section 23(b)(2) given that the examples of a violation were use of position to get favorable treatment ("don't you know who I am") and use of City resources. *See* Ex. 49.

V. **The Prosecution Failed to Prove That Sullivan Used Economic Fear to Achieve Wrongful Ends.**

Hobbs Act extortion requires proof that the defendants wrongfully used fear of economic harm to obtain property. *See* 18 U.S.C. § 1951(b)(2). The use of fear of economic harm "is not necessarily 'wrongful' for Hobbs Act purposes." *Burhoe*, 871 F.3d at 9. "In fact, just as fear of economic harm is part of many legitimate business transactions, fear of economic harm may also be a necessary consequence of many legitimate exercises of official authority." *Brissette*, 919 F.3d at 685 (citations and internal quotations omitted). "In the end, whether '[t]he use of economic fear' is 'wrongful' within the meaning of the Hobbs Act extortion provision turns, at least in part, on whether it was employed to achieve a wrongful purpose." *Id.* (internal quotations and citations omitted). *See Burhoe*, 871 F.3d at 9 ("The use of economic fear is rendered wrongful under the Hobbs Act, however, when employed to achieve a wrongful purpose.").

The First Circuit has held that economic fear was employed to achieve a wrongful purpose when it was used to "obtain money or property to which [the defendant] has no claim of

right." *United States v. Didonna*, 866 F.3d 40, 47 (2017).  *See* U.S. District Court of Maine,

*Pattern Criminal Jury Instructions for the District Courts of the First Circuit*, 4.18.1951 (2019) (

("[Defendant] must know that he was not legally entitled to the property."); *United States v.*

*Emnons*, 410 U.S. 396, 399-400 (1973) ("Rather, 'wrongful' has meaning in the Act only if it

limits the statute's coverage to those instances where the obtaining of the property would itself be

'wrongful' because the alleged extortionist has no lawful claim to the property.").  The Supreme

Court has cited as examples of wrongful conduct "where union officials threatened force or

violence against an employer in order to obtain personal payoffs," and "where unions used the

proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted,

superfluous and fictitious services' of workers" as examples of wrongful conduct.  *Burhoe*, 871

F.3d at 8, *citing Emnons*, 410 U.S. at 400.  *See Brissette*, 919 F.3d at 682 ("[I]nsofar

as <u>Burhoe</u> addressed the distinction between the exaction of wages for fictitious and for real

work, it did so only in connection with deciding whether the defendants' alleged conduct was

'wrongful' within the meaning of the Hobbs Act extortion provision.").

   A.   *The Government Failed to Prove That IATSE Local 11 Members Had No Pre-existing Claim of Right to the Wages and Benefits That They Received in Return for Their Work.*

The government did not introduce evidence at trial that would prove that the workers

from IATSE Local 11 who received wages and benefits from Crash Line received them without

a claim of right.  Specifically, the government did not elicit evidence that the individuals

received wages and benefits in return for no-show or fictitious jobs.  To the contrary, Mike Snow

testified that the stagehands from IATSE Local 11 did indeed work and perform the jobs that

they were hired to do.  Where a worker has provided actual services to an employer, he is

entitled to be compensated by the payment of wages and benefits. In such a situation, the

employer "has paid for the services he bargained for, and the workers receive the wages to which

they are entitled in compensation for their services." *Enmons,* 410 U.S. at 400. Because the workers from IATSE Local 11 had a right to be compensated by Crash Line for the services that they provided, Sullivan did not seek wrongful ends.

> B. *The Government Failed to Prove That Sullivan Knew That IATSE Local 11 Members Did Not Have a Claim of Right to the Wages and Benefits They Received in Return For Their Work.*

"In cases involving extortion based on wrongful use of economic fear, the intent component of the wrongfulness element requires the government to establish that the defendant knew that he had no legitimate claim of right to the property in question." *United States v. Sturm*, 801 F.2d 769, 777 (1st Cir. 1989).  As a third party received the property at issue in this case, the government must prove that the defendant knew that the third party did not have a claim of right to the property. Again, the government has not elicited any evidence to prove that Sullivan knew that the stagehands hired through IATSE Local 11 had no claim of right to wages and benefits that they received in return for actual work.

