UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | ) Case No. 16-cr-10137-LTS |
|  | ) |
| KENNETH BRISSETTE and | ) |
| TIMOTHY SULLIVAN | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANT SULLIVAN'S MOTION FOR A NEW TRIAL

Defendant Sullivan submits the following memorandum of law in support of his motion for a new trial pursuant to Fed. R. Crim. P. 33(a) on Count One of the Third Superseding Indictment. The memorandum incorporates by reference arguments made by his co-defendant in his Rule 33 motion that are not specific to Brissette.

## ARGUMENT

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). "Motions for a new trial are directed to the broad discretion of the trial judge, who may weigh the evidence and evaluate the credibility of witnesses in considering such a motion." *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979). The Court's "power to order a new trial is greater than its power to grant a motion for an acquittal." *United States v. Ruiz*, F.3d 1492, 1501 (1st Cir. 1997).

The court may grant a new trial under to Rule 33 where it finds that errors occurred during the trial, "and it is reasonably possible that such errors…substantially influenced the jury's decision." *United States v. Crim*, 561 F.Supp. 2d 530, 533 (E.D. Pa 2008). The remedy of a new trial is sparingly used, but apt in this case, where failure to acquit under Rule 29 would

1

amount to a miscarriage of justice, and the evidence preponderates heavily against the conspiracy verdict. *See United States v. Merlino*, 592 F. 2d 22 (1st Cir. 2010). A new trial is in the interest of justice because the government presented evidence relating to Top Chef that was highly prejudicial to Sullivan, and because the government's trial presentation and closing argument constructively amended the conspiracy charge on which Sullivan was indicted, effectively presenting a color of official right case without the requisite *quid pro quo*, rather than a use of fear of economic loss case.

## I. A New Trial is Required Where the Government Presented Evidence Relating to Top Chef That Had No Relevance to Sullivan and Was Highly Prejudicial to Him.

Prior to trial, Defendant Sullivan sought severance of his trial from his co-defendant based, in part, on the government's intention to introduce evidence of Brissette's conduct in connection with the filming of the television show Top Chef. *See* Dkt # 117. Sullivan argued that "evidence about Brissette's alleged prior acts have no bearing on whether Sullivan committed the crimes charged involving Crash Line Productions." The government opposed Sullivan's motion, arguing that the Top Chef evidence "explains why Brissette and Sullivan (both members of the charged conspiracy) chose their words carefully when dealing with Crash Line, i.e., because at least one member of the conspiracy knew that it was wrongful to withhold city permits in order to induce an employer to hire union labor. " Dkt #140 at 11.

In its order denying Sullivan's motion for severance, the Court stated that "To the extent Sullivan believes the Top Chef evidence has 'zero relevance to him,' Doc. No 118 at 9, that he and Brissette 'have markedly different degrees of culpability,' *id.* at 11, and that 'there could be a substantial amount of evidence against Brissette that has nothing to do with Sullivan,' *id.* at 12, the Court cannot grant the uncommon remedy of severing co-conspirators for separate trials

based on such characterizations, as they are not supported by the current record." Dkt #192 at 12. "The government may—and indeed, has stated it intends to—offer evidence from which the jurors could infer that Sullivan was at least aware of the Top Chef events (and, thus, that evidence of those events bears on his knowledge and intent during the interactions giving rise to the charges in this case)." *Id.*

Predictably, the first three witnesses at trial were called to testify about Brissette's conduct related to the filming of Top Chef and never even mentioned Sullivan's name. Thus, the government introduced "a substantial amount of evidence against Brissette that has nothing to do with Sullivan." *See* Dkt #192 at 12. Moreover, the government introduced no evidence from which the jury could infer that Sullivan was aware of the Brissette's conduct related to Top Chef. For example, Derek Cunningham testified about a conversation he had with Brissette about Top Chef's permits potentially being cancelled and that Brissette told him not to shoot the show until he spoke to Bravo. (3 Tr. 32:17-33:15.) There was no testimony that Sullivan had any idea that conversation ever took place. As there was no evidence that Sullivan knew about Brissette's conduct related to the filming of Top Chef, it could not be used to prove that he knowingly and willfully used Crash Line's fear of economic harm to induce it to part with its property.

In arguing that severance was required to remedy the potential prejudice of a joint trial in which the Top Chef evidence was introduced, Sullivan posed the following hypothetical:

> [I]magine that the jurors hear testimony suggesting that Brissette conducted a meeting with Top Chef producers, during which he threatened to pull their permits unless they agreed to hire union workers, and that they also hear testimony that Brissette did the same thing to the company shooting the Top Chef promotions. In this hypothetical the government then presents evidence that Brissette and Sullivan requested a meeting with the principals of Crash Line Productions, at which they spoke of

3

>potential picketing that could be avoided by hiring union labor.   If jurors believe the testimony that Brissette illegally threatened to withhold permits from Top Chef, they might improperly infer that <u>both</u> Brissette and Sullivan intended to communicate a threat to Crash Line Productions, even though Sullivan is not alleged to have had any involvement with Top Chef.

