## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
**UNITED STATES OF AMERICA**              )
                                                    )
       **v.**                                    )  **Case No. 16-cr-10137-LTS**
                                                    )
**TIMOTHY SULLIVAN**                       )
_____ )

### TIMOTHY SULLIVAN'S REPLY TO THE GOVERNMENT'S
### COMBINED RESPONSE TO DEFENDANTS' MOTIONS FOR A NEW TRIAL

The conspiracy charged here has been aptly described as "novel" and a potentially problematic expansion of the Hobbs Act.  This prosecution of two public employees teeters on the edge of criminalizing acts routinely performed by public officials and outlawing advocacy for constituent groups.  The jury verdict, which was returned after the Government's argument that was laced with references to "City Hall" and referred to city officials largely by the indefinite pronoun "they", pushes the case over the edge and has a serious effect on the public reputation of the judicial proceedings.  This reply memorandum replies *seriatim* to particular arguments advanced in the Government's Combined Response.

### THE GOVERNMENT'S STANDRD OF REVIEW ARGUMENT

In articulating the legal standard which is to be applied to motions for a new trial, the Government overstates the import of both case law and the Rules of Criminal Procedure pertaining to plain error.  Doc. 399, p. 2-3.  The argument section is written as if the issues raised by defendants' motions are being advanced for the first time in an appellate court, as was the situation in *United States v. Flete-Garcia*, 925 F. 3d 17, 36 (1st Cir. 2019).  Doc. 399, p. 2.  The

1

Government begins its "proper preservation" argument with citation to *United States v. Carpenter*, 736 F. 3d 619 (1st Cir. 2013) (*Carpenter II*), but that case followed Carpenter's second trial.  More relevant to the instant case is the appeal that followed Carpenter's first trial, as it dealt with the Government's use of metaphors (like "City Hall") in its closing arguments as to which there was no contemporaneous objection.  *United States v. Carpenter,* 494 F. 3d 13, 18 (1st Cir. 2007) (*Carpenter 1).*  There, as here, the defendants filed motions in limine and made several trial objections to the introduction of evidence.  *Id.*  In light of those motions and objections, the First Circuit rejected the Government's argument that a specific objection to the Government's closing was required before jury deliberations and deferred to the District Court's decision that the issues were preserved and did not require plain error analysis.  *Id.* at 20-21.

*Carpenter I* remains good law.  It was cited with approval most recently in *United States v. Gorski,* 880 F. 3d 27 (1st Cir.2018) which dealt with a motion for a new trial based on statements made by the prosecutor during closing to the effect that the defendant could not "face the music" and "stand in front of you."  There was an objection and a curative instruction in that case.  *Id.* at 37.  In *Gorski,* the First Circuit articulated the standards it would apply as follows:

> We review the District Court's denial of a motion for a new trial for abuse of discretion. United States v. Rodriguez, 675 F.3d 48, 58 (1st Cir. 2012) (citing United States v. Boylan, 898 F.2d 230, 262 (1st Cir. 1990)). A defendant is not entitled to a new trial on the basis of a prosecutor's improper statements to the jury unless they resulted in prejudice to the defendant. Id. at 62 (citing United States v. Giorgi, 840 F.2d 1022, 1037 (1st Cir. 1988)). With respect to whether a prosecutor's improper statements during closing arguments resulted in such prejudice, "[w]e afford the district court substantial deference ..., reflecting the trial judge's familiarity with the case." United States v. Carpenter, 494 F.3d 13, 24 (1st Cir. 2007).

880 F.3d  at 38.

Respectfully, this case is one, like *Carpenter I,* where the issues raised concerning the Government's closing were more than adequately preserved.  Even if they were not, however, Rule 52(b) F.R.Crim.P. would be applicable.  It provides that a plain error affecting substantial rights may be considered <u>even if it was not brought to the Court's attention.</u>  That rule, as the Advisory Committee notes, has been amended to reflect the Supreme Court's views expressed in *United States v. Olano*, 507 U.S. 725 (1933).  There the Court opined that Rule 52(b) was permissive, not mandatory and rejected the notion that it was only warranted in cases of actual innocence.  *Id.* at 735, 736.  "Rather, the standard that should guide the exercise of remedial discretion under Rule 52(b) is whether the error "seriously affects the fairness, integrity or public reputation of judicial proceedings."  *Id.*  at 735.  When is the last time both of Boston's major newspapers ran first full page and then multi-page advertisements from scores of advocacy groups concerning a jury verdict?

In this case, the issues raised by the defendants' new trial motions were brought to the Court's attention during trial and at the bench both before and after the improper closing.  With respect to the jury instructions, Sullivan provided a redline for use at the charging conference in which he unsuccessfully sought:

- An instruction that the inferences to be drawn by jurors were "not to be based on other inferences." p.5;

- Instructions that it would be improper for jurors to be influenced by any negative views of government they might have and to the effect that "City Hall" was not a defendant and that "City Hall" is not a person and cannot be a conspirator, pp. 9 and 27;

- An instruction emphasizing the requirement that when the property obtained goes to a third party, that party has to be <u>identified</u> by a defendant, p 15;

- Instructions that in order to use fear, one must know that it exists, p. 18;

- An Instruction that the mere facts that the defendants were at a meeting together and were both working on a particular problem did not make them conspirators, p. 26.