## VI. The Prosecution Failed to Prove That Sullivan Participated in a Conspiracy to Commit Extortion Encompassed Within the Hobbs Act.

To prove Hobbs Act conspiracy, the government must prove that "(1) two or more persons agreed to commit extortion encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." *United States v. Diaz*, 248 F.3d 1065 (11th Cir. 2001).  *See United States v. Morales-Machuca*, 546 F.3d 13, 20 (1st Cir. 2008)("A Hobbs Act conspiracy requires the government to prove an intent to agree and an intent to commit the substantive offense.").  "Mere presence at the scene of a crime is insufficient to prove membership in a conspiracy*." United States v. Ocampo*, 964 F.2d 80, 82 (1st Cir. 1992). In addition, "the fact that a defendant knew what was going on is, on its own, not enough to establish intent to conspire." *United States v. Morillo*, 158

F.3d 18, 23 (1st Cir. 1998)(internal quotation and citation omitted).  Although a conspiratorial agreement is not required to be express, its existence must be "plausibly inferred from the defendants' words and actions."  *United States v. Boylan*, 898 F.2d 230, 241 (1st Cir. 1990).

Sullivan notes at the outset that he could not agree to commit extortion encompassed within the Hobbs Act because the charged conduct, even if proven, is not a crime under the Hobbs Act.  Specifically, the "conspiratorial goal" of getting real jobs for union members is not criminal under the Hobbs Act and therefore cannot be the basis for a criminal conspiracy. Regardless, the government cannot meet its burden of proving that Sullivan intended to help accomplish the goal of any criminal conspiracy.

The government's only evidence that Sullivan participated in a conspiracy to commit extortion was that (1) Sullivan attended the meeting on September 2, 2014; (2) Sullivan had a number of phone calls with Brissette on September 2, the substance of which is unknown; and (3) Sullivan received a draft contract from IATSE Local 11 International Vice President Colleen Glynn in August. Such evidence proved only Sullivan's mere presence at the September 2 meeting, which is insufficient to prove participation or intent to help the criminal goal succeed. The government presented no evidence that Sullivan was informed about any communications that Brissette or anyone else from "City Hall" had with Crash Line prior to the September 2, 2014, meeting.  Instead, the testimony at trial was that Chief of Policy Joyce Linehan asked Sullivan to find out how much hiring IATSE Local 11 would cost Crash Line; that Sullivan followed up on that request and asked Colleen Glynn from IATSE Local 11 to get him its best deal; and that Glynn subsequently sent Sullivan a draft contract with relaxed terms. Accordingly, Sullivan's receipt of the draft contract cannot prove that he participated in any criminal conspiracy.  Furthermore, the government failed to elicit evidence about "words or

25

actions" by Sullivan from which a conspiratorial agreement with Brissette could be plausibly

inferred.  *See Boylan*, 898 F. 2d at 241.

**CONCLUSION**

Based on the foregoing, the Court should enter a judgment of acquittal for Sullivan on

Counts One and Two of the Third Superseding Indictment.

Respectfully submitted,

TIMOTHY SULLIVAN,
By his attorneys,

*/s/ Thomas R. Kiley*
*/s/ William J. Cintolo*
*/s/ Meredith G. Fierro*

_____

Thomas R. Kiley (BBO # 271460)
William J. Cintolo (BBO # 084120)
Meredith G. Fierro (BBO # 696295)
COSGROVE EISENBERG & KILEY, P.C.
One International Place, Suite 1820
Boston, MA 02110
617-439-7775
tkiley@ceklaw.net
wcintolo@ceklaw.net
mfierro@ceklaw.net

Dated: August 3, 2019