*See* Dkt # 117.  The hypothetical posed by Sullivan is exactly how the government tried its case against the defendants.  The government introduced prior acts of Brissette to prove that both defendants intended to exploit Crash Line's fear of economic harm in this case without presenting any evidence that could plausibly connect Brissette's acts to Sullivan or show that Sullivan was ever even made aware of Brissette's acts.  Nevertheless, because the government charged Brissette and Sullivan with conspiracy, "[i]t [wa]s difficult for [Sullivan] to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *U.S. v. Krulewitch*, 336 U.S. 440, 454 (1949)(Jackson, J., concurring)(reversing defendant's conspiracy conviction because hearsay declaration made by co-conspirator "in furtherance of an implied but uncharged conspiracy" was improperly admitted at trial).  *See King v. United States*, 355 F.2d 700, 703-704 (1st Cir. 1996)("Because of the natural tendency to infer guilt by association, a defendant may suffer by being joined with another allegedly 'bad man.'").  While it is true that the Court gave a limiting instruction on the jury's use of the Top Chef evidence, "[t]he naïve assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be an unmitigated fiction." *Krulewitch*, 336 U.S. at 723 (Jackson, J., concurring).

In this case, the effect of the limiting instruction was minimized by two factors.  First, the limiting instruction pertaining to Mr. Sullivan was substantially similar to the limiting instructions pertaining to Mr. Brissette.  Second, the jurors had before them the Third Superseding Indictment (Docket #177) .  Paragraphs 8 through 15 of that document relate to Top

Chef. Paragraph 16, immediately following the Top Chef paragraphs, contains three references to **"BRISSETTE and SULLIVAN"**, thus joining the two defendants at the hip. While there was no real evidence that Mr. Sullivan received any "warnings" similar to those received by Mr. Brissette, or that between July and September Mr. Sullivan repeated advised Crash Line that it would need to hire members of IATSE Local 11 to work at the Boston Calling music festival or that Messrs. Appel or Snow told Mr. Sullivan prior to the meeting referenced in paragraph 17 that they had a contract with a non-union company, Mr. Brissette's alleged knowledge and actions were ascribed to Mr. Sullivan,

**II.     A New Trial Should Be Granted Because the Government's Trial Presentation and Closing Argument Constructively Amended the Conspiracy Charge on Which Sullivan Was Indicted.**

Defining the conspiracy charged in the instant case has been problematic. It has required four (4) presentations to the Grand Jury, several Motions to Dismiss, a dismissal of the charges by this Court, an appeal to the First Circuit Court of Appeals, and reversal of this Court Order of Dismissal.

As originally drafted, the conspiracy count appeared to charge a criminal agreement between Kenneth Brissette and unnamed others to force Crash Line's owners (collectively the Partners) to hire unwanted and unnecessary union labor. Sullivan was added as a defendant in a Superseding Indictment. The charging theory was fleshed out by a Bill of Particulars, and after two more iterations of the Indictment, the overall goal of the conspiracy remained the same – to extort Crash Line into hiring union labor – but the means changed. As trial approached, the government was seeking to prove that Brissette and Sullivan exploited the Partners' fear of economic harm and preyed off that fear to extract their consent to hire and pay for some union

labor. At trial and particularly in its closing arguments, the government relied on the defendants' public positions and essentially presented a color of official right case.[1]

The government conceded that neither violence or threats of physical harm were involved, and no explicit threat was made by defendants. Instead, the consequences for refusal to hire union labor were conveyed by implication. The implied consequences of failing to hire workers through IATSE were Crash Line (1) would not receive the Entertainment License to operate the concert; (2) would have its hours within which alcohol could be served dramatically reduced, thereby significantly reducing the revenue generated; or (3) not be given fair consideration in the future for an expected RFP awarding additional dates beyond 2017 (referred to by the Partners as "an extension of their Agreement").

Unlike the conspiracy charged in the Third Superseding Indictment, an indispensable component of the conspiratorial mechanism proffered at trial was the existence of a concerted effort by individuals, other than the defendants, performing wrongful acts outside the scope of the conspiracy charged. As presented, the criminality of Brissette and Sullivan involved using the Police Commissioner William Evans and the Director of Consumer Affairs and Licensing Patricia Malone to impose unwarranted and contrived restrictions as obstacles to obstruct and slow down the issuance of the Entertainment License. The plan was to "ramp-up" Appel's and Snow's anxiety and fear of economic harm so Brissette and Sullivan could falsely create the threat of a union protest by IATSE as a device to pounce on Crash Line's principals and demand that union labor be employed.