## THE GOVERNMENT'S ARGUMENT IIA

The Government also submitted a written response to the draft instructions, including requests that bear on the motions for new trial.  The Government asked the Court to add a clause at the end of the first full paragraph on page 14 of the draft dealing with its introduction of M.G.L. c. 268A.  The parties argued the point at the charging conference.  In a written order issued later that day, this Court rejected the Government request that it could rely on that law to prove wrongfulness.  Doc. 349. Nevertheless, the Government argued that very point to the jury, twice displaying slides from a PowerPoint presentation by Maribeth Cusick of the City's Law Department.

The Government devotes three pages to its contention that notwithstanding the Court's order, it was proper for it to bring G.L. c. 268A, §23 to the jury's attention in assessing "wrongfulness."  Doc. 399, pp. 8-10.  Pointedly the Government states that the defendants did not object to the introduction of the text of G.L. c. 268A itself, distinguishing it from the PowerPoint presentation prepared by Maribeth Cusick.  Doc. 399, p. 9.  Thus, the Government asserts the issue is one calling for plain error review.

The Government's argument is specious.   As a matter of fact, the Government never sought to introduce the text of G.L. c. 268A.  It sought instead to introduce a PowerPoint slide show prepared by Maribeth Cusick which was repeatedly the subject of objections.  Tr. 9, pp. 63, 65 and 68.  The testimony on page 69 to which the Government points does not reflect the text of the statute.  It reflects instead what appears on a particular slide prepared by Ms. Cusick.  The

objections with respect to the slides were made at least four times.  Thus *Carpenter I*, not

*Carpenter II,* provides the appropriate touchstone for this Court's analysis.

## THE GOVERNMENT'S ARGUMENT IIB

The Court's Order precluding use of G.L. c. 268A to prove wrongfulness reflects the

Government's request that all references to the NLRA be deleted from the jury instructions and

its concession that it could not establish the theory of wrongfulness it had advanced based on it.

Doc. 349.   Yet the next three pages of the Government's Response, supposedly "based on the

evidence", are based in part on the NLRA and case law interpreting it.  Doc. 399, pp. 11-13.  Its

Argument IIB deals with Brissette's argument that the Government impermissibly argued that

the City could not require Crash Line to use union labor.  The Government concedes that in

acting as a proprietor, the City could theoretically have required certain labor requirements, *id*. at

12, but then asserts that instead of doing so, the City it specifically gave Crash Line the

responsibility and right to hire its own labor in the Irrevocable License Agreement ("ILA")

Exhibit 7, specifically pointing to p. 3, (¶4(i)).

There is a difference between requiring and asking.  Crash Line asked for a provision in

the ILA that would have precluded the City from imposing or encouraging the imposition of any

requirement Crash Line or its affiliates use unionized workers, but the aforesaid ask was rejected

by Ms. Cusick.  The rejected language is at the very end of paragraph 3 of the draft ILA

introduced as Exhibit 251.  The very next sentence is the one that the Government states, with

emphasis on the words, gives Crash Line "**the right** to be free from the demands that they use

Local 11 for the September 2014 festival".  To be clear, there is no evidence that Mr. Sullivan

made such a demand or agreed to such a demand being made.  Nevertheless, the concession that

the City could theoretically impose labor conditions severely undercuts the Government's

reliance on *United States v. Vigil*, 523 F.3d 1258, 1265 (10th Cir. 2008) (Hobbs Act does not preclude government contracting official from "insisting on certain capabilities"). As discussed in the defendants' Rule 29 memoranda, paragraph 8 <u>NonDisturbance</u> of the ILA can be read as insistence that Crash Line have the capability of minimizing disruptions to the environment around City Hall Plaza. As with its Argument IIA, the government's argument IIB is not to be analyzed as if the relevant issues were not timely brought to this Court's attention so they could be addressed. On the contrary, they were addressed in the Court's order following the charging conference.

## THE GOVERNMENT'S ARGUMENT III

The government claims that there was sufficient evidence to find that Sullivan was aware of Brissette's conduct related to Top Chef, but cites only two pieces of evidence that have little, if any, probative value. First, the government claims that the fact that Brissette sent Sullivan an email with a link to an article about Top Chef proves that Sullivan had knowledge of Brissette's actions. But no evidence was offered showing that Sullivan ever read Brissette's email or the article. In fact, the article does not even mention Brissette and says only that Top Chef's permits were delayed for a couple of days. *See* Ex. 54.2. It would be pure conjecture to find that Sullivan read the email, clicked on the link, and read the article. Even if all of these events occurred, Sullivan would not have knowledge of the events in question, as the story would not inform him that Brissette mentioned the possibility of pulling the permits or footage and/or that Rull had told Brissette that it was not legal to do so.