The government's theory appears to be that the merging of all the potentially show closing events three days before the festival was to open would act as a powerful lever, wrongfully used, to obtain Crash Line's consent to hire and pay for union labor from IATSE.

---

[1] Sullivan submits that even if this is not a constructive amendment it is a prejudicial variance.

The prosecution's multi-faceted theory would have required all the participants to know, understand and willfully agree to the conspiratorial goal and share the specific intent to perform the wrongful acts to achieve the goal.  This theory was never provided or articulated before trial began. Such a theory would have implicated those involved in the charged conspiracy.  But, after being ordered by the Magistrate Judge to provide the names of all unindicted coconspirators, the government initially answered there were none and a subsequent discovery letter identified but one person.  At trial, the government broadly referred to the conspiratorial antagonists as "City Hall" or an unidentified "they", thus expanding it well beyond the conspiracy charged in the Indictment as clarified by the particulars and discovery letters.  By doing so, the government changed the charged conspiracy to one involving the "official right" of many unnamed, unknown public employees.

The full breadth of the government's trial presentation and prosecution theory is shown through a side-bar conference concerning the testimony of the person identified as an unindicted co-conspirator.  Seeking to introduce statements that person purportedly made to Mayor Walsh about a meeting that occurred in August 2014, the government argued that the conspiracy started at that meeting – either August 19th or 20th.  This Court, responding to this argument, reminded the prosecutors:

> THE COURT: [Appel] said he was asked to hire 30 people and he said no thanks, I already have my people. That's my memory of what he said about the August meeting and you told me the August meeting was innocuous. At a sealed hearing. Yes, you said it was innocuous. And you said the real issue happened in September 2nd."

TT, Day 8, p. 23.

Moving on, this Court indicated there was not enough independent evidence to meet the preponderance standard to find the witness to be a coconspirator and refused to admit the proffered statements under §801(d)(2)(E). See TT, Day 8, pp. 7-27. The Court reasoned that it did not understand how the curfew and alcohol issues "establishes by preponderance of the evidence that [the witness] joined a conspiracy to threaten the permits in order to get them to hire union members at the September concert. Id., at pp. 19-20.

Typifying the prosecution theory the government presented at trial, the Court continued to express the tough time it had understanding how the alcohol and curfew matters related to the conspiracy charged. The Prosecutor interrupted and stated:

> MS. KAPLAN: Well, much of it is about the union, and the IATSE issue, and the union labor. The issue with respect to BPD and the alcohol and the beer gardens and the curfew, is that -- as Brian testified, if they had to do beer gardens at the last minute, if they had to change the curfew at the last minute, they would go bankrupt. And that's part of the whole issue that Brian –
>
> THE COURT: Is your theory that the defendants got the police to say no beer gardens?

TT, Day 8, p. 12.

The Prosecutor responded:

> MS. KAPLAN: I don't think we have evidence of that, but *they* were certainly trying to -- *they* were all engaged in trying to make sure that Crash Line hired union labor and if that --

When the Court pointedly asked:

> THE COURT: Which *they*? Including the police?

TT, Day 8, pp. 12-13.

8

The Prosecutor answered negatively and explained "but they were certainly trying to" and "they were all engaged in trying to make sure that Crash Line hired union labor …" did not pertain to Evans, Malone or Mayor Walsh. In context, *they* had to be a reference to Commissioner Evans, Captain Fong and Patricia Malone and possibly Mayor Walsh. A denial of such an implication was, at best, disingenuous.

The Prosecutor continued and uttered a quintessential *Freudian Slip*:

> MS. KAPLAN: So the police are charged as an unindicted co-conspirator, but no [the witness]. And that *they* waited until just three days before, knowing that *they* could change their permits again, that *they* could go back to beer gardens again. In fact, they had gone back to beer gardens again. So it's just to show that [the witness] has knowledge of and –

TT, Day 8, p. 13.

Announcing that he was persuaded that [the witness] was involved in discussions about whether Crash Line should hire IATSE, the Court pondered "but from what I've seen so far, it seems to me that she was at the meeting, from the e-mails that you showed me, but presence isn't like joining a conspiracy. And there has to be something that shows that -- I mean, she's talking to them, but there's nothing illegal about talking to them about these issues." Id.

Refusing to let go, and finally linking [the witness's] alleged illegal actions to Mayor Walsh, the Prosecutor said:

> MS. KAPLAN: Well, she's -- well, what's illegal is what she's telling him [Mayor Walsh] in his -- in this memo, that, "while they're not adverse to hiring some guys, they do know that they'll eventually be expected to hire 100 percent union," she's telling that to Marty Walsh, which will increase their production costs.

Id., at pp 13-14.