Second, the government cites phone contact between Brissette and Sullivan in late August without any evidence that Brissette and Sullivan ever actually spoke to one another or what was said by either of them. Thus, it is clear that neither the email nor the phone records

prove anything about Sullivan's knowledge.  The initial indictment, which referenced Crash

Line's desire for permits but not an extension of its licensing agreement, opened with the Top

Chef evidence in a deliberate effort to suggest to the jury that the defendants had a propensity for

threatening permits because it had no other evidence that the defendants threatened Crash Line's

permits.  That same deliberate effort was reflected in three superseding indictments and then the

Government's direct case.  Although the Court gave a limiting instruction on the jury's use of the

Top Chef evidence, it could not ameliorate the prejudice to Sullivan from its admission.  *See*

*United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994)( "The presumption that a jury will adhere

to a limiting instruction evaporates where there is an overwhelming probability that the jury will

be unable to follow the court's instructions and the evidence is devastating to the defense.").  A

new trial should result.

## THE GOVERNMENT'S ARGUMENT IV

There was a constructive amendment in this case.  Crash Line's fear of economic harm

was stoked through the acts and conduct of persons other than the defendants who were neither

indicted in this case nor named as co-conspirators.  To show the existence of Appel's  and

Snow's fear and wrongful exploitation of it, the government initially charged that Brissette

committed acts in unrelated conspiracies (Top Chef and Bark Bark) that were insufficiently

similar and different in kind and unconnected to the allegations involving Crash Line.  At trial,

the government relied on evidence about permit problems caused by BPD and Patricia Malone,

seeking to inferentially link the permitting problems to the defendants.  This constitutes the

constructive amendment.

The government makes a threadbare argument that it "never took the position that Evans

and Malone were involved in the conspiracy charged in the indictment."  Sullivan submits that

irrespective of the name used to describe the relationship and circumstances surrounding the "demand" to hire union labor, the evidence in this case needed to show a concerted effort between the defendants and the Boston Police Department, Patricia Malone and "City Hall" to get Crash Line to hire union workers. Otherwise, there could not be (and was not) any evidence that Crash Line feared not getting its permits.

The government clearly had a problem with the Court limiting the proof of Crash Line's fear to not getting permits and licenses since, on several occasions, the prosecutors conceded that there was no evidence that the defendants ever directly said to Crash Line, "if you don't hire IATSE for the September festival, we won't give you your permits or your entertainment license." *See* 12 Tr. 18. Also problematic was the evidence from Appel and Snow that permits and licenses were never mentioned nor discussed with Sullivan.

Appel believed the Boston Police Department and Patricia Malone were responsible for these problems. *See* 5 Tr. 135. When Appel was asked his reasons for concern about permits and who the culprits might be, he answered that he knew that neither Sullivan nor Brissette "could influence [the] permits or entertainment license" and they did not have direct oversight of [Crash Line's licenses or permits. But he was still concerned because "City Hall" could withhold the permits and Brissette worked in City Hall. *See* 4 Tr. 144.

Introducing the evidence of the curfew and alcohol issues and the evidence of permitting problems – and Appel's dissatisfaction with the modifications made by BPD – in conjunction with Appeal's belief that BPD was behind these problems was, according to the government, the foundation for the defendants' acts of exploitation. This supposed relationship of the disparate events established a causal connection between events that was not alleged in the Indictment.

The full scope of the effort to get Crash Line to hire union labor was thus expanded well beyond the conspiracy charged in the Indictment and thus a constructive amendment occurred.

Rebutting the defendants' claim the Indictment was constructively amended, the government said it had "argued to the jury that Brissette and Sullivan timed their meeting with Appel and Snow for the week of the show in part because **they knew** Crash Line was waiting for its permits." There was no witness testimony, no email, and/or no text message that indicates either Brissette or Sullivan knew that the permits and licenses had not been issued when the September 2nd meeting occurred. Shifting the nature and source of the fear alleged in the *Indictment* from the defendants to whatever other allegedly non-complicit individuals might be encompassed by the indefinite pronoun "they" or the metaphor "City Hall" vitiated the need to show that the defendants' acts were themselves wrongful. This previously unarticulated theory of prosecution improperly expanded the scope of the conspiracy and, either by itself, or when viewed in conjunction with the introduction of the Top Chef evidence, amounted to a constructive amendment of the *Indictment*.

## **CONCLUSION**

For all the reasons cited in this reply and in Sullivan's prior memoranda as well as those filed by Mr. Brissette, acquittal is the proper remedy but, at the very least, a new trial is required to remedy the manifest injustice of this case.

Respectfully submitted,

TIMOTHY SULLIVAN,
By his attorneys,

*/s/ Thomas R. Kiley*
*/s/ William J. Cintolo*
*/s/ Meredith G. Fierro*
_____

Thomas R. Kiley (BBO # 271460)

William J. Cintolo (BBO # 084120)
Meredith G. Fierro (BBO # 696295)
COSGROVE EISENBERG & KILEY, P.C.
One International Place, Suite 1820
Boston, MA 02110
617-439-7775
tkiley@ceklaw.net
wcintolo@ceklaw.net
mfierro@ceklaw.net

Dated: September 25, 2019

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, September 25, 2019, a copy of the foregoing document

has been served via electronic filing upon all registered parties.

           */s/ Thomas R. Kiley*
           Thomas R. Kiley