This argument, made by the Prosecutor, clearly evinces the government's belief, and covert prosecution theory, that any request by a public official to hire union labor is *ipso facto*

9

illegal. Trying to provide further support for her position, and employing the logical fallacy *post hoc ergo propter hoc*, the Prosecutor argued:

> MS. KAPLAN: Right, but in September, they take nine, and then they eventually have to go to 100 percent union, so she's ***in it***. Obviously, we didn't charge her, because the evidence wasn't as strong as it was with respect to Brissette and Sullivan. …

Id., at p. 14.

The import of the government's position in the argument at side-bar, if followed to its logical conclusion, leads to the inference that any employee who was involved in the permitting process for the Boston Calling 2014 concert on Boston City Hall Plaza – all of whom in one way or another delayed the issuance of the Entertainment License – each had the same goal and intent to jointly use their respective positions to provide Brissette and Sullivan an opportune time to extort Crash Line to hire nine stagehands for three days.  Thus, under the theory the government advanced at trial, the Police Commissioner, the Chief of the Fire Department, the Building Department, the electrical inspectors, the health inspectors, the maintenance and janitorial staff at City Hall, and others involved in the process would have to have had the same focus and the same intent – getting work for nine (9) stagehands.   Each risking, if the plan failed and Crash Line refused to hire the IATSE workers, the loss of the detail money that those same police, firemen, inspectors, city hall employees and administrative staff would have earned to work at the concert – according to Appel, hundreds of thousands of dollars.  The trial evidence is thus materially different from the crime charged in the indictment.

As with the first argument presented in the memorandum, the effect of the constructive amendment asserted here was compounded for the jury.  In this instance, it was by the government's closing arguments.  Those arguments pointedly put City Hall and all who work there front and center, most pointedly Mayor Walsh.  Mr. Sullivan will not belabor the point

10

here, knowing that Mr. Brissette's memorandum in support of his Motion for New Trial deals with that closing at some depth. Instead, Mr. Sullivan adopts the arguments advanced by Mr. Brissette as if fully set forth herein while focusing on one particular aspect of the closing. The prosecutor capped her political polemic by telling the jury "If you feel this is just politics as usual, then [we] have failed to find an impartial jury." Tr. 12, p. 98. That statement was not only improper, but at constructive amendment with the real evidence of politics presented at trial.

That evidence was that the first City Hall employee to whom Crash Line turned to seek the use of City Hall Plaza was the then mayor's daughter-in-law, with whom he met in April 2012. Tr. 6, p. 53. Following up on her advice, Brian Appel wrote a letter to the former mayor pitching the festivals and promising to make sizable donations from each festival to charities of the former mayor's choosing. (Exhibit 203). To move the project forward, Crash Line engaged a lobbyist who had served as the former mayor's press secretary. Mr. Appel and that lobbyist continued to communicate with respect to donations to entities favored by the mayor. (Exhibit 104). Within four hours of Mayor Walsh's November 2013 election, Brian Appel contacted Joyce Linehan, (Tr. 8, p. 123) co-chair of the Walsh Transition Team, and offered assistance for inaugural events. In 2014, Mr. Appel dispatched his lobbyist "to go to work on the 5th floor", (Exhibit 127) where the mayor's office is located, and shortly thereafter replaced her with a lobbyist with ties to Mayor Walsh rather than his predecessor. "Politics as usual" was Brian Appel's game. Making sure the public safety was served was the business of the Boston Police Department and the permitting agencies within City Hall. Nobody in City Hall received anything of value from Crash Line, and receipt of such an item of value is the *sine qua non* for the color of right case the government actually presented.

## CONCLUSION

For all the reasons set forth herein, those articulated in support of Kenneth Brissette's Motion for New Trial that are incorporated by reference, and those advanced by either Timothy Sullivan or Kenneth Brissette in their respective memoranda supporting their Rule 29 motions for acquittal, Timothy Sullivan should be granted a new trial if his Rule 29 motion for acquittal is either not granted or granted but reversed on appeal.

                                              Respectfully submitted,
                                              TIMOTHY SULLIVAN
                                              By his attorneys,

                                              /s/ *Thomas R. Kiley*
                                              Thomas R. Kiley (BBO # 271460)
                                              William J. Cintolo (BBO # 084120)
                                              Meredith G. Fierro (BBO #696295)
                                              COSGROVE, EISENBERG & KILEY
                                              One International Place, Suite 1820
                                              Boston, MA 02110
                                              617.439.7775 (tel)
                                              617.330.8774 (fax)
                                                       tkiley@ceklaw.net
                                                   wcintolo@ceklaw.net
                                                     mfierro@ceklaw.net

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, August 21, 2109, a copy of the foregoing document has been served via electronic filing upon all registered parties.

                                              /s/ Thomas R. Kiley
                                              Thomas R. Kiley