UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 16-cr-10137-LTS |
| | ) |
| KENNETH BRISSETTE and TIMOTHY SULLIVAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM & ORDER ON POST-TRIAL MOTIONS

February 12, 2020

SOROKIN, J.

On August 7, 2019, a jury convicted Kenneth Brissette and Timothy Sullivan of Hobbs

Act conspiracy, and also convicted Brissette of Hobbs Act extortion, arising from the

defendants' interactions with Crash Line Productions, the company that produces Boston Calling

music festivals.  Presently before the Court are both defendants' original and renewed Motions

for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29, and both

defendants' Motions for a New Trial pursuant to Federal Rule of Criminal Procedure 33.

After a careful review of the entire record in this case, including the parties' substantial

post-trial briefs, the Court takes the unusual step of setting aside the jury's guilty verdicts and

directing the entry of verdicts of NOT GUILTY as to both Brissette and Sullivan on all charges.

This action is required based on the government's failure to prove that either man committed the

charged offenses.  The Court reaches this conclusion for three separate and independent reasons.

First, because this case hinged solely on the defendants' status as public officials and

arose exclusively from actions they undertook in that capacity, the decisions of the Supreme

Court required the government to allege and prove the existence of a quid pro quo. This the government did not do. Neither Brissette nor Sullivan received a personal payoff or any other cognizable benefit in connection with the charged conduct.

Second, even under the government's narrower view of its burden of proof, it failed to establish that either defendant acted wrongfully, as is required to sustain an extortion conviction. In the waning moments of a ten-day trial and after years of litigation, the government gave up the central pillar of its case: that federal labor law prevented the defendants from demanding that Crash Line hire union labor, and that the defendants knew it. And, contrary to the government's argument, the law does not recognize its alternative theories for establishing that the defendants acted wrongfully. The Hobbs Act does not empower federal prosecutors to use the criminal law to enforce a contract, a state code of conduct that itself has no criminal or even civil penalties, or a local government policy.

Even if the Hobbs Act authorized its alternatives, the government failed to prove them. The plain language of Crash Line's contract gave it no protection from the demands allegedly made by the defendants. Crash Line proposed such protection during contract negotiations, but lawyers for the City of Boston rejected that request in 2012. Instead, the contract required Crash Line to attempt to remedy "disturbances," such as, for example, a threatened protest of its festival by angry union members, and to coordinate with "local stakeholders" like the City of Boston to do so. Similarly, the government failed to prove that either defendant, in fact, knowingly violated either state ethics law or local policy.

The government also argued that the defendants lied to Crash Line about the threat of a union protest. The government, of course, bore the burden to prove that assertion. The United States Constitution mandates that it is never a defendant's obligation to prove his innocence.

Here, the government failed to prove that the defendants lied. In fact, the evidence at trial was one-sided as to this. The union wanted jobs at Crash Line's festivals. It repeatedly said so. It threatened to protest at the festival starting in May, including with an inflatable rat. It said that in writing and orally, including in the weeks before the September event. The possibility of a protest was discussed at City Hall. Given the posture of the case, the Court must disregard the evidence favorable to the defendants. What remains after doing so is an absence of evidence establishing a lie. As such, the government failed to meet its burden of proof.

Third, the government failed to prove beyond a reasonable doubt that the defendants knew about and intended to exploit Crash Line's fears regarding festival permits or an extension of the agreement allowing it to hold events on City Hall Plaza. Proof that a public official meets in his government office with someone seeking a permit as the end of the permitting process approaches cannot—without more, and there was no more here—establish the requisite intent for Hobbs Act extortion.

Each one of these three failures compels the Court to acquit Brissette and Sullivan under Rule 29.

When entering judgment of acquittal after a jury verdict convicting a defendant, Rule 29 requires the Court also to consider whether a new trial is warranted. Here, the Court conditionally finds that a new trial is necessary. The government's abandonment of federal labor law as a foundation for its prosecution of the defendants eliminated the primary basis for the Court's admission of evidence regarding events that unfolded when a different union engaged in a violent protest directed at the reality show "Top Chef" as it filmed in and around Boston in 2014. Furthermore, the government induced the admission of such evidence through pretrial proffers it ultimately failed to fulfill, resulting in the jury hearing unfairly prejudicial and

irrelevant evidence that substantially undermined the fairness of the trial. And, in its closing argument, the government disregarded clear written rulings of the Court, misstated the law, mischaracterized the evidence, and invited jurors to convict the defendants based on theories the Court had expressly ruled out of the case. In these circumstances, the interests of justice warrant a new trial.

Accordingly, and as explained more fully below, the Court ALLOWS the defendants' motions under Rule 29 and Rule 33.

I.      BACKGROUND[1]

The charges in this case arose from actions taken by Brissette and Sullivan in the summer of 2014 in the course of performing their duties as public officials serving in the administration of Martin J. Walsh, who had recently become the Mayor of the City of Boston. Brissette was the Director of the Office of Tourism, Sports and Entertainment, and Sullivan was the Chief of Staff for Intergovernmental Relations. Brissette's duties included acting as a liaison between entities planning to stage events in Boston and the City departments whose approval was necessary in order to produce such events. Sullivan's duties included acting as a liaison between the City and other government agencies, such as the Massachusetts Attorney General's Office, and advising the administration on issues related to labor unions. Both Mayor Walsh and Sullivan had union backgrounds, and Boston-area unions had generally supported Walsh's candidacy for Mayor.

---

[1] The Court provides this recitation as background only. With respect to each of the pending motions, and each issue raised therein, the Court describes the relevant record evidence in more detail in the appropriate discussion section and considers it in light of the applicable legal standards.

The Boston Calling music festival, produced by Crash Line Productions, was held on City Hall Plaza twice yearly, in May and September, beginning in 2013.[2] Crash Line used Bill Kenney Productions ("BKP"), a non-union production company, to provide production management and labor, including stagehands, for the Boston Calling festivals. The International Alliance of Theatrical Stage Employees ("IATSE"), Local 11, is a labor union representing stagehands and technicians working in the entertainment industry in Boston. In the run-up to the first Boston Calling festival in May 2013, IATSE attempted to secure jobs at the festival for its members and others seeking work through Local 11's hiring hall. These efforts, including contacting a public official in the administration of then-Mayor Thomas Menino and reaching out to Crash Line directly, were unsuccessful. Crash Line did not hire any workers through Local 11 in 2013, though it did indicate a willingness to consider using them in the future.

In July and August of 2014, Crash Line's representatives—including chief executive officer Brian Appel and chief operating officer Michael Snow—were preparing to produce the fourth Boston Calling festival, set to occur the weekend after Labor Day. This case concerns a series of interactions among Brissette and Sullivan, representatives of IATSE, and Appel and Snow, that culminated in Crash Line hiring eight stagehands and one crew chief for the September 2014 Boston Calling festival pursuant to a contract with IATSE signed on September 3, 2014.

According to the government, Crash Line's decision to hire union stagehands was the result of extortion, and it charged Brissette with violating the Hobbs Act in a one-count

---

[2] Crash Line dropped the September show after 2015, making Boston Calling an annual May event from 2016 forward. In 2017, Crash Line relocated the festival from City Hall Plaza to Harvard University's Athletic Complex.

Indictment returned on May 17, 2016.  Doc. No. 1.[3]  About a month later, the government filed a First Superseding Indictment ("FSI") charging both Brissette and Sullivan with conspiracy and extortion in violation of the Hobbs Act.  Doc. No. 17.  The government's theory underlying the charges at that time was that Brissette and Sullivan, "act[ing] as agents for the union," Doc. No. 115 at 7, had implicitly threatened permits Crash Line needed for the September 2014 festival, and had explicitly threatened a disruptive picket of the festival, in order to compel an unwilling employer to hire union stagehands to perform actual (albeit unwanted) work, Doc. No. 83-1 at 2-3; Doc. No. 86 at 12-13.

The defendants moved to dismiss the FSI.  Doc. No. 82.  The Court denied the motion in May 2017 and set a trial date for January 2018.  Doc. No. 106; Doc. No. 110.  On September 8, 2017, the First Circuit issued its decision in United States v. Burhoe, 871 F.3d 1 (1st Cir. 2017).  The following month, the defendants renewed their motions to dismiss, arguing that the First Circuit's interpretation of the Hobbs Act in Burhoe, and the resulting reversal of extortion convictions of the members of a labor union charged as defendants in that case, exposed fatal flaws in the FSI.[4]  Doc. No. 121; Doc. No. 123.  In response, the government conceded that it believed Burhoe had "significantly changed the legal landscape of Hobbs Act extortion in the labor context," and that a new indictment was required.  Doc. No. 130 at 1.

---

[3] Citations to "Doc. No. __" reference items appearing on the Court's electronic docket; pincites are to page numbers in the headers appended by CM/ECF.

[4] In Burhoe, the First Circuit found error in jury instructions that had "impermissibly relieved the government from having to prove that the work [sought by union-member defendants] was 'fictitious,'" and erroneously "could have allowed the jury to find a violation" of the Hobbs Act "merely because the union sought to turn around nonunion jobs to maintain the prevailing wage through . . . a threatened picket" where "the employer did not want to use the union workers to perform the work."  871 F.3d at 20.  Burhoe did not address conduct outside the scope of "protected union activity," nor did it speak to whether defendants who are neither members nor agents of a union may pursue legitimate labor objectives.

The government obtained a Second Superseding Indictment ("SSI") against Brissette and Sullivan on November 29, 2017. Doc. No. 143. With the SSI, the government abandoned its view that Brissette and Sullivan had acted as agents of Local 11, changed its description of the "property" extorted, and adopted a theory that the defendants—acting solely as agents of the City—had implicitly threatened to withhold permits and directed Crash Line to pay wages and benefits to members of Local 11. Doc. No. 164 at 5-6, 12-13; Doc. No. 179 at 8, 45-47; accord Doc. No. 142 at 14; Doc. No. 190 at 5, 13. In light of these substantial revisions, the Court allowed the defendants to consider supplementing or replacing their existing motions to dismiss. Doc. No. 190 at 12.

Trial was rescheduled for March 26, 2018. Doc. No. 156. The defendants moved to dismiss the SSI, Doc. No. 159, and filed various other pretrial motions. On January 31, 2018, the government filed a Third Superseding Indictment ("TSI"), making minor changes that neither party suggested would impact any of the pending motions. Doc. No. 177. The Court denied the motion to dismiss the SSI on February 28, 2018, terminated as moot the earlier motions challenging the FSI, and provided a draft jury instruction stating the Court's view of what it meant to "obtain" property for purposes of the Hobbs Act—an issue that had received considerable attention in the course of briefing and arguing the various motions to dismiss. Doc. No. 192 at 6-8, 13. The government sought reconsideration of the draft instruction, Doc. No. 194, which the Court denied, Doc. No. 204. Thereafter, the government proffered facts it intended to prove regarding whether the defendants "obtained" the relevant property, conceding it would not be able to prove the element as the Court had defined it, Doc. No. 214, and the defendants moved to dismiss once again, Doc. No. 215. Based on these submissions, the Court dismissed the indictment on March 22, 2018. Doc. No. 220.

The government appealed.  Doc. No. 221.  The First Circuit vacated the order of dismissal on March 28, 2019, rejected the undersigned's construction of the word "obtain" in the Hobbs Act, defined that term as the government had urged, and remanded the case for trial.  United States v. Brissette, 919 F.3d 670 (1st Cir. 2019).[5]  Another raft of pretrial motions ensued, including a motion effectively renewing the defendants' previous requests for dismissal, Doc. No. 243, which the Court denied, Doc. No. 293 at 1.  A jury was empaneled on July 22, 2019.  The presentation of evidence began on July 23, 2019 and continued for a total of ten days.  On August 7, 2019, the jury convicted Brissette of both conspiracy and extortion, and convicted Sullivan of conspiracy but acquitted him of extortion.  Doc. No. 357.

Both defendants filed motions for acquittal under Rule 29 at the close of the government's evidence, then renewed the motions at the close of all evidence.  Doc. No. 334; Doc. No. 335; Doc. No. 346.  The Court reserved on each motion.  Both defendants filed supplemental post-verdict briefs supporting their Rule 29 motions, Doc. No. 388; Doc. No. 389, as well as motions for a new trial under Rule 33, Doc. No. 390; Doc. No. 392.[6]  Those motions are fully briefed and ripe for resolution.[7]  The Court addresses them in turn.

---

[5] The sole question resolved in the appeal was whether the "obtaining of property" element of extortion required the government to prove that defendants who directed the transfer of property to a third party (rather than receiving it themselves) had personally benefitted as a result of the transfer.  The First Circuit held there was no such requirement in the element at issue.  919 F.3d at 680.

[6] The Court construes the supplemental briefs as renewing the Rule 29 motions post-verdict pursuant to Rule 29(c)(1).  The Court also acknowledges that each defendant incorporates the arguments of the other into his own motion papers, and each defendant's Rule 33 motion incorporates by reference his Rule 29 papers.  Likewise, the Court considers the government's Rule 29 and Rule 33 submissions as to both motions and both defendants.

[7] The Court resolves these motions on the papers.  No party has requested a hearing.  See L.R. 7.1(d) (requiring parties "making or opposing" motions to include a request for oral argument in their pleadings).  Moreover, the issues raised have been the subject of multiple motions and extensive oral and written argument by the parties before, during, and after trial.

II.     RULE 29

A.      Relevant Background[8]

In 2012, Crash Line approached the City proposing a music festival to be held on City Hall Plaza.  Ex. 203.[9]  These discussions occurred primarily between Brian Appel and Chris Cook, then-Mayor Menino's Director of Arts, Tourism, and Special Events.  Doc. No. 364 at 100; Doc. No. 365 at 54, 58.

On September 12, 2012, Appel wrote to Lisa Lamberti Menino, asking "to confirm . . . that [City Hall Plaza] is non-union and there are no union requirements in order to use the property."  Ex. 205.  The daughter-in-law of then-Mayor Menino, Ms. Menino was working in the City's Property Management Department as City Hall's events manager.  Doc. No. 367 at 28, 30.  Ms. Menino maintained the calendar for events on City Hall Plaza and met with people planning such events.  Id. at 63.  She possessed no formal authority to negotiate or approve contracts or leases of City Hall Plaza.  She replied to Appel: "City hall is union and we ask that [you] use union but [it is] not a requirement to have an event on the plaza."  Ex. 205.  There is no evidence Ms. Menino consulted with anyone before responding to Appel's inquiry.

The trial evidence established that the City has no general policy requiring producers of events on City Hall Plaza to use exclusively union workers, although producers of such events are required to use various City employees who are unionized, such as Boston police officers, firefighters, emergency medical personnel, custodial staff, electricians, plumbers, carpenters, and

_____

[8] This section recounts the trial evidence that is relevant to resolving the issues presented by the defendants' Rule 29 motions.  In the discussion sections that follow, the Court considers this evidence, viewed in the light most favorable to the verdict.

[9] Citations to "Ex. __" reference exhibits admitted at trial.  Copies of the exhibits are in the possession of the Clerk's Office.  A number of exhibits contain personal contact information for witnesses and others associated with the underlying events.  Such information is not to be disclosed to anyone seeking to view the exhibits without a Court order.

property managers.  Doc. No. 367 at 36; see Ex. 20 (reflecting Crash Line's estimate that union workers required by the City amounted to "roughly 25%" of its festival staffing).

Approximately two weeks after Appel's exchange with Ms. Menino, on September 24, 2012, Crash Line provided the City with a draft Irrevocable License Agreement ("ILA"), which reserved City Hall Plaza on certain dates for music festivals produced by Crash Line.  Ex. 254. This draft, written by Crash Line's lawyers based on a template the City had provided, Doc. No. 366 at 21-23, contained the following proposed language:

> The [City] acknowledges that [Crash Line] expects to operate exclusively using non-union labor, and [the City], on behalf of itself and its affiliates, agrees that it will not impose, or encourage the imposition of, any requirement on [Crash Line], its affiliates, the Events or the Event Property to use unionized workers or otherwise to be subject to rules or terms imposed or encouraged by any labor, service or other union or collective bargaining entity or representative, including prevailing wage or similar conditions or requirements.

Ex. 254 at 3.  The City of Boston rejected that language.  The lawyer who reviewed and negotiated the final terms of the agreement on behalf of the City deleted it.  Ex. 251 at 3; Doc. No. 370 at 93.

On November 19, 2012, the relationship between Crash Line and the City formally began with the execution of the ILA.[10]  Ex. 7.  The final, executed version of the ILA omitted the language proposed by Crash Line and excerpted above, and it contained no language regarding the use of union or non-union labor.  Id.  The ILA reserved specific dates in 2013 and 2014 when Crash Line would be allowed to stage its Boston Calling festival on City Hall Plaza, subject to its ability to secure all necessary permits and approvals for such events.  See Doc. No. 365 at 61, 89.

---

[10] The ILA was amended in March 2014 to add a third day to each Boston Calling festival from May 2014 through September 2017.  Ex. 8.  The Amendment further noted that the City had "implemented a request for proposal ("RFP") process for use of City Hall Plaza for ticketed events," and stated that, for any dates beyond 2017, Crash Line would have to "comply with the RFP process."  Id.

Two paragraphs of the ILA are especially relevant. Paragraph 4, which defines the "Licensee's Responsibilities," provides:

> [Crash Line] shall also be solely responsible for and shall have the right to do each of the following: (i) Performing all set up and breakdown for each Event, including staff; . . . (ix) Selecting, in its sole discretion and contracting with the performers, talent and other acts performing at or appearing during each Event . . . .

Ex. 7 at 4. And, paragraph 8, entitled "Non Disturbance," provides:

> [Crash Line] understands that the Events are scheduled to take place in a location typically used as a public space. [Crash Line] agrees that during each License Period it will use commercially reasonable efforts, taking into consideration the intended use of the Event Property for outdoor music festivals, to minimize any material disruption to the environment surrounding the Event Property. [Crash Line] specifically agrees that it will coordinate with local stakeholders, either in person or telephonically to ensure consideration is given to minimize any disruption from the Event. . . .

Id. at 6.[11]

Crash Line publicly announced the first Boston Calling festival in February 2013. Doc. No. 366 at 4. On March 29, 2013, Local 11's business manager, Colleen Glynn, e-mailed Appel and Snow to convey IATSE's interest in "provid[ing] the labor" for the May 2013 festival, and to express the "hope" that Boston Calling's "workers will be paid the area standard for similar sized events." Ex. 103. Glynn also described BKP as an "anti union compan[y]" that staffs "only low wage workers." Id. Snow responded promptly, thanking Glynn for her message and explaining that Crash Line already had a contract in place with BKP covering both 2013 festivals, but inviting "a bid for labor moving forward." Id. No evidence was offered showing further contact between Crash Line and Local 11 in 2013.

---

[11] This provision also appeared in the draft ILA originally prepared by Crash Line's counsel. Ex. 254 at 6-7.

Mayor Walsh took office in January 2014.  According to Glynn, Local 11 had supported Walsh by canvassing and hosting phone banks for him leading up to the election, Doc. No. 367 at 180, but neither she nor Local 11 had given money to his campaign, Doc. No. 368 at 88.  No evidence was offered showing that Local 11 or any of its approximately 240 individual members had made financial contributions to Walsh's campaign, nor was there evidence from which a meaningful comparison could be made between the scope of the volunteer support Glynn generally described and the level of such campaign assistance Walsh enjoyed from other individual or organizational supporters.

On January 16, 2014, Crash Line executed a new "Independent Contractor Agreement" with BKP, pursuant to which BKP would provide "[p]roduction management and labor as required" for the 2014 Boston Calling festivals.  Ex. 10.  The terms of the contract permitted Crash Line to cancel the agreement at any time "before the Event," for any reason, with seven days' written notice.[12]  Id. ¶ 8(b).  There was no evidence suggesting Crash Line invited bids from any other production companies, or from Local 11, before renewing its relationship with BKP, nor was there evidence that Local 11 had reached out to Crash Line again between Glynn's March 2013 e-mail and January 2014.

By late February 2014, City officials were aware that Crash Line had used a national program to enlist volunteers for its Boston Calling festivals, pursuant to which program participants were charged a registration fee and, if they did not honor the terms of their volunteer work commitment, were automatically charged the full cost of a festival ticket.  Ex. 38.  City officials also were aware that IATSE was expressing concerns about the program, which IATSE

---

[12] Crash Line's invocation of this provision would have required it to pay BKP's "pro rata share of the fees owed . . . based upon the Services actually performed before the effective date of the termination."  Ex. 10 ¶ 8(c).

viewed as undermining area standard wages and benefits by requiring people to pay a fee to work as unpaid volunteers, and that IATSE was unhappy that Crash Line was not using union production workers.  Doc. No. 368 at 180; Doc. No. 370 at 147, 154-55.  In a February 21, 2014 memorandum describing the volunteer program, Joyce Linehan, Mayor Walsh's Chief of Policy, noted there were "issues to be ironed out with IATSE."  Ex. 38.  Sullivan was copied on this memorandum.  Id.

On March 5, 2014, Appel and Snow met with Mayor Walsh and other City officials, including Linehan and Sullivan.  Ex. 138.  The volunteer program was one topic raised at the meeting; the hiring of union workers by Crash Line was not discussed.  Doc. No. 365 at 86-89.  In an e-mail to Linehan soon after the meeting, Appel promised to "follow up with Tim Sullivan . . . and set up a call . . . to sort out any union questions regarding the volunteers."  Ex. 171.  In an April 13, 2014 e-mail to Linehan, Appel confirmed he had met with someone from the Office of the Massachusetts Attorney General "and solved the volunteer issue" by agreeing to "pay all these people moving forward."  Ex. 39; Doc. No. 365 at 87-88.  There is no evidence of the volunteer program issue arising again.

Brissette began working at City Hall in May 2014.  Mayor Walsh introduced Appel to Brissette, saying: "Ken will be your guy if you need anything."[13]  Doc. No. 365 at 85.

Days before the May 2014 Boston Calling festival, Glynn exchanged e-mails with Richard Rogers, the principal officer for the Greater Boston Labor Council.  Ex. 158; Doc. No. 370 at 178.  Rogers met with City officials regularly to advocate on behalf of labor unions

---

[13] Appel testified the Mayor made this statement at the March 2014 meeting; other witnesses who attended the meeting said Brissette was not there, and Brissette did not yet work for the City in March 2014.  However, the timing of the statement is insignificant.  Plainly, Appel met Brissette, and the jury could credit that the Mayor at some point made this statement to Appel.

affiliated with his organization.  Doc. No. 368 at 56; Doc. No. 370 at 169; see id. at 178 (listing "lobbying" among Rogers's duties and responsibilities).  In an e-mail with the subject "Memorial Day Concert," Rogers wrote to Glynn: "I talked to the Mayor's people about this weekend.  I got the same response as you about making it right in September."  Ex. 158.  Glynn responded, thanking Rogers for his help, expressing her view that the "Boston Calling folks do not pay area standard wages & benefits" and her understanding that "last year there was a whole host of safety concerns," and saying that "Local #11 stagehands should be servicing Boston Calling this year!"  Id.  She went on to write:

> I do not want to cause any problems for our new Mayor by setting up a protest with our 15' inflatable Rat next weekend but my Members are ready to protest.  I will talk them down because I do have faith in Mayor Walsh and hopefully, we can work with the Mayor's office to make it right in September.  IATSE Local #11 should have the opportunity to bid on ALL work on City Hall Plaza.

Id. (emphasis added).  Around the same time, Glynn saw Sullivan at a conference, where she spoke to him about her concerns regarding Boston Calling and the fact that Local 11 members were angry.  Doc. No. 368 at 17, 95-97.  She specifically recalled telling Sullivan the members were "chomping at the bit."[14]  Id. at 17, 97.

The third Boston Calling festival took place over Memorial Day weekend in May 2014. No one staged a protest at the event on behalf of IATSE.  Doc. No. 365 at 140.  According to Appel, Brissette told him "shortly after the May 2014 festival" that they "would need to have a conversation about union labor at some point."  Doc. No. 365 at 103.

On June 5, 2014, Brissette learned that a different union, Boston's Teamsters Local 25, had discovered that the reality television show "Top Chef" was filming in Boston and was not

---

[14] Glynn also testified that at least two other individuals holding elected positions within Local 11 communicated with government officials on behalf of the union, that Local 11's members are able to communicate their own concerns with government officials directly, and that Local 11's members are "very vocal about getting work."  Doc. No. 368 at 46, 90-91.

using the Teamsters to drive its production trucks, and that a member of the Teamsters had caused a loud disruption at a "Top Chef" filming location that day.[15]  Ex. 178.  In response to this incident, Brissette called the Teamsters' president "and asked him not to protest."  Doc. No. 371 at 125; Ex. 164.  Brissette also told "Top Chef" representatives they could not film, or that that the filming permits that had been issued for the following week would be cancelled, due to the Teamsters' threatened protest.  Ex. 2; Ex. 5.  The next day, after consulting two friends and colleagues who said he could not withhold or cancel the permits, Brissette told a "Top Chef" producer filming could proceed.  Ex. 164; Doc. No. 364 at 83; Doc. No. 370 at 144-46.

In the days that followed, one Boston hotel where "Top Chef" had been planning to film rescinded its permission, hoping to avoid a union demonstration at its doorstep, and the show's producers decided not to film another episode at a restaurant in Boston for the same reason. Doc. No. 364 at 71-74; Doc. No. 370 at 162-64.  Despite those measures, and notwithstanding Brissette's call to the union's president, a group of Teamsters staged a loud and disruptive protest, involving threats of violence directed at "Top Chef" cast and crew and damage to the show's property, on June 10, 2014 outside a restaurant in Milton where the show was filming.[16] Ex. 54.2; Doc. No. 371 at 136; Doc. No. 364 at 62, 70.

Sometime in late June 2014, Rogers had a meeting at City Hall with Sullivan and Joseph Rull, who was the Chief of Operations for the City of Boston at the time.  Doc. No. 370 at 138, 172, 182; see Ex. 207 (referencing meeting having occurred "last week" in June 30, 2014 e-mail).  Rogers asked if Sullivan or someone else from City Hall would speak with Glynn about

---

[15] The "Top Chef" evidence will be described in greater detail in the section below analyzing the defendants' Rule 33 motions.  It is recounted here only to the extent it bears on the government's theories of wrongfulness at issue under Rule 29.

[16] Brissette and Sullivan both knew about the June 10th demonstration by the Teamsters by August 21, 2014, at the latest.  Ex. 54.1.

her concerns regarding the Boston Calling festival.  Doc. No. 370 at 183.  According to Rogers, though he did not bring up the fact that Local 11 might picket the festival, "it may have come up" during the discussion.  Id. at 184-85.  Describing the same meeting, Rull recalled discussing "having a Labor Day event . . . without labor at the table," the possibility of "a demonstration at the [September 2014] concert by IATSE," and Rogers's request to "get the sides to the table to work something out."  Id. at 172-73.  Both Rull and Rogers denied any explicit reference to an inflatable rat, though both testified they were aware that union protests sometimes include them. Id. at 173, 185, 190.

On June 27, 2014, Brissette e-mailed Sullivan to say he would be "meeting with IATSE on July 8th at 2pm in [his] office," and Sullivan thanked him.  Ex. 53; see also Ex. 207.  At that meeting, union officials including Glynn and Local 11's president shared information with Brissette about Local 11 and expressed a desire to provide "services to different events" on City property.  Doc. No. 368 at 7-8, 69-71.  They also raised their concerns about Boston Calling, but did not mention a potential protest.  Id. at 17-18; but see id. at 98 (reflecting Glynn's testimony that she "may have" mentioned the possibility of a demonstration at the July 8th meeting). According to Glynn, Brissette told them "he couldn't do much to help until after 2017," when the terms of the ILA expired, leaving Glynn with the impression "that he would not really be much help to Local 11."  Id. at 71-74; see Ex. 208 (reflecting Rogers checked in with Glynn before a "meeting with some of the Mayor's folks" on July 28, 2014, and that Glynn had "nothing new to report" because "deals ha[d] already been made" for the scheduled festivals, but Local 11 continued to desire "a union presence on . . . City Hall Plaza . . . jobs").

On August 15, 2014, Brissette called Appel to set up a meeting to "discuss union involvement at the festival."[17] Doc. No. 365 at 114. They scheduled the meeting for August 19, 2014. Id. at 115. On August 17, Appel contacted Linehan, who "had been helpful to" Crash Line, and asked her to attend the meeting as well. Id.; Ex. 119. In his e-mail to Linehan, Appel wrote that, "as a partner of the city," Crash Line was "open to this conversation" regarding "adding union production staff" to the September 2014 festival. Ex. 119. He went on to say: "I think it could be a bigger/more impactful conversation than just a couple of guys added to the production team. We think it might be a good opportunity for both Boston Calling and the city." Id. Appel echoed that sentiment in an e-mail he sent to Brissette the same day asking to change the meeting time to accommodate Linehan's schedule. See Ex. 141 (reiterating, "I think we can have a broader discussion about the unions," and that it "might be [a] good opportunity for both Boston Calling and the city").

The August 19, 2014 meeting was attended by Brissette, Linehan, Appel, and possibly Crash Line's lobbyist, and was held in Brissette's office. Doc. No. 365 at 116, 120. According to Appel, Brissette "told [him] that the union was interested in providing staff for the Boston Calling which was happening in September of 2014," but Appel explained "that [Crash Line was] under contract with Bill Kenney," so using union stagehands "was not something that [Crash Line was] going to be able to do." Id. at 120-21; cf. Doc. No. 369 at 90 (describing memorandum prepared after the meeting in which Linehan wrote that Brissette "told" Crash Line

---

[17] Appel also met with Brissette on July 31, 2014. Ex. 18. The meeting, also attended by a lawyer for the City and Crash Line's lobbyist, was held in Brissette's office at City Hall. Id.; Ex. 113. The topic of the meeting was Crash Line's desire for a license extension for festival dates beyond 2017. Doc. No. 365 at 106; Exs. 18, 19, 113. The City's lawyer explained that Crash Line would have to participate in the RFP process in order to procure additional dates. Doc. No. 365 at 106; Doc. No. 370 at 57-58. There was no discussion of union labor or of festival permits or licenses at this meeting. Doc. No. 370 at 59, 126.

"they would have to hire a few [IATSE] guys").  Although Appel recalled learning before the September festival "that IATSE was not pleased that this was an event that did not have IATSE staff involved and that they were potentially planning to picket" the festival, he did not remember whether that possibility was raised during the August 19th meeting.  Doc. No. 365 at 122-23; see also Doc. No. 366 at 144-45 (agreeing the subject "could have" come up in connection with the August meeting).

Around the same time, Glynn had a meeting at City Hall with Sullivan and Local 11's secretary/treasurer, at which Glynn again sought "help with making the connections to get [IATSE's] foot in the door at Boston Calling."  Doc. No. 368 at 9; Ex. 159.  Glynn testified that she felt "very hopeful" at the meeting because it seemed like Local 11 was "making progress" toward a connection with Crash Line, making it unlikely that she would have "brought up" a union protest "at that point."  Doc. No. 368 at 102.  On August 20, 2014, Glynn e-mailed Sullivan a draft contract IATSE proposed to use for the September Boston Calling festival, expressing in her message her hope for "a deal for a dozen or so stagehands."  Ex. 30.

On August 21, 2014, Brissette forwarded to Sullivan a link to an online entertainment news article published the previous day describing the Teamsters' violent protest at the "Top Chef" filming in Milton on June 10th.  Exs. 54.1, 54.2.  The same day, Appel spoke by phone with Jesse Du Bey (his cousin and business advisor, and Crash Line's most active board member) about "the union situation," later sending Du Bey an e-mail linking to a news article about a union demonstration.  Doc. No. 369 at 51-52; see id. at 51 (stating it was "possible" Appel told Du Bey that day "about the possibility of a demonstration by the union").

By Friday, August 22, 2014, Glynn told Rogers in an e-mail that she remained "cautiously optimistic" about having "a deal in place shortly," reiterating her view that BKP

treated its workers unfairly. Ex. 159. She went on to say that Local 11 would "be preparing for an informational picket line/job action"—which she described as "the last thing [she] want[ed] to see happen"—unless she "hear[d] something by early [the following] week." Id. In her trial testimony, Glynn described "leafleting demonstrations" as protests union members stage when they believe an employer is not providing fair "area standard" wages, benefits, and working conditions, and she said such protests can involve a group of workers handing out information, carrying signs, and blowing up a fifteen-foot inflatable rat owned by Local 11. Doc. No. 368 at 30-34, 113; see Doc. No. 364 at 146-47 (reflecting Cook's understanding that unions sometimes use an inflatable rat "[t]o protest the use of nonunion labor within [a] venue").

Sometime in late August, Snow spoke with BKP's owner, Bill Kenney, and discussed strategies for incorporating some IATSE workers into the production staff for the September 2014 festival. See Doc. No. 371 at 71-72 (describing this topic as one they had "planned . . . a week or two before" September 2nd); see also Doc. No. 370 at 33-35 (describing this topic as having been discussed before September 2nd). On the first day Crash Line and BKP were building the event area on City Hall Plaza for the September 2014 Boston Calling festival, Glynn and another IATSE representative visited the festival site and spoke with Kenney.[18] Doc. No. 370 at 7. According to Kenney, Glynn suggested he hire "IATSE people," and he declined, saying he was "under contract" and "good on this particular event," but that they "could talk about it in the future." Id.

---

[18] The evidence suggests this likely would have occurred sometime over Labor Day weekend in 2014. The festival began on Friday, September 5th. According to Snow and Kenney, the process of building the festival area on City Hall Plaza began between four and six days before the opening of the event. Doc. No. 370 at 7; Doc. No. 371 at 33. In 2014, Labor Day was on Monday, September 1st.

On September 2, 2014, Brissette called Appel and said they "needed to meet." Doc. No. 365 at 134. Appel invited Snow, id. at 135, who assumed the "meeting was going to be about union labor," Doc. No. 371 at 33-34. Appel drew the same conclusion, as the union issue "was the only other topic that [they] had been going back and forth on over the last couple of months." Doc. No. 365 at 136. The meeting occurred that day in Brissette's office, with Sullivan, Appel, and Snow present, and Crash Line's lobbyist participating by telephone. Id. at 137-38; Doc. No. 366 at 151. According to both Appel and Snow, either Sullivan or Brissette began the meeting by referencing the "lingering labor problem," saying "IATSE was not happy" and was "threatening to picket the event" and "blow up the inflatable rat at the entrance to the festival throughout the weekend."[19] Doc. No. 365 at 138; Doc. No. 366 at 65; Doc. No. 371 at 34. Although no one from IATSE had expressed such a threat to Crash Line directly, both Appel and Snow testified that they believed Brissette and Sullivan were telling the truth and were, in fact, concerned about the possibility of a union demonstration. Doc. No. 365 at 142; Doc. No. 366 at 65-66, 153, 158-59, 168-69; Doc. No. 371 at 70, 94-95; see Doc. No. 369 at 118-19 (reflecting Linehan's recollection that, at some point before the September festival, Rull and possibly others had talked within City Hall "of there potentially being a picket" by IATSE at the event).

The conversation then turned to the number of IATSE workers Crash Line would take, with Brissette or Sullivan first suggesting half the production staff, or thirty stagehands. Doc. No. 365 at 139-40; Doc. No. 366 at 159; Doc. No. 371 at 36. Appel refused, citing Crash Line's contract with BKP, and proposed taking only a few union workers. Doc. No. 366 at 159; Doc. No. 371 at 37. No agreement was reached, and the meeting ended with Brissette saying he

---

[19] Appel characterized Brissette as the primary speaker during the meeting, while Snow remembered Sullivan doing most of the "negotiating." Doc. No. 365 at 139, 141; Doc. No. 371 at 79.

would "have conversations and get back to [Crash Line] later" about a number.  Doc. No. 365 at 140.  Ultimately, as a result of the September 2nd meeting, Crash Line agreed to take on eight stagehands and one crew chief through IATSE to work only on the three festival days.[20]  Doc. No. 365 at 147-48; Exs. 14, 160.  IATSE did not protest at the event.  The men hired by Crash Line through IATSE worked at the festival and were paid a total of "about $8,000."[21]  Doc. No. 365 at 152; Doc. No. 371 at 78-79.

B.    Legal Standard

Rule 29 empowers this Court to set aside a guilty verdict and "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a), (c)(2).  Such power is appropriately exercised only rarely; a jury's verdict must be upheld unless no "plausible rendition of the record" supports it.  United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992); accord United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010); United States v. Salemme, No. 16-cr-10258, 2018 WL 3429909, at *1 (D. Mass. July 16, 2018).  The focus under Rule 29 is "on whether the verdict was reasonable, not whether [the Court]

---

[20] After the meeting, Appel e-mailed both defendants, thanking them "for the time today" and saying: "Will wait to hear back from you regarding our discussion before" responding to a message he had received from Glynn.  Ex. 23.  According to Appel, Brissette called him back and told him "the number of jobs requested was eight," a message he conveyed to Snow, who then coordinated with Glynn and BKP.  Doc. No. 365 at 146-47.  Crash Line and IATSE signed a contract on September 3, 2014.  Ex. 14.

[21] The $8,000 represents the money paid to the workers, not necessarily the net cost to Crash Line.  See Doc. No. 370 at 32-33, 40-41 (reflecting Kenney's agreement that Local 11's rates, even including benefits, were lower than his, and that the Local 11 workers replaced overtime by BKP stagehands, for which Kenney would have charged an even higher rate); Doc. No. 371 at 77 (reflecting Snow's agreement that Local 11's rates, with benefits included, were lower than BKP's, but noting an added charge for payroll services, the amount of which was neither specified by Snow nor revealed elsewhere in the trial record).  Compare Ex. 10 at 10 (listing labor rates charged by BKP, including $43/hour for "Crew Chief" and $35/hour for "Stagehand/Loader"), with Ex. 14 at 4 (listing labor rates charged by Local 11, including $33.50/hour for "Crew Chief" and $28/hour for "Extra Men," i.e., stagehands, and describing an additional total of 15% in benefits).

believe[s] it is correct." United States v. Edwards, 303 F.3d 606, 635 (5th Cir. 2002); cf. United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001) (assessing sufficiency in Rule 29 context does not require a finding "that no verdict other than a guilty verdict could sensibly be reached" (quotation marks omitted)).

The Court must "scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995); see United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (asking whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond reasonable doubt"). The Rule 29 standard does not allow a reviewing court to "weigh the evidence or make any credibility judgments," as such questions "are left to the jury." Merlino, 592 U.S. at 29. In applying this standard and assessing whether the evidence sufficed to prove each element of each offense beyond a reasonable doubt, the Court "must examine all the evidence submitted to the jury, regardless of whether it was properly admitted." United States v. Acevedo, 882 F.3d 251, 258 (1st Cir. 2018) (quotation marks omitted). These governing principles mean that a defendant challenging a jury's guilty verdict faces "daunting hurdles," to be sure, United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005), but not insurmountable ones, United States v. Tavares, 844 F.3d 46, 49 (1st Cir. 2016).

The essential elements of Hobbs Act extortion, where the theory charged involves the use of fear of economic harm, are: 1) that the defendant knowingly and willfully obtained property from the victim with the victim's consent; 2) that the defendant induced the victim's consent by knowingly and intentionally using the victim's fear of economic harm; 3) that the defendant's

use of the victim's fear of economic harm was wrongful; and 4) that the defendant's conduct affected interstate or foreign commerce.[22] Doc. No. 348 at 15; see 18 U.S.C. § 1951(a), (b)(2).

The essential elements of Hobbs Act conspiracy are: 1) that the agreement specified in the indictment existed between at least two people to commit extortion; and 2) that the defendant willfully joined in that agreement knowing of its criminal goal and intending to help it succeed. Doc. No. 348 at 25; see 18 U.S.C. § 371; United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000) ("Evidence of an overt act is not required to establish a Hobbs Act conspiracy.").

Applying these standards to the evidence presented here, the Court finds that a judgment of acquittal is warranted as to both defendants for three independent reasons, each of which is sufficient on its own to justify allowing the defendants' Rule 29 motions. As explained in the sections that follow, the three areas in which the government's failure of proof compels acquittal are: the lack of evidence showing a quid pro quo where the defendants were prosecuted exclusively for acts undertaken while performing their duties as public officials; the lack of evidence showing the defendants acted "wrongfully"; and the lack of evidence showing the defendants knowingly and intentionally exploited Crash Line's fear of economic harm.

C.    Extortion by Public Officials

The Court finds no support for an application of the Hobbs Act in this case that, if accepted, would expose to criminal prosecution "local officials . . . using their putative

---

[22] Courts have subdivided the elements of Hobbs Act extortion in different ways, depending on the circumstances presented. Compare, e.g., Tr. Excerpt from Day Eight of Trial Jury Instructions at 18-19, United States v. Fidler, No. 15-cr-10300-DPW, ECF No. 338 (D. Mass. Sept. 8, 2017) (listing five elements of extortion), with 1st Cir. Pattern Crim. Jury Instruction 4.18.1951 (listing four elements of extortion), and Cruzado-Laureano, 404 F.3d at 480-81 (listing three elements of a Hobbs Act violation and separately defining "extortion"). The four elements listed above are those identified in the Court's instructions to the jury in this case, and were not the subject of objections by any party at or after trial.

permitting authority to benefit others" by "secur[ing] real work for members of a specific union" and inducing "the transfer . . . of wages paid for real rather than fictitious work," all "without personally receiving any gain."[23]  Brissette, 919 F.3d at 685-86.  Cf. Burhoe, 871 F.3d at 8, 12-22 (drawing a line in the union context between economic threats aimed at securing real work even if such work is "unwanted," which is not a wrongful purpose, and economic threats aimed at securing payoffs for work not actually performed, which is a wrongful purpose).  If adopted, the government's view of wrongfulness—providing that a public official commits extortion under the Hobbs Act each time he knowingly violates a civil law and, in doing so, requires a private person or entity to transfer money to an identified third party, Doc. No. 179 at 38-41, 48, 50-51, 67, 72-75—would, in these circumstances, impermissibly blur the line between extortion under color of official right and extortion by wrongful use of fear of economic harm.[24]  This is especially so where, as here, the third party arguably has a lawful claim to the identified property.

In "color of official right" extortion prosecutions, the Supreme Court has drawn a clear line to mark the boundary of criminal liability under the Hobbs Act, requiring proof of a quid pro quo when public officials are charged with extortion in the exercise of their official authority.  McDonnell v. United States, 136 S. Ct. 2355, 2365 (2016); Wilkie v. Robbins, 551 U.S. 537, 564-67 (2007); McCormick v. United States, 500 U.S. 257, 273 (1991).  Adherence to this view "defines the forbidden zone of conduct" for public officials exercising their government

---

[23] This is especially so because the law upon which the government's theory rises and falls given the circumstances presented here—the NLRA—was eliminated from the case.  See § II(D)(7), infra.

[24] The Court is aware of no other case in which a public official has been charged with Hobbs Act extortion only on a fear-of-economic-harm theory for actions undertaken exclusively within the scope of his official authority.  Cf. Doc. No. 398 at 3-4 (citing various cases in which public officials were charged under both theories).

authority "with sufficient clarity," thereby avoiding serious constitutional, federalism, and other policy concerns. McCormick, 500 U.S. at 273. It defines the boundaries of federal criminal law "with sufficient definiteness that ordinary people can understand what conduct is prohibited," and "in a manner that does not encourage arbitrary and discriminatory enforcement." Skilling v. United States, 561 U.S. 358, 402-03 (2010); accord McDonnell, 136 S. Ct. at 2373. It preserves states' "prerogative to regulate the permissible scope of interactions between state officials and their constituents" by preventing federal prosecutors and courts from setting and policing "standards of good government for local and state officials."[25] McDonnell, 136 S. Ct. at 2373 (quotation marks omitted). And, it avoids "tak[ing] the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the Government and the public," Wilkie, 551 U.S. at 567, by opening to federal prosecution "conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation," McCormick, 500 U.S. at 272.

Although the government chose to pursue this case under a different prong of the Hobbs Act, as is its prerogative, the entire theory of this prosecution—in particular, the government's

---

[25] To the extent the government believes, as it argued to the jury, that public officials may serve only "constituents" who are members of the relevant electorate, that view is untenable. Doc. No. 363 at 20-21; Doc. No. 384 at 32. There is no law precluding public officials from considering the interests of non-residents or making demands on their behalf. To the contrary, state and local officials commonly do such things, for example, by courting the relocation of out-of-town businesses to the community served by the official, or by addressing the woes of commuters or visitors living, voting, and sometimes also working in other communities. In any event, no reasonable jury could conclude that Local 11 was not located in Boston. See Doc. No. 367 at 174-75 (describing Local 11's jurisdiction as "east of Route 495," including Boston); Doc. No. 368 at 25 (reflecting that Local 11's hiring hall is located in South Boston); see also Doc. No. 177 at 1-2 (alleging in TSI that Local 11 represented employees working at entertainment events "in Boston, Massachusetts"). That the nine persons who obtained work through Local 11 at the September 2014 Boston Calling festival did not live in Boston is immaterial to assessing the legitimacy of the defendants' conduct.

theory supporting the threats and wrongfulness elements of extortion—rests solely on actions undertaken by the defendants using their authority as public officials.[26]  As such, all of the same considerations that caused the Supreme Court to reject "expansive interpretation[s]" of federal criminal law proposed by the government in the "color of official right" context, e.g., McDonnell, 136 S. Ct. at 2372, apply with equal force here.  The Court, therefore, declines to construe the "wrongfulness" element in a manner that would mark a sweeping expansion of Hobbs Act extortion, criminalizing "the most prosaic interactions" involving public officials, and causing such officials reasonably to "wonder whether they could respond to even the most commonplace requests for assistance."  Id. at 2372-73; cf. McCormick, 511 U.S. at 272 ("Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator.").

Finally, United States federal courts are often asked to assess whether government officials have violated civil laws, local ordinances, or contracts, including in ways which involve directing someone to pay money to an identified third party.  See, e.g., United States v.

---

[26] Though this view had been articulated by the defendants in various forms before trial, the Court concluded that it was theoretically possible for public officials to commit extortion by wrongful use of fear of economic harm without also committing extortion under color of official right.  The fact that this case did not present such a scenario became certain only upon hearing the government's evidence and argument at trial.  The government's opening statement and closing argument both underscored the extent to which this case hinged on the defendants' status as public officials.  E.g., Doc. No. 363 at 5 (suggesting defendants had "all the hallmarks of power," "official titles," "official positions," and "offices in City Hall"); id. at 21-22 (referencing "the defendants' authority" and their "position of power"); Doc. No. 384 at 6 (arguing the defendants "breached the public trust" and "used their power"); id. at 10, 36-37, 88 (referencing what "public officials" can and cannot do); id. at 21, 29, 93 (describing the defendants as "representing the City" and holding "the power of City Hall in their hands"); id. at 33 (accusing the defendants of "trading the power they had to [a]ffect the permits and the entertainment license, and the extension of the licensing agreement or RFP, all in exchange for Crash Line to hire union labor"); see also Doc. No. 411 at 71 (opposing Rule 29 motion by arguing that Brissette's "presence and involvement [on September 2] alone was the implicit threat" due to his official position).

Massachusetts, 440 F. Supp. 2d 24 (D. Mass. 2006), rev'd, 493 F.3d 1 (1st Cir. 2007), on remand, 724 F. Supp. 2d 170 (D. Mass. 2010), rev'd sub nom, United States v. Coalition for Buzzards Bay, 644 F.3d 26 (1st Cir. 2011) (involving civil suit brought by the United States challenging a Massachusetts statute requiring oil tankers entering certain Massachusetts waters to hire state-licensed pilots and to use tugboat escorts, which the government argued was preempted by federal law). Disputes over the boundaries of government officials' actions under civil law in a given set of circumstances ordinarily are the subject of civil litigation. E.g., id. Declining to extend the Hobbs Act to encompass such matters does not strip the government or the apparent victims of the only tool at their disposal for challenging and redressing conduct by public officials that violates such laws. Cf. Tavares, 844 F.3d at 54 ("[N]ot all unappealing conduct is criminal."); United States v. Capo, 817 F.2d 947, 955 (2d Cir. 1987) ("It is the sensitive duty of federal courts to review carefully the enforcement of our federal criminal statutes to prevent their injection into unintended areas of state governance.").

In this case, the government neither proved, nor even alleged, a quid pro quo. Where the defendants have been prosecuted for acts undertaken solely within the scope of their authority as City officials, the absence of such proof is fatal to a prosecution for Hobbs Act extortion. For this reason, the Court ALLOWS both defendants' Rule 29 motions, VACATES both defendants' convictions, and enters a finding of NOT GUILTY as to Brissette on Counts 1 and 2 of the TSI and as to Sullivan on Count 1 of the TSI.

The next two sections explain the government's failure to prove two of the traditional elements of extortion by wrongful use of fear of economic harm.

D.    Wrongfulness

At trial, the Court instructed the jury that, in this case, the government was required to prove both that a defendant used "wrongful means," and that he did so to achieve a "wrongful purpose."[27] Doc. No. 348 at 21-22.  The government objected, arguing that only a "wrongful purpose" was required, Doc. No. 339 at 5, an argument it reiterates in opposing the pending motions, Doc. No. 398 at 7-8.  According to the government, the First Circuit has construed the "wrongful purpose" element of Hobbs Act extortion as requiring proof that a defendant used threats of economic harm to procure property to which he knew he had no claim of right.  Id. at

---

[27] The Court's interpretation of "wrongfulness" as requiring both showings was grounded in its reading of Supreme Court and First Circuit precedent.  In its decision resolving an appeal in this very case, the Court of Appeals stated: "In the end, whether the use of economic fear is 'wrongful' within the meaning of the Hobbs Act extortion provision turns, at least in part, on whether it was employed to achieve a wrongful purpose."  919 F.3d at 684 (emphasis added, quotation marks omitted).  The underlined provision, which the government dismisses as "not a holding," Doc. No. 309 at 16, reflects the Circuit's carefully chosen words and undermines the government's view that only proof a "wrongful purpose" is required.  That view is also undermined by decisions of the Supreme Court, e.g., United States v. Enmons, 410 U.S. 396, 399 (1973) (explaining "'wrongful' [in the Hobbs Act] modifies the use of each of the enumerated means of obtaining property [and] would be superfluous if it only served to describe the means used"); see A. Terzi Prods., Inc. v. Theatrical Protective Union, 2 F. Supp. 2d 485, 505 (S.D.N.Y. 1998) (Sotomayor, J.) ("Thus, for union misconduct to be actionable under the Hobbs Act, . . . it had to be wrongful both in its means and in its ends."), and prior decisions of the First Circuit, e.g., Burhoe, 871 F.3d at 9 ("Setting aside the issue of 'wrongful' ends . . . , there is also another principle in play—namely, that the means used to obtain the end must also be 'wrongful.'").  Requiring both components in a case like this one, where the defendants are public officials, makes sense for the same reasons identified by the Supreme Court as precluding, in the union context, the "broad concept of extortion" advanced by the government in Enmons.  In both scenarios, the Court's obligation is to "strictly construe[]" the Hobbs Act and to resolve "any ambiguity . . . in favor of lenity."  410 U.S. at 411.  And, the Court concludes that "it would require statutory language much more explicit than that" used in the Hobbs Act "to lead to the conclusion that Congress intended to put the Federal Government in the business of policing" state or local officials and their compliance with state and local laws as they interact with constituents and exercise their governmental authority.  Id.

6-8.[28]  The government further suggests that "one way wrongfulness may be established is by showing that the alleged extortion victim 'had a pre-existing statutory right to be free from the defendant's demand,'" a determination the government characterizes as arising within the "wrongful purpose" analysis.  Id. at 7 (quoting George Lussier Enters., Inc. v. Subaru of N. Eng., Inc., 393 F.3d 36, 50 (1st Cir. 2004), and Sanchez v. Triple-S Mgmt. Corp., 492 F.3d 1 (1st Cir. 2007)).

Giving due deference to the verdict and to the government's arguments in support of it, the Court will consider whether the defendants' convictions would be sustained under the government's interpretation of "wrongfulness," though the Court remains of the view that the law requires more, as it instructed the jury.  Because the Court concludes that no rational jury could have found that either defendant here acted with a "wrongful purpose," as the government defines it, the convictions of both defendants necessarily fail.

Over the life of this case, the government has identified a number of theories it claims could support a finding that the defendants acted in pursuit of a "wrongful purpose," either by showing that Crash Line had a right to be free from the alleged demands to use union stagehands, or by showing that the defendants had no lawful basis for making such demands and no claim of right to the wages and benefits at issue.  The government's theories arise from the ILA, state ethics rules, City policy, the defendants' alleged untruthfulness, and federal labor law.  Though the government has not pressed each of these theories at every stage of the case, the Court considers each "purpose" that was expressly or implicitly raised by evidence or argument put before the jury, whether or not the government has advanced all of them in its post-trial briefing.

_____

[28] In urging this definition, the government discusses Burhoe, United States v. Kattar, 840 F.2d 118 (1st Cir. 1988), United States v. Sturm, 870 F.2d 769 (1st Cir. 1989), and United States v. DiDonna, 866 F.3d 40 (1st Cir. 2017).

1.      *The ILA*

According to the government, the express terms of the ILA gave Crash Line the sort of preexisting right to be free from the defendants' demands to hire workers from Local 11 necessary to establish wrongfulness under the Hobbs Act.  Doc. No. 384 at 7, 21-24.  There are several flaws in this theory.

First, as a matter of law, the text of the ILA did not confer upon Crash Line a right to be free from a demand to hire union stagehands, or from a demand to hire any other specific individuals or groups as event staff.  Nowhere does the contract say that.  The plain and ordinary words in the agreement executed by the parties, after negotiation and editing by lawyers for both Crash Line and the City, contain no provision granting Crash Line such a right.  See Mount Vernon Fire Ins. Co. v. Visionaid, Inc., 76 N.E.3d 204, 208 (Mass. 2017) (explaining contract interpretation begins with the plain language of the agreement, and also ends there if the meaning of the language is clear); Ex. 7 at 12 (providing that the ILA is to be construed in accordance with Massachusetts law).  Likewise, nothing in the text of the ILA prevents the City or its officials from requiring the use of specific event staff, including union stagehands.

Furthermore, the Court must read the contract as a whole.  Gen. Convention of New Jerusalem in the U.S., Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007).  Another provision of the ILA explicitly bestows upon Crash Line the responsibility to select "in its sole discretion" all performers for each festival.  Ex. 7 at 4 (paragraph 4(ix)).  That another item in the same list of responsibilities grants Crash Line "sole discretion" in selecting performers—a level of independence that did free Crash Line from demands by City officials to hire particular performers—confirms that the ILA provisions the government cites did not secure for Crash Line protection from a similar demand regarding event staff generally or stagehands

specifically.[29]  See MacDonald v. Jenzabar, Inc., 93 N.E.3d 1173, 1179 (Mass. App. Ct. 2018) (reasoning that one contract clause showed parties "knew how to properly craft an exception," such that the omission of similar language from another clause revealed "that they did not intend to create" such an exception there).

Thus, the Court reads the plain language of the ILA as unambiguously not creating the right the government urges.  Even if the ILA were deemed ambiguous in this regard, consideration of extrinsic evidence such as its drafting history and the parties' course of conduct only confirms the Court's interpretation.  See Gen. Convention of New Jerusalem, 874 N.E.2d at 1087 (permitting consideration of such evidence "when a contract is ambiguous on its face or as applied to the subject matter," "to remove or to explain the existing uncertainty or ambiguity").

There is a reason the ILA contains no language granting Crash Line a right to be free of the charged demand.  Crash Line prepared and proposed the original draft of the ILA and included within it a clause conferring upon itself just such a right to be free from demands to hire union labor.  Doc. No. 365 at 61-62; Doc. No. 370 at 82, 88, 91-92; Ex. 254 at 3.  The City's lawyers reviewed the proposed contract and intentionally deleted that proposed provision.  Doc. No. 370 at 92; Ex. 251 at 3.  Crash Line accepted this change by executing the final version of the ILA, which no longer contained the relevant proposed language, and there is no evidence whatsoever suggesting that its decision to do so was not freely and voluntarily made.  Thus, Crash Line formed a binding contract with the City by signing the revised contract, knowing it omitted the provision restricting demands on the use of union labor.  In the face of that evidence, the ILA cannot be read to confer a right to be free from demands regarding the use of union

---

[29] Ms. Menino's September 2012 e-mail to Appel is not to the contrary, as the ILA contains an integration clause expressly disclaiming the binding effect of any earlier "representation, promise or inducement not included" in the ILA.  Ex. 7 at 12 (paragraph 17(c)).

labor.  It cannot be construed to mean what it does not say, or to include a right the City's lawyers specifically rejected.

Without explaining or even addressing the foregoing, the government points to another provision of the ILA.  The relevant paragraph assigns to Crash Line the "sole[] responsib[ility] for," and also "the right to" do, a list of things, including two upon which the government's argument relies: "Performing all set up and breakdown for each Event, including staff"; and "Providing and setting up all electrical, stage, sound and displays for the Event."  Ex. 7 at 3-4; see Doc. No. 384 at 7 (quoting the latter item); Doc. No. 398 at 9 (citing the former item).  These subsections within the list of Crash Line's responsibilities under the ILA plainly mean that: (1) Crash Line has the right to engage in these activities on the City of Boston's property (which would otherwise constitute trespassing); and (2) Crash Line, and not the City, is responsible for setting up and breaking down all necessary event structures, including stages and equipment required for a music festival.  Standing alone, these words do not confer upon Crash Line a right to be free from requests or demands from the City or its officials regarding the workers it hires, including requests or demands to hire union labor, nor does the provision otherwise limit the City's ability to make such demands.  In granting Crash Line "the right" to do the enumerated things, including to provide "staff," the ILA authorizes Crash Line to hire workers to perform various tasks on City property—a right Crash Line otherwise lacked—but the language does not grant it sole and exclusive control over choosing the "staff."

Finally, the evidence at trial established a uniform, unchallenged course of conduct by Crash Line and the City directly contrary to the government's interpretation of the contract. Though the ILA says Crash Line is "solely responsible for" electrical setup, Ex. 7 at 4, the City "demanded" that renters of City Hall Plaza, including Crash Line, use union electricians

employed by the City, Doc. No. 367 at 36, 38; Ex. 20.  Though the ILA says Crash Line is "solely responsible for" sanitation personnel and facilities, as well as trash and debris pick-up, Ex. 7 at 4, the City "demanded" that renters of City Hall Plaza, including Crash Line, use union custodial staff employed by the City, Doc. No. 367 at 38; Ex. 20.  And, though the ILA says Crash Line is "solely responsible for" all aspects of event setup and breakdown, Ex. 7 at 3, the City "demanded" that renters of City Hall Plaza, including Crash Line, use union inspectors and carpenters and a union event planner/property manager employed by the City, Doc. No. 367 at 30, 36, 38; Ex. 20.  This course of conduct by the parties to the ILA, neither contested by Crash Line nor challenged at trial by evidence or argument, supports only one construction of the ILA: that it did <u>not</u> confer upon Crash Line a right to be free from demands by the City to hire specific event staff, including union stagehands.  See <u>Martino v. First Nat. Bank of Bos.</u>, 280 N.E.2d 174, 179 (Mass. 1972) ("There is no surer way to find out what parties [to a contract] meant than to see what they have done." (quotation marks omitted)).

Second, the ILA at least arguably conferred upon City officials, including the defendants, a right to make demands upon Crash Line aimed at avoiding disruptions at or near City Hall Plaza during any Boston Calling festival.  In a paragraph entitled "Non Disturbance," Crash Line explicitly agreed that, during each festival, it would: 1) "use commercially reasonable efforts . . . to minimize any material disruption to the environment surrounding" City Hall Plaza, and 2) "coordinate with local stakeholders . . . to minimize any disruption from the Event."  Ex. 7 at 6 (paragraph 8).  Identical language was present in the original draft of the ILA prepared by Crash Line's lawyers.  Ex. 254 at 6-7 (paragraph 9).  Consistent with this provision, "local

stakeholders," and City officials acting on their behalf,[30] could make demands upon Crash Line in order to prevent or mitigate potential disruptions at or near the festival site. For example, a City official reasonably could invoke the "Non Disturbance" provision to require Crash Line to attempt to resolve the complaints of an unhappy organization threatening a protest—whether a leafletting or a demonstration with a large inflatable object—in the vicinity of the impending large-scale, multi-day gathering on City property at which alcohol would be served.

The government has not, by evidence or argument, established that the "Non Disturbance" provision would <u>not</u> apply under circumstances such as those.[31] Though the defendants have cited this provision as precluding a finding of "wrongfulness" here, Doc. No. 411 at 78; Doc. No. 389 at 14, the government has never acknowledged its existence, let alone explained why it would not authorize the defendants to demand that Crash Line take "commercially reasonable" steps to avoid a disruptive protest at the festival's entrance gate.[32]

Accordingly, the Court concludes that the ILA, as a matter of law, granted Crash Line no right to be free from City officials' demands with respect to the use of union stagehands in 2014 or at any other time.[33]

---

[30] Of course, the City, as the owner of the concert venue and the abutting property, was itself a "local stakeholder."

[31] The Court notes that the provision could be properly invoked only in a good-faith effort to avoid a disturbance that was, in fact, threatened or feared. As explained below, § II(D)(4), <u>infra</u>, the evidence cannot support the conclusion that the defendants lied.

[32] Notably, the only evidence bearing on commercial reasonableness came from Du Bey, who testified that the cost of hiring nine workers through Local 11 was not "material in the context of [the] $4 million" the festival took in. Doc. No. 369 at 49-50.

[33] Citing the testimony of Appel and Snow, the government suggested to the jury that an April 8, 2014 letter from Patricia Malone, the Director of the Mayor's Office of Consumer Affairs and Licensing, entitled Crash Line to permits and licenses for the September 2014 festival reflecting particular hours of operation and of alcohol service. Doc. No. 384 at 12. That letter, however, did no such thing—nor did it confer any rights upon Crash Line, or limitations upon the defendants, regarding demands to hire union stagehands. It provided: "[T]he Division will

Even if the ILA could be reasonably construed as having granted Crash Line a contractual right to be free from a City official's demand to use union stagehands, such a right would not satisfy the government's burden of proving wrongfulness under the Hobbs Act in any event.  The First Circuit has explained that "economic fear is wrongful under the Hobbs Act if the plaintiff had a pre-existing statutory right to be free from the defendant's demand."  George Lussier, 393 F.3d at 50 (emphasis added); accord Sanchez, 492 F.3d at 12.  The government has cited no case, and this Court is aware of none, in which a right derived from a contract, rather than from a state or federal statute, provided the basis for a finding of wrongfulness.  Cf. George Lussier, 393 F.3d at 50-51 (considering whether Hobbs Act plaintiff had a right under state and federal statutes which the defendant's demands had impaired).  Moreover, the government concedes that, to date, the First Circuit has applied the "pre-existing statutory right" theory of wrongfulness only in civil Hobbs Act cases, and never in a criminal prosecution for extortion.  Doc. No. 398 at 7 n.2.[34]

Of course, the ILA is not a statute, and this is not a civil lawsuit.  Constitutional due process considerations and the rule of lenity counsel against applying the George Lussier test to extend criminal liability to these novel circumstances, as the government urges.  See McDonnell, 136 S. Ct. at 2373 (interpreting a criminal statute as "a scalpel" rather than "a meat axe," and "in

_____

continue to evaluate license conditions . . . and will reserve the right to order further conditions in order to protect the public safety and order."  Ex. 12 at 2.

[34] The government suggests that another Court of Appeals has applied the standard in a criminal case.  Doc. No. 398 at 7 n.2 (citing United States v. Vigil, 523 F.3d 1258 (10th Cir. 2008)).  Not so.  The Tenth Circuit merely acknowledged an argument made by a defendant who attempted to invoke the "pre-existing statutory right" standard in attacking his conviction.  Id. at 1265.  The Court's analysis of wrongfulness, however, in no way endorsed, adopted, or applied that standard.  Id.  Rather, the Tenth Circuit looked to Enmons, 410 U.S. at 400, and resolved the defendant's challenge by considering whether he had "a claim to the property [he] receive[d]" and whether he had pursued "a legitimate objective."  523 F.3d at 1265.

a manner that does not encourage arbitrary and discriminatory enforcement" against "public officials . . . without fair notice" (quotation marks omitted)); Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 403 n.8 (noting rule of lenity applies when construing the Hobbs Act); Burhoe, 871 F.3d at 20 (same).

In sum, the ILA did not confer upon Crash Line a preexisting right to be free from a demand to hire union stagehands, nor did it establish that the defendants had no lawful claim to make such a demand. The jury, therefore, could not have relied upon the ILA to find that the defendants acted wrongfully.

### 2. *State Ethics Law*

In the months leading up to this trial, the government also began citing a Massachusetts ethics rule, suggesting it prohibited the defendants from demanding that Crash Line hire workers through Local 11 and, thus, rendered their conduct wrongful.

The government had originally told the Court that it would not "be pointing to a specific Massachusetts law" as a basis for finding the defendants' conduct wrongful under the Hobbs Act. Doc. No. 179 at 45. After the case was remanded by the Court of Appeals, this Court invited the parties to supplement their previous pretrial submissions. Doc. No. 237. In its opposition to the defendants' renewed motion to dismiss, the government argued for the first time that the "[d]efendants' conduct was wrongful because it violated Massachusetts General Laws, Chapter 268A," citing section 23(b)(2)(ii). Doc. No. 249 at 9-10. The government's revised proposed jury charge on wrongfulness filed thereafter also included a one-sentence reference to the same state ethics rule. Doc. No. 267 at 28-29.

During the trial, the Court allowed the government to adduce testimony from a former lawyer for the City of Boston, along with one related exhibit, describing general ethics training

City employees receive regarding the Massachusetts conflict-of-interest laws.  Doc. No. 370 at 56-57, 62-63, 65-70; Ex. 49.  However, the Court limited such testimony and warned the government that the reach of the relevant statute and its availability as a basis for proving wrongfulness were legal questions it would resolve when composing the final charge.  Doc. No. 412 at 7-11.

The Supreme Judicial Court ("SJC") has noted that section 23 of Chapter 268A—the section containing the provision(s) the government invoked here[35]—"contains no criminal sanctions," and held that even the State Ethics Commission is not authorized to enforce that section of the state ethics code.  Saccone v. State Ethics Comm'n, 480 N.E.2d 13, 15, 18-19 (Mass. 1985).  Indeed, the SJC emphasized that section 23 "was not intended as a set of specific provisions punishable [by penal sanction or] by [civil] fine, but rather, it performs a particularly useful role in outlining the principles of the other more concrete provisions" of Chapter 268A. Id. at 17 (quotation marks and brackets omitted).  At most, section 23 may be "enforced through administrative action" by a public official's supervisor.  Id.

Interpreting the "under color of official right" prong of 18 U.S.C. § 1951(b)(2), the Supreme Court declined to construe the Hobbs Act "in a manner that . . . involves the Federal Government in setting standards of good government for local and state officials."  McDonnell, 136 S. Ct. at 2373 (quotation marks omitted).  Cf. Tavares, 844 F.3d at 49, 54 (finding the government "overstepped its bounds in using federal criminal statutes to police" what it deemed "unappealing conduct" by state officials); United States v. Walker, 490 F.3d 1282, 1299 (11th

---

[35] The government has explicitly advanced one subsection of the relevant chapter (§ 23(b)(2)(ii), Doc. No. 249 at 9-10), and also elicited testimony regarding another subsection (§ 23(b)(3), Doc. No. 370 at 69-70).

Cir. 2007) (holding that federal prosecutors are not empowered to "instruct state officials on how to conform their conduct to state law, because this power is reserved to the states").

Accordingly, the Court rejected the government's requested instruction on the state ethics law, overruled an objection by the government to language in the draft charge explaining that jurors were "not authorized by way of federal criminal law to enforce state or local codes of conduct or ethics," and so instructed the jury. Doc. No. 339 at 1; Doc. No. 411 at 34-35. The day before closing arguments, following the charge conference, the Court memorialized its ruling in an electronic order, saying: "In addition, the Court rejects the government's request that it include [chapter] 268A of the Massachusetts General Laws as a basis upon which it may seek to prove wrongfulness, for the reasons stated in open court." Doc. No. 349. The government did not seek reconsideration of that ruling or otherwise reiterate its request or objection regarding the state ethics rule. This decision eliminated the state ethics law as a viable theory of establishing wrongfulness.

In any event, for all the foregoing reasons, the jury could not have relied upon the cited provisions of the state ethics law to find that the defendants acted wrongfully.[36]

_____

[36] Two other considerations bear mention with respect to Chapter 268A. First, the government neither adduced evidence at trial, nor proposed a jury instruction, that would have permitted the jury to determine whether the jobs and resulting wages at issue in this case amounted to an "unwarranted privilege" that was "not properly available to similarly situated individuals," as required by § 23(b)(2)(ii) of Chapter 268A. Neither this statute, nor any other source of law of which this Court is aware, creates a general right on the part of those interacting with public officials to be free from any and all political considerations in the exercise those officials' discretion and authority. Thus, even if this were a viable legal theory as a general matter, there was no basis for the jury to conclude either defendant's conduct violated such a rule, as the government failed to sustain its burden of proving it on the merits in this case. Second, unlike certain other provisions of Massachusetts's conflict-of-interest law, section 23(b)(2)(ii) of Chapter 268A is not subject to criminal enforcement even by state authorities. This renders the government's effort to use it as a basis for federal criminal liability even more problematic from a constitutional standpoint. See Valdes v. United States, 475 F.3d 1319, 1323 (D.C. Cir. 2007)

### 3. *The Absence of a City Policy*

Another focal point of the government's wrongfulness argument has been the testimony of various City officials and other witnesses that the City of Boston had no policy requiring "that a company looking to hold an event at City Hall Plaza use union labor."  Doc. No. 398 at 9.  But the mere absence of a policy did not give Crash Line a legal right to be free from a demand to hire union stagehands, nor did it preclude City officials from requesting or demanding that such workers be used in specific instances or in response to particular sets of circumstances.  It was the government's burden to <u>prove</u> that Crash Line had a right to be free from the demand, or that the defendants were barred from making such a demand.  That burden might have been met with evidence of a City policy affirmatively prohibiting public officials in Boston from imposing a union requirement.[37]  There was no evidence of any such prohibition, nor a basis to reasonably infer one.[38]  In fact, the uncontested evidence in this case established that the City could—and

_____

(emphasizing the need "to protect a citizen from punishment under a statute that gives at best dubious notice that it has criminalized his conduct").

[37] Even if such proof had been offered—this is, evidence that the City of Boston had a policy prohibiting City officials from requiring the use of union labor—any effort by the government to use the Hobbs Act as a means of policing a City official's failure to comply with such a policy would be foreclosed by the same decisions which supported the Court's elimination of the state ethics law as a theory of wrongfulness here.  <u>E.g.</u>, <u>McDonnell</u>, 136 S. Ct. at 2373 (warning against using federal criminal law to set "standards of good government for local and state officials").

[38] Rull's statement to Brissette that he could not cancel or pull the "Top Chef" filming permits is not such evidence.  Crediting the government's version of the "Top Chef" events, Brissette was threatening or attempting to cancel permits that had <u>already issued</u>.  That is very different from imposing a condition for an as-yet <u>unissued</u> permit or license.  Nor do Strout's statements to Brissette that "we can't discriminate against union or nonunion" and "it's none of our business in Government whether something is union or nonunion" fill this void.  Doc. No. 364 at 83-84.  By her own testimony, Strout was speaking about standards applicable to those in "state Government" (where she worked), <u>id.</u>, and she was not "aware of policies, rules and regulations [applicable to] filming in Boston," <u>id.</u> at 85.  The only general prohibition on state or local government involvement in the hiring of union by private businesses arises from the NLRA, which was eliminated as a basis of proving wrongfulness in this case.  <u>See</u> § II(C)(7), <u>infra</u>.

routinely did—require companies leasing City Hall Plaza to use certain categories of unionized workers. Doc. No. 367 at 36; Ex. 9;[39] Ex. 20.

In its brief opposing the Rule 29 motions, the government asks the Court to uphold the jury's verdict by citing the absence of a City policy and faulting the defendants for eliciting "no evidence" of a union requirement that could have provided them a "claim of right" to dictate how Crash Line directed its wages and benefits. Doc. No. 398 at 9 (also asserting a lack of evidence showing the ILA "contemplated" that the defendants could "intervene in Crash Line's hiring decisions"). Under the United States Constitution, of course, the government bears the burden of proving guilt; a defendant bears no burden to prove his innocence. Here, the government had to prove each element of extortion, including wrongfulness, beyond a reasonable doubt. It was not at trial, nor is it now, the defendants' obligation to offer evidence negating this essential element of the charged offense. In other words, Brissette and Sullivan were not required to establish that they had a lawful claim to Crash Line's property; the government had to prove beyond a reasonable doubt that they lacked such a claim. It failed to do so.

Thus, the jury could not have relied upon the absence of a City policy generally requiring the use of union labor as a basis for finding that the defendants acted wrongfully.

### 4. *The Defendants' Truthfulness*

Finally, the government argued to the jury, and reiterates in its post-trial briefs, its view that the defendants lied to Crash Line about the possibility of a protest by IATSE at the festival, and that such lies rendered the alleged threats of economic harm wrongful. Doc. No. 398 at 13;

---

[39] The government makes much of the fact that Crash Line "expressly confirmed" with the City's event manager "that Crash Line would not be required to use union labor." Doc. No. 398 at 9. However, as noted previously, after the e-mail exchange the government cites, the City rejected contract language that would have formalized this exchange, and the parties executed a contract pursuant to which the City required the use of various types of union labor.

accord [Doc. No. 384 at 7-8](#), 16, 29-32, 38, 89-90, 96.  This theory cannot sustain the jury's verdict.[40]

The government bore the burden of proving wrongfulness, regardless of which theory it pursued.  Insofar as this theory was concerned, it was the government's burden to prove, with direct or circumstantial evidence establishing or permitting a reasonable inference beyond a reasonable doubt, that the defendants lied about the threatened protest.  It was not the defendants' burden at trial, nor is it their burden now, to prove that they did not lie.  The Court observed the trial first-hand and has conducted a careful review of the parties' submissions, the transcribed testimony of every trial witness, and all admitted exhibits.  Giving due deference to the jury's verdict and applying the prosecution-friendly standard governing Rule 29 challenges, the Court nonetheless finds that the evidence cannot support a reasonable inference that Brissette and Sullivan manufactured the threat of a protest by IATSE.

There was ample evidence, including witness testimony and documents, that IATSE members were angry about Crash Line's employment practices—in particular, its use of volunteers in 2013 who were charged a fee rather than paid to work, and its selection of BKP as the provider of production labor for the Boston Calling festivals.  There was evidence that Glynn shared her members' concerns with Rogers in writing via e-mail (hoping he would convey the information to City officials), and also directly with Sullivan (to whom she described her members as "angry" and "chomping at the bit").  There was evidence that just before the May

---

[40] The theory, as the Court understands it, is that threatening a disruptive union protest, knowing that no such protest will occur, in order to secure real jobs at a fair wage for real people, amounts to a threat of economic harm that is per se wrongful, irrespective of any claim of right by the defendants or the recipients of the wages.  Cf. Sturm, 870 F.2d at 773 (leaving open "the possibility that the use of wrongful economic threats to obtain property to which the defendant is legally entitled may be prosecutable as extortion under the Hobbs Act"); Kattar, 840 F.2d at 124 n.3 (noting "it is not obvious that every form of economic fear is equally legitimate").

2014 Boston Calling festival, Glynn wrote to Rogers about her members wanting to protest the event—making specific reference to IATSE's inflatable rat—at a time when Rogers was meeting with City officials to discuss union issues. There was evidence from both Rull and Rogers that the possibility of a union protest at a Boston Calling festival was discussed during a meeting at City Hall attended by both of them and Sullivan, as well as evidence that Linehan was aware of the possibility of a protest by IATSE, having heard discussions about it at City Hall. There was evidence that elected officials from Local 11 besides Glynn, including the union's president, communicated with City officials on the union's behalf, and evidence that Local 11's members were free to communicate their own concerns as well. There was evidence that late in August 2014, Glynn again reached out to Rogers via e-mail, this time writing that she would begin preparing for a demonstration at the September festival unless her efforts to secure work from Crash Line bore fruit. And, there was evidence that both Appel and Snow believed Brissette and Sullivan were sincerely worried that IATSE might stage a disruptive protest at the festival.

Of course, the jury was not obligated to credit any of this evidence. Rather, it was free to reject all of the foregoing testimony and the several contemporaneous e-mails Glynn wrote.[41] But, even if the jurors had elected to reject all of it, they would have been left with no evidence at all regarding whether the union or its members intended to protest and, if so, whether either defendant was aware of it. There was no affirmative evidence that Local 11's leadership or its members (or even any one of its leaders or members) were not considering a protest—with or without an inflatable rat—or that they were not unhappy with Crash Line's use of BKP.[42]

---

[41] The Court notes there was no challenge to the authenticity of the e-mails, nor was there any attack on the veracity of the statements Glynn made in them regarding her members' discontent or their desire to protest at the 2014 Boston Calling festivals.

[42] The government correctly points out that there was evidence that neither Glynn nor Rogers specifically mentioned a picket or the inflatable rat to Brissette or Sullivan, and there was

So, assuming this theory of wrongfulness was legally viable,[43] it remained the government's burden to prove beyond a reasonable doubt that one or both defendants lied to Crash Line. The only evidence offered on this subject tended to show that there <u>was</u> a threatened protest, and that the defendants were concerned about it.[44] Setting that evidence aside, as

---

evidence that Local 11 had not submitted a formal bid to Crash Line for work at its festivals. But this evidence, standing alone, cannot support a reasonable inference that the defendants lied. There was no basis to infer, let alone to find beyond a reasonable doubt, that Glynn and Rogers were the defendants' only possible sources of information about Local 11. To the extent the government faults the defendants for not proving that they <u>had</u> heard about a possible picket, Doc. No. 398 at 13, such arguments impermissibly shift the burden of proof to the defendants.

[43] The government's suggestion that it need only prove the defendants lied in order to establish a wrongful purpose marks another novel aspect of this case. Threats of financial harm are not inherently "wrongful," for purposes of the Hobbs Act, because fear of such harm "is a part of many legitimate business transactions," <u>Burhoe</u>, 871 F.3d at 9, and "may also be a necessary consequence of many legitimate exercises of official authority," <u>Brissette</u>, 919 F.3d at 685. Similarly, exaggeration, or even wholesale bluffing, is common fare in routine business negotiations. <u>Cf. NPS, LLC v. Ambac Assurance Corp.</u>, 706 F. Supp. 2d 162, 172 (D. Mass. 2010) ("Courts vary in their conclusions of just where the line between [civilly actionable] misrepresentation and [inactionable] puffery lies, and often the determination is highly fact-specific."). The lack of precedent for transforming any lie that exploits economic fear into a federal felony under the Hobbs Act raises serious due process concerns. <u>See Wilkie</u>, 551 U.S. at 567 (declining to "embrace the expansive notion of extortion" proposed by a civil litigant absent "some text in the Hobbs Act" suggesting Congress intended such breadth).

[44] There was no evidence from which the jury could have concluded that Glynn or Local 11's members—none of whom are alleged to have been co-conspirators with the defendants—had lied about the possibility of a protest. Though the evidence established that Local 11 had not used an inflatable rat since 2009 (five years before the relevant events), the union still owned the rat in 2014 and at the time of the trial. Doc. No. 368 at 19, 35. And, though Glynn testified to certain conditions the union would have to meet "in order to have a <u>strike</u>, picket line"— conditions which were not met with respect to Crash Line in 2014—she distinguished "that type of a job action" from an "informational picket" (which the government preferred to call a "leafletting"), which she said Local 11 could have undertaken with respect to Crash Line, and which she testified could have involved a group of people at the festival entrance with signs and "the rat on the back of a pickup truck." <u>Id.</u> at 111-13 (emphasis added); <u>cf.</u> <u>Burhoe</u>, 871 F.3d at 20 (finding "no basis in the labor laws" for viewing "peaceful picketing in pursuit of" real jobs at a fair wage as "illegitimate simply because the jobs that the union seeks to turn around are jobs already being performed by nonunion workers"); <u>Meaney v. Dever</u>, 326 F.3d 283, 284 (1st Cir. 2003) (describing "informational picket" by police and firefighters' unions held to coincide with city mayor's inauguration, involving "between 80 and 125" picketers and additional supporters in cars driving around the location and honking their horns steadily for an hour).

required by Rule 29, the record is devoid of any evidence from which the jury reasonably could have inferred that the defendants had lied.  Put simply, the government offered no direct or circumstantial evidence suggesting—let alone proving beyond a reasonable doubt—that the defendants lied to Crash Line, about the threatened picket or about their desire to avoid it.  As the government observed in a sidebar discussion related to this very subject: "You can't just argue an inference based on no evidence."  Doc. No. 368 at 62.

Rather than meeting its burden of proving this theory beyond a reasonable doubt, the government instead points to evidence that was lacking, arguing that the absence of such evidence meant the defendants must have lied.  In particular, the government argues there was no evidence showing "that anyone from Local 11 or on behalf of Local 11 had informed the defendants that the union was going to picket the concert or set up a rat," or that the defendants "told anyone else . . . that they were concerned about a picket," or that Brissette called Glynn to ask her not to picket.  Doc. No. 398 at 13-14; see Doc. No. 384 at 29-32 (reflecting the same arguments in the government's closing).  But such arguments, of course, amount to improper burden-shifting by the government, and this Court is constitutionally bound to reject them.

The defendants' convictions cannot be sustained by faulting them for failing to satisfy a burden that was not theirs to meet, such as by suggesting they should have provided evidence showing how they learned of the potential picket and to whom they spoke about it thereafter.  Evidence that neither Glynn nor Rogers told Brissette the union might protest—even setting aside the evidence that both of them did participate in conversations with Sullivan during which the possibility of a protest either did or may have come up—does not support a reasonable inference that no one "from Local 11 or on behalf of Local 11" ever mentioned a possible union demonstration to either defendant.  Similarly, evidence that Brissette did not discuss the Boston

Calling festival generally, or this particular problem, with Cook (who held Brissette's position previously, though not immediately before him), Rull (who was not Brissette's boss), or the Police Commissioner does not support a reasonable inference that the defendants "never told anyone else" they were concerned about a possible union protest.[45] And, evidence that Brissette did not call Glynn to ask her to prevent her members from protesting does not support a reasonable inference that Sullivan made no such request of Glynn, or that either defendant made no such request of Local 11's president or any other IATSE representative or member.[46]

On this record, and guided by both the Rule 29 standard and the fundamental principle that the burden of proof as to each element at all times rests with the government, the Court concludes that the government has not established beyond a reasonable doubt that the defendants made up the threatened union protest, or pretended to be nervous about it. The jury, therefore, could not have found that the defendants lied and thereby acted wrongfully.

### 5. *The Defendants' Knowledge*

Even if the government had proven that Crash Line had a pre-existing right to be free of the relevant demands, or that the defendants had no claim of right to demand the property at issue, the "wrongful purpose" element requires proof that the defendants "knew as much."

---

[45] Other people to whom Brissette might have spoken about this subject were either not called as witnesses (e.g., his direct supervisor, the person who held his position immediately before he did, Local 11's president, Captain Fong, or any other police official besides former Commissioner Evans), or were not asked about this subject (e.g., Strout). Additionally, the government offered no e-mails or telephone records establishing whether either defendant spoke (or tried to speak) with anyone besides Appel and Glynn on or around September 2nd.

[46] Glynn, of course, was not Local 11's president. Her testimony established that Brissette had personally met with the man who was Local 11's president at least once before September 2014. The "Top Chef" evidence reveals that, when confronted with the threat of a protest by the Teamsters, Brissette called that union's president in an (unsuccessful) effort to prevent the protest. The government offered no evidence showing whether Brissette contacted Local 11's president on or around September 2nd about the threatened protest at Boston Calling.

Burhoe, 871 F.3d at 9.  Brissette and Sullivan cannot be guilty of extortion "if [they] genuinely believed that [they were] entitled to" demand that Crash Line hire workers through Local 11 at the September 2nd meeting.  Sturm, 870 F.2d at 774.  Thus, the government was obligated to prove that Brissette and Sullivan knew they had no lawful right to demand that Crash Line hire, and pay wages and benefits to, Local 11's stagehands.[47]  The government failed to establish such knowledge beyond a reasonable doubt.

_____

[47] The government opposes consideration of whether Local 11 had a lawful claim to the wages at issue, saying it has found no cases in which other courts have given "weight to the right of the third party recipient, rather than the extortionist."  Doc. No. 398 at 8; but see United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981) (excerpting a jury instruction requiring jurors to consider whether "the purpose of the defendant . . . was to obtain money for himself or for others to which they were not entitled" (emphasis added)); Doc. No. 140 at 6 (reflecting government's belief in November 2017 that it "would [have] to prove defendants knew Local 11 had no claim of right to the wages and benefits extorted from Crash Line" (emphasis added)).  The Court is aware of no other case in which a defendant has been charged with, let alone convicted of, extorting property which he never directly received, from which he derived no personal benefit, and to which the third-party recipient had a lawful claim.

The Court adheres to its view of the law as permitting—perhaps even requiring, in the present circumstances—consideration of whether the third-party recipient of the property had a lawful claim to it.  The defendants are not private individuals, but public officials charged with extortion in the performance of their government duties.  Public officials regularly advocate for, and make demands on behalf of, constituents and members of the public.  They also routinely exercise their discretion to favor the groups, persons, and policies that led to their election (or to the election of those who appointed them).  That is, at least, an unavoidable feature of representative democracy.  Cf. Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 349 (2010) (quoting Justice Kennedy's opinion in McConnell v. Fed. Election Comm'n, 540 U.S. 93, 297 (2003), its reference to quid pro quo as the appropriate measure of political corruption, and its observation that "[f]avoritism and influence are not . . . avoidable in representative politics").

Here, the government has not established that Local 11 lacked a claim of right to the money Crash Line paid the nine workers at issue.  The evidence is to the contrary.  It is undisputed that the nine individuals were paid for work they performed.  There is no evidence they were paid at an extortionate rate, especially where the union agreed to wages and benefits less than the amount BKP charged for similar workers.  The government suggests the law precluded the union from seeking jobs for its members and/or from threatening a protest of the festival.  Doc. No. 398 at 11-12; but see Doc. No. 339 at 8 (arguing that "whether unions can picket or protest is beside the point").  The only source of law that might impose such a prohibition is the NLRA.  See Doc. No. 309 at 20 (arguing the NLRA precludes unions from threatening a "picket for the purpose of coercing a private employer to reassign work from a nonunion company to a union company").  Having conceded this ground, as discussed below,

46

No evidence was adduced at trial suggesting that either Brissette or Sullivan ever saw the ILA, let alone read it and understood it to give Crash Line sole and exclusive authority over all decisions regarding the hiring of stagehands.  Cf. Ex. 38 (reflecting that, in February 2012, other City officials had not seen the ILA).  Likewise, the absence of a City policy requiring the use of union labor—even combined with proof that Brissette and Sullivan were aware the City had no such policy, Doc. No. 371 at 126-27—does not establish that either defendant knew he was affirmatively prohibited from requesting or requiring the use of union workers under any circumstances.[48]  Nor did the "Top Chef" evidence establish such knowledge, given the material differences between those events and the events the defendants faced with respect to Crash Line.  See § III(B)(2), infra.

Even if the state ethics code had been available to the jury as a basis for finding wrongfulness—and even assuming it could be interpreted as having precluded the relevant demands—the government offered nothing to show that either defendant understood the relevant provision to both apply to the circumstances here and preclude them from making the charged demand.  Although there was some evidence that the defendants were aware that they were

---

§ II(D)(7), infra, the government cannot defend the verdict by invoking the NLRA (which, as the Court understands it, protects Local 11's right to conduct an informational picket in circumstances such as those presented here in any event).  See Burhoe, 871 F.3d at 16 (noting "no basis in the labor laws for" finding that a union may not legitimately protest in order to "turn around . . . jobs already being performed by nonunion workers").

Because the government's proof fails, the Court need not address further the complexities posed by the interrelationship of Local 11's claim for the wages and the legality of the defendant's conduct under the Hobbs Act.

[48] This is especially so in light of the "Non Disturbance" provision of the ILA, whether or not there was evidence that the defendants knew of it and intended to invoke it.  Cf. Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (finding arrest valid if the facts known at the time supply probable cause to believe that one crime has occurred, even if the arresting officer had neither recognized nor cited that offense as the basis for the arrest).

bound by certain ethical rules applicable to public officials, such evidence did not constitute proof beyond a reasonable doubt of the knowledge required in order to establish wrongfulness.

Put simply, the government failed to establish by any measure, let alone beyond a reasonable doubt, that Brissette or Sullivan infringed Crash Line's pre-existing right <u>about which they knew</u>, or demanded property despite <u>knowing</u> they lacked a claim of right. (Of course, the defendants could not have done so knowingly, as the above discussion establishes the government has not proven they did so at all.) As such, the jury could not have found a "wrongful purpose" as required to sustain a conviction for extortion under the Hobbs Act.

6. *Other Purposes*

First Circuit decisions examining the Hobbs Act and its wrongfulness element leave open the possibility that other considerations might factor into the "wrongful purpose" determination. For example, in this very case, after emphasizing that the Hobbs Act requires proof that economic fear was "employed to achieve a wrongful purpose," the First Circuit queried whether wrongfulness can be demonstrated where government officials use "economic fear . . . to secure real work for members of a specific union" but "receive no personal gain." <u>Brissette</u>, 919 F.3d at 685. As such, the Court addresses other "purposes" suggested by the evidence and identified by the government as possibly underlying the defendants' conduct here.

At various times, the government has argued that the defendants' "purpose" (as that term is commonly understood) was one or more of the following: to repay a political supporter of their boss, Mayor Walsh; to curry favor with, and ensure future support from, Local 11; to please Mayor Walsh by advancing his agenda; or to avoid a disruptive or embarrassing protest at a major event on City Hall's doorstep. <u>E.g.</u>, Doc. No. 363 at 5 (describing the purpose behind the charged conduct "as payback to a union that was a political supporter and ally of their boss"); <u>id.</u>

48

at 20 (predicting the evidence would prove the defendants pursued a "personal benefit" by seeking "to please their boss, the Mayor, who owed a debt to the unions who got him elected"); Doc. No. 384 at 7 (citing "no legitimate reason" for the charged conduct other "than to curry favor with and pay back the union that had helped to elect [the defendants'] prounion boss and to maintain their support"); id. at 96 ("The only purpose behind what the defendants did was to avoid embarrassment to the mayor, to themselves, [and] to pay back the union and ensure their continued support . . . ."); see also Doc. No. 214 at 3 (proffering evidence that the defendants "wanted to avoid any embarrassment that a Local 11 picket and the use of a giant inflatable rat on City Hall Plaza might cause" them or "the Walsh administration").

Even if one finds some of these objectives distasteful, they simply do not suffice to trigger criminal liability under the Hobbs Act. The Supreme Court has admonished against subjecting public officials to criminal liability under the Hobbs Act "when they act for the benefit of constituents" or to "further[] the interests of some of their constituents," describing such conduct as "in a very real sense unavoidable" given the features of "election campaigns" in this country. McCormick, 500 U.S. at 272

The jury, therefore, could not have relied on any of these arguments to find that the defendants acted wrongfully.

7. *The NLRA*

At various times before the trial, the government pointed to the National Labor Relations Act ("NLRA") as a federal statutory regime it believed prohibited the defendants from demanding that Crash Line hire workers through Local 11. However, by the time the jury retired to deliberate, that theory was no longer available as a basis for proving or finding wrongfulness.

The NLRA is a federal civil law through which Congress established a "comprehensive system" to regulate "industrial relations," including the relationship between employers and labor unions.  Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc., 475 U.S. 282, 287-88 (1986).  It preempts state and local laws that would present a conflict with the federal "integrated scheme of regulation," as embodied in the NLRA and implemented by the National Labor Relations Board.  Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224-25 (1993).  As relevant here, the NLRA prevents local officials from using their regulatory authority to influence the decisions of private employers regarding whether to bargain with a labor union or hire union workers.  Id. at 226-28.  It does not, however, prohibit "all legitimate state activity that affects labor."  Id. at 227.  Where a state or municipality "acts as a market participant with no interest in setting policy," such as when it "manage[s] its own property," it may "act[] just like a private [property owner] would act."  Id. at 227, 231, 233.  Due to this "distinction between government as regulator and government as proprietor," id. at 227, the preemptive scope of the NLRA can present complicated factual issues.[49]

_____

[49] Determining the boundaries of a local official's permissible conduct when it comes to labor relations depends on the particular capacity in which he was acting at the relevant time.  For example, in a case arising from the pollution of Boston Harbor, state officials seeking bids from companies to clean up the Harbor required, "as a condition of being awarded a contract or subcontract," that applicants "agree to abide by" a previously executed labor agreement.  Bldg. & Constr. Trades Council, 507 U.S. at 220-22.  The Supreme Court concluded the bid specification was not preempted by the NLRA because it was "proprietary conduct" by state officials focused on ensuring "an efficient project that would be completed as quickly and effectively as possible at the lowest cost," and "not government regulation."  Id. at 232-33.
    Application of NLRA preemption doctrines in this case would require an assessment of whether the City generally, and the defendants specifically, were acting as proprietors of City Hall Plaza, as regulators interested in labor issues, or as a hybrid of the two, during the relevant interactions with Crash Line.  That assessment is complicated, as the relationship between the City and Crash Line—as described by the government—involved the permitting process (a

50

From the earliest stages of this case through the final pretrial conference, the government contended that the NLRA prohibited the defendants from demanding that Crash Line hire union stagehands, and that the defendants knew as much. It was the government's unequivocal position in opposing the defendants' motions to dismiss that NLRA preemption, combined with the defendants' knowledge thereof, was sufficient to prove wrongfulness:

> THE COURT: . . . The reason that it's wrongful, on your theory, is that there's a federal law that says they're free – the company is entitled to be free from a demand from any local or state official acting in a regulatory capacity –
>
> MS. KAPLAN: Correct.
>
> THE COURT: --that they hire union.
>
> MS. KAPLAN: Correct.

Doc. No. 179 at 48; see also Doc. No. 86 at 17 ("[Crash Line] had a statutory right under the NLRA to negotiate with Local 11 freely and without interference from the defendants, and the defendants' use of the permitting process to extort [Crash Line] into hiring Local 11 members for its music festival was wrongful under the Hobbs Act.").

The same position underlay the government's stated justification for seeking to admit the "Top Chef" evidence, which it argued would help to prove the defendants' knowledge that they "could not withhold permits" or "discriminate on the basis of a production's union or non-union status."[50] Doc. No. 140 at 6. The government also advanced this position in the jury instruction it proposed regarding "wrongfulness" in advance of the trial:

> States and cities do not have authority to enact or enforce regulations or policies that conflict with the NLRA or intrude upon matters that the NLRA, by implication,

---

regulatory function), as well as the parties' rights and obligations pursuant to the ILA and ongoing discussions regarding a potential extension of Crash Line's lease (proprietary functions).
[50] Although the government did not explicitly reference the NLRA in its briefing regarding "Top Chef" as the source of these limits on the defendants' regulatory conduct, and the "Top Chef" witnesses did not mention federal labor law, the government has identified no other law giving rise to such limits, and the Court can think of none.

leaves to the parties to resolve without outside interference. In that context, I instruct you that the NLRA generally contemplates that the question of whether an employer should enter into an agreement with a union is one that the parties may resolve without such interference. However, if a state or city is acting strictly as the owner of property or as a market participant with no interest in setting policy, it may require private parties with which it contracts to adhere to certain labor requirements.

Doc. No. 267 at 29. And, the government reiterated this position during the final pretrial conference, days before jury selection began:

Another way the Government can prove defendants' conduct was wrongful was because the victims had a preexisting right to be free from this type of interference or economic harm . . . because of . . . the National Labor Relations Act, which prohibits this type of interference. This is an area where the defendants were . . . regulators, they were not proprietors, and they were not free to wade into whether an employer enters into an agreement with the union. That's an issue that the parties are entitled to resolve without interference. That's what's contemplated by the NLRA.

Doc. No. 309 at 19-20.

Because of the government's consistent focus on the NLRA as one of the pillars supporting its charges against the defendants, the Court included such an instruction in the draft of its final charge circulated to the parties as the trial was drawing to a close. See Doc. No. 337 at 21-22 (describing the "federal laws establishing uniform national standards governing relationships between employers and labor unions," the effect of such laws on the conduct of local officials, and what unions are permitted to do under such laws). In its objections to the Court's draft charge, the government—for the first time—took the position that "the Court should not instruct on the NLRA." Doc. No. 339 at 6. The government's stated reason for taking this position was that "the jury has not heard anything about the National Labor Relations Act." Id. Of course, the Court excluded no evidence bearing on the defendant's knowledge of federal law, and the actual terms of the NLRA, like any other law, are properly explained to the jury in the charge, not proven by way of evidence.

At the charging conference on the eve of closing arguments, the government expanded on its objection, arguing that neither this case nor the events surrounding the "Top Chef" filming permits had anything to do with federal labor law. Specifically, government counsel suggested that the government's "position about 'Top Chef'" did not "necessarily" have "anything . . . to do with the NLRA"; that evidence "designed to show Mr. Brissette's knowledge that he wasn't supposed to do this" did not concern "the niceties of every bit of the" NLRA; and that "this case is not about labor unions."[51] Doc. No. 411 at 9, 11-12; see also Doc. No. 363 at 21 (asserting in opening statement that "this really isn't a case about organized labor at all"). Government counsel also said: "[F]rankly, I'm not sure that the Government can prove that either defendant, especially Ken Brissette, I'm not sure that we can prove that he specifically knew about the NLRA." Id. at 10.

In light of the government's unprompted decision to abandon its previous reliance on the NLRA as a theory of wrongfulness, the Court revised its final charge and removed all references to federal labor law from its wrongfulness instruction. Doc. No. 348 at 21-22. The Court emphasized this revision in a contemporaneous electronic order:

> In amending the draft final jury instructions following today's charging conference with counsel, the Court has deleted all references to the NLRA, thereby eliminating it as a basis upon which the government may seek to prove wrongfulness, based on the government's request that all such references be deleted from the jury instructions and its concession that it does not wish to proceed on, and cannot establish, that theory of wrongfulness.

Doc. No. 349 (emphasis added). The government did not object to this change—then, or ever—and the Court delivered the revised instruction to the jury the next day.

---

[51] This position directly contradicts positions taken by counsel for the United States in this very case. E.g., Doc. No. 309 at 19-20 (arguing that federal law governing the interactions between employers and unions and specifying the permissible forms of union demonstrations were relevant to assessing the wrongfulness of the defendants' conduct in this case).

Given this course of events—and especially the Court's order removing it as a theory available to the government in this case—the NLRA cannot support a finding of wrongfulness here. The jury could not have based its verdict, and the verdict cannot now be supported, on a legal theory the government waived and the Court did not explain in its instructions. Without an explanation of NLRA preemption, including the distinction between what public officials may do in their regulatory and proprietary capacities, the jury could not have determined whether the defendants' conduct violated the NLRA at all, let alone whether they knew it and, thus, acted wrongfully.

Even if the NLRA had been available to the government to argue, and the jury to consider, at the close of this trial, a finding of wrongfulness on this basis is neither factually nor legally supported in this case. Factually, the government's evidence and argument portrayed the relevant events as involving both the regulatory and proprietary roles the defendants held with respect to Crash Line. Though there was evidence permitting an inference that one or both defendants knew that there were limitations on what City officials could do when it came to interactions between unions and private employers, there was no evidence establishing or supporting a reasonable inference that either Brissette or Sullivan: understood "the niceties of every bit of the" NLRA, Doc. No. 411 at 11, including the contours of NLRA preemption; were aware of the different limitations placed on them depending on whether they were enacting policy or dealing with renters of City property; or understood the capacity in which they acted when it came to Crash Line (an entity that was both seeking permits from City regulators and operating pursuant to, and seeking an extension of, a lease from the proprietor of City Hall

Plaza).  In other words, the government failed to prove beyond a reasonable doubt that the defendants knowingly violated the NLRA in the circumstances they faced.[52]

Legally, the Court's instructions required jurors to find both a "wrongful means" and a "wrongful purpose."  A finding that the defendants knowingly violated the NLRA by demanding the hiring of union workers while acting in their capacity as regulators—were such a finding supported here, and it is not—would satisfy only the "wrongful means" component, as it was described by the Court.  See Doc. No. 348 at 21 (defining "wrongful means" as the use of "threats of economic harm that [the defendant] knows are prohibited" or that infringe the victim's "preexisting right to be free from [the] threat").  The Court's instructions also obligated the government to prove, and the jury to find, that each defendant acted "to achieve . . . an illegitimate or illegal objective."  Id.  None of the "objectives" supported by the government's evidence and argument here—to obtain jobs for real people who performed actual work and were paid a fair wage, to avoid an embarrassing protest at a major event on City Hall Plaza, to satisfy the request or concern of a Boston-based organization that was a constituent of the defendants and the Mayor, or to thank or repay an organization that had supported the Mayor's election— were illegitimate as a matter of law.  See §§ II(C), (D)(6), supra.  Absent proof that the defendants received a personal benefit, such as a payoff from Local 11, or that Local 11's members sought and were paid for fictitious work they did not actually perform or were paid at an extortionate rate, the government has not proved that the defendants acted with a "wrongful purpose" as the Court defined that term.

Accordingly, the jury's verdict cannot be sustained by resort to the NLRA.

---

[52] The defendants did not need to know it was the NLRA that governed their conduct, but they did need to know that the law prohibited their actions.

8.    *Conclusion*

For the foregoing reasons, the government has failed to prove beyond a reasonable doubt the wrongfulness element necessary to sustain Brissette's conviction under the Hobbs Act. Accordingly, the Court ALLOWS Brissette's Rule 29 motion, VACATES Brissette's conviction on Count 2 of the TSI, and enters a finding of NOT GUILTY as to Brissette on that charge.

For the same reasons, the government has failed to prove beyond a reasonable doubt that either defendant had the "requisite intent" needed to sustain their conspiracy convictions, as it was obligated to establish that both defendants "intended the substantive offense [of extortion] to be committed."[53]  United States v. Gonzalez, 570 F.3d 16, 24 (1st Cir. 2009); accord Doc. No. 348 at 25.  Because the government has neither identified nor proven a viable theory of wrongfulness, it necessarily follows that the government has failed to prove either defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements" of extortion.  Salinas v. United States, 522 U.S. 52, 65 (1997); accord Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016).  Accordingly, the Court ALLOWS both defendants' Rule 29 motions, VACATES both defendants' convictions on Count 1 of the TSI, and enters a finding of NOT GUILTY as to Brissette and Sullivan on that charge.

E.    Threats and Fear of Economic Harm

Brissette and Sullivan also challenge the government's proof of the second element of extortion: that they induced Crash Line to hire workers through Local 11 by knowingly and

---

[53] The government identified only one unindicted co-conspirator in advance of trial, and the Court ruled that the government had not shown by a preponderance of evidence that the identified person was involved in the alleged conspiracy, as would have been required to admit that individual's statements pursuant to Federal Rule of Evidence 801(d)(2)(E).  The government has expressly conceded that various other individuals involved in the relevant events, including Local 11 and its representatives, Crash Line and its representatives, and the former police commissioner, were not co-conspirators.

intentionally using Crash Line's fear of economic harm.  Doc. No. 348 at 15.  In particular, the defendants argue that the evidence was insufficient to establish beyond a reasonable doubt that either of them knowingly and intentionally threatened Crash Line, or knowingly and intentionally exploited Crash Line's existing fear of economic harm.[54]  After carefully reviewing the trial record, the Court finds no evidence from which the jury reasonably could have inferred that Brissette or Sullivan intended to convey a threat of economic harm, or that they knew Crash Line feared such harm related to its permits or license extension and intended to exploit that fear.

The Court instructed jurors regarding this element as follows:

The second element of extortion requires the government to prove beyond a reasonable doubt that the defendants induced Crash Line's consent to pay the wages and benefits at issue by using Crash Line's fear of economic harm.  In particular, the government alleges that the defendants *exploited Crash Line's fear* of economic harm *by implicitly threatening* certain permits and approvals related to the September 2014 Boston Calling festival, as well as the prospect of a license extension allowing festivals beyond 2017 . . . .

The government is not required to prove that there was an <u>explicit</u> threat of harm.  Threats may be made implicitly, by statements made or by physical acts or gestures.  Whether a statement, physical gesture, or act by the defendant was a threat depends on the surrounding circumstances.  In order to find that one or both defendants used or exploited Crash Line's fear of economic harm, you must find not only that the defendant you are considering <u>conveyed</u> an implicit threat of economic harm . . . , but also *that the defendant* <u>*intended*</u> *to convey such a threat*. . . .

In determining what a defendant intended at a particular time, you may consider any statements made or acts done or omitted by that defendant, and all other facts and circumstances received in evidence that may aid in your determination of his intent.  You may infer, but you certainly are not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. . . .

The government need not prove that the defendants created or caused Crash Line's fear.  This element could also be satisfied by evidence proving beyond a reasonable

---

[54] The defendants also dispute whether there was proof that Crash Line perceived a threat by either defendant, feared "cognizable 'economic harm,'" and actually and reasonably believed that either defendant "could or would harm the company."  Doc. No. 388 at 17.  As to these questions, the Court finds that there is sufficient evidence to support the jury's verdict under the applicable standard.

doubt that Crash Line had a preexisting fear of economic harm . . . , that the defendants were aware of Crash Line's fear, *and that the defendants intended to exploit that fear*. . . .

If you find the evidence establishes that Crash Line did, in fact, have a reasonable fear of economic harm based on the statements and actions of one or both defendants, *Crash Line's fear alone is not sufficient to establish that either defendant intended to convey an implicit threat*. . . .

So, to establish the second element of extortion, the government must prove beyond a reasonable doubt that the defendant you are considering *intended to threaten and did implicitly threaten* economic harm . . . .

Doc. No. 348 at 17-20 (italics added).  This instruction required the government to prove beyond a reasonable doubt that the defendants knew of Crash Line's reasonable fear <u>and</u> intended to exploit it to induce Crash Line's consent.  The government has never disputed that it bore such a burden.[55]  <u>See</u> Doc. No. 339 at 2-4 (objecting to other portions of the Court's proposed charge as to this element of extortion, but not to the language excerpted above).

There were three potential subjects of the defendants' implied threats, and Crash Line's fears, of economic harm: 1) the possibility that unfavorable conditions would be placed on festival hours and service of alcohol in the required alcohol permit and the entertainment license; 2) the possibility that the pending application for an entertainment license, required for the festival to occur, would be denied; and 3) the possibility that Crash Line would not be granted, or considered for, a license extension covering festivals beyond 2017.[56]  The government points to

---

[55] In a footnote to its post-trial briefing, the government suggests that the exploitation of "a pre-existing fear that [the defendants] did not cause . . . was not the theory presented here."  Doc. No. 398 at 20 n.4.  However, the government explicitly invoked precisely that theory in its closing, arguing there was "evidence of an implied threat" and saying "[t]he issue is whether the defendants <u>exploited Crash Line's fear</u>."  Doc. No. 384 at 14-15 (emphasis added); <u>see also</u> <u>id.</u> at 8, 20, 93 (accusing the defendants of exploiting Crash Line's fear).  The Court instructed the jury on that theory without objection by the government, as noted above.

[56] To the extent the defendants challenge the evidence proving that Crash Line subjectively feared harms arising from any or all of these possibilities, that these possibilities constituted "economic harm" cognizable under the Hobbs Act, or that Crash Line reasonably believed one or both defendants could and would cause one or more of these harms to occur, the Court finds the

only two things that it urges support a finding that the defendants intended to exploit one or more of these fears: the defendants' official positions, and the timing of the September 2nd meeting only three days before the festival was slated to open.[57]  Doc. No. 398 at 15-16.

In considering these points together, the Court first notes what was absent from the evidence.  There was no evidence of menacing conduct by either defendant during the September 2nd meeting or at any other time.  Cf. Kattar, 840 F.2d at 122 (recounting evidence that the extorter had "used a threatening tone of voice and demeanor").  There was no evidence that Crash Line ever spoke to either defendant about any problems or concerns regarding permits during the summer of 2014, including at the September 2nd meeting and the two meetings Appel had attended with Brissette in his office during the preceding months.  See Doc. No. 366 at 135-36 (reflecting Appel's testimony that he had not discussed "either permits or liquor licenses" in Brissette's presence).  When Crash Line had permitting concerns leading up to the September 2014 festival, the evidence uniformly established that Appel or one of Crash Line's consultants spoke with the permitting authorities directly, or that Appel reached out to Joyce Linehan.  There was no evidence that either defendant raised the subject of permits with anyone from Crash Line

---

evidence sufficient to withstand Rule 29 challenges to those aspects of the relevant element of extortion and DENIES those aspects of the pending motions.  There was ample evidence that Crash Line was concerned in the time leading up to the September festival, including on September 2nd, about the festival curfew and limits on the time in which alcohol could be sold.  There also was sufficient evidence from which jurors could have inferred that Crash Line was generally worried about receiving its entertainment license, and that it would suffer economic harm if the license either did not issue or issued with severely curtailed hours.  And, there was plenty of testimony about Crash Line's desire for a license extension, plus a modicum of evidence that Appel feared the City might not fairly consider his request for an extension, if he did not relent and hire Local 11.

[57] The government also argues now that it proved the defendants explicitly threatened economic harm by lying to Crash Line about the possibility of a disruptive union protest.  Doc. No. 398 at 16.  But, as previously explained, the government failed to prove that the defendants lied, and that failure of proof also is fatal to this aspect of the government's position regarding threats.

before, during, or after the September 2nd meeting, and there was no evidence that either defendant created, exacerbated, or suggested they would mitigate Crash Line's fears. Cf. Doc. No. 371 at 91 (reflecting Snow's testimony that neither defendant said the festival would not occur unless Crash Line hired union labor).

On the other hand, there was evidence that Brissette told Appel, during the August 19th meeting also held in Brissette's office at City Hall, that Crash Line "would have to hire a few guys" from Local 11 for the September festival.[58] Doc. No. 369 at 90. There was plenty of evidence regarding Crash Line's desire to secure an agreement covering festivals beyond the years provided in the ILA, and Appel testified that Brissette, at least, was aware of this desire (because Appel asked about it "every opportunity that [he] had"). Doc. No. 365 at 102-03. But, Appel further testified that each time he broached the subject, Brissette assured Appel "he was working on it and . . . believed it would" happen. Id. at 103. Appel also testified that he raised his desire for a license extension with Brissette on September 2nd, either during the meeting or during a telephone call thereafter, and that Brissette responded, "[i]t's done." Doc. No. 365 at 143-44, 146-47.

On this record, the jury could not conclude beyond a reasonable doubt that these two public officials both knew about, and intended to exploit, Crash Line's fear of economic harm, whether arising from permit hours, the pending application for an entertainment license, or any

---

[58] There was no evidence that Crash Line subjectively perceived a threat arising from the August meeting, and the government has consistently argued that the extortion did not occur until the "fateful" meeting on September 2nd. Doc. No. 384 at 7; Doc. No. 314 at 23-24; see Doc. No. 398 at 17 ("And had Brissette accepted Appel's 'no thank you' when he asked Appel at the August 19, 2014 meeting to hire Local 11 workers for the September festival, Brissette could not have been said to cross the line [from advocacy to extortion]." (emphasis added)).

potential license extension.[59]  Simply put, the requisite knowledge and intent are not established by proof that the defendants are public officials who summoned Appel and Snow to a meeting in a City Hall office three days before the Boston Calling festival.  More is required—even if the jury reasonably could have inferred that the defendants, by virtue of their positions, were aware of Crash Line's concerns at the time of the meeting—to prove beyond a reasonable doubt that the defendants choreographed the meeting with the aim of capitalizing on Crash Line's fear or otherwise intentionally exploited its concerns.  The government offered no such proof.

A different result on this issue might obtain if the government had proven that the defendants were prohibited from making the demand and knew it, or that they had lied about the prospect of the union protest, or if there was any affirmative evidence in the record establishing the requisite intent.  Here, however, the totality of evidence (as described by the government, and as established by the Court's searching review of the trial record) generates too thin a reed to

_____

[59] The Court assumes for present purposes that there was evidence from which the jury could infer that Crash Line reasonably feared "economic harm"—and not the loss of a hoped-for benefit or preferential treatment—in connection with its quest for a license extension.  Crash Line was not legally entitled to a lease extension, no matter how strongly it wished for one.  The evidence established Crash Line was aware by September 2nd that the City intended to require it to respond to an open RFP process in order to obtain future dates for its festival.  Crash line was entitled to fair consideration in the RFP process.  See United States v. Rivera Rangel, 396 F.3d 476, 483-84 (1st Cir. 2005) (distinguishing attempts to secure "preferential access" from attempts to ensure "a fair opportunity" to be considered for government contracts, with only the latter properly supplying a basis for "fear of economic loss" under the Hobbs Act).  The record contains one passing reference by Appel to his concern that Crash Line would not be fairly considered if he declined to hire members of Local 11, Doc. No. 366 at 169, but there is even less proof of the defendants' intent to exploit this worry than there is of their intent to exploit Crash Line's permitting concerns.  Moreover, the "Non Disturbance" clause of the ILA undermines the government's position insofar as it relies upon Crash Line's desire for a license extension.  The 2015 RFP, to which Crash Line responded, specified that the City would employ "comparative evaluation criteria" including consideration of an applicant's history of successfully producing similar events.  Ex. 26 at 14-16.  As a matter of law, Crash Line is not denied fair consideration in its quest for a license extension (via RFP or otherwise) by City officials evaluating its compliance with the ILA's "Non Disturbance" clause.

support a finding in this case that these two public officials knowingly and intentionally exploited Crash Line's fear of economic harm.

To accept the government's view, which is unsupported by any language in the Hobbs Act itself, would allow a jury to find that a public official intended to exploit a permit applicant's fears, based solely on the fact that the official met in his office with the applicant in the final days of the permitting process. This gives the Court great pause, especially in light of the government's contention that "this case is not about labor unions." Doc. No. 411 at 12. In other words, the government's view potentially reaches all public officials as they interact with all constituent organizations, leaving the Court (and public officials) to guess at where the "forbidden zone of conduct" might end. McCormick, 500 U.S. at 273; see McDonnell, 136 S. Ct. at 2373 (emphasizing the constitutional imperative of guarding against interpretations of terms in criminal statutes that would not permit "ordinary people" to "understand what conduct is prohibited," and could expose "public officials" to "prosecution, without fair notice, for the most prosaic interactions").

For all of these reasons, given the deficiency of proof on a necessary component of the second element of extortion, the Court ALLOWS both defendants' Rule 29 motions on this third and independent basis, VACATES Brissette's conviction on Count 1 of the TSI and both defendants' convictions on Count 2 of the TSI, and enters findings of NOT GUILTY as to both defendants on both charges.[60] See Salinas, 522 U.S. at 65.

_____

[60] The defendants also mount challenges to the government's proof that their demands "induced" Crash Line's decision to hire workers through Local 11 and to the evidence that Crash Line subjectively and reasonably believed that the defendants could and would cause it economic harm. As to those issues, the Court finds the evidence sufficient to withstand a Rule 29 challenge, and the motions are DENIED.

F.    Other Elements

According to the First Circuit's decision in this case, the "obtaining of property" element of Hobbs Act extortion "may be satisfied," insofar as "obtaining" is concerned, "by evidence showing that the defendants induced the victim's consent to transfer property <u>to third parties the defendants identified</u>, even where the defendants do not incur any personal benefit from the transfer." <u>Brissette</u>, 919 F.3d at 685-86 (emphasis added).  The Court so instructed the jury. <u>Doc. No. 348 at 16</u>.  Pointing to the underlined language, Brissette and Sullivan argue that they must be acquitted, because the evidence at trial established that even if their demands induced Crash Line to agree generally to hire IATSE workers, the defendants themselves did not "identify" the <u>specific</u> workers to whom the wages and benefits at issue were paid.  <u>Doc. No. 389 at 17-19</u>; <u>accord</u> <u>Doc. No. 388 at 25</u> n.5; <u>see</u> <u>Doc. No. 368 at 81</u> (reflecting Snow sent Glynn a list of preferred workers identified by Kenney); <u>Doc. No. 371 at 77-78</u> (same); Ex. 160 (listing individuals requested by Kenney and asking Glynn to select the nine men from that list).

The defendants have advanced a colorable interpretation of the requirement as it was articulated by the First Circuit.  Had the defendants named the individuals Crash Line ultimately hired and paid, they plainly would have "identified" the third party recipients and satisfied the First Circuit's definition of this element.  This the government did not prove.  The government did prove that the defendants identified Local 11 as the union through which Crash Line was to hire stagehands.  This, the Court concludes, was sufficient to establish beyond a reasonable doubt that the defendants directed the transfer of the relevant property (the wages) to "third

parties [they] identified," within the meaning of the Circuit's decision.  Accordingly, this ground

of the Rule 29 Motions is DENIED.[61]

III.  <u>RULE 33</u>

The Court now turns to the defendants' requests, in the alternative, for a new trial

pursuant to Rule 33, a determination also required by Rule 29(d)(1) in light of the foregoing

ruling that a judgment of acquittal should enter as to both defendants.  The Rule 33 motions

focus on three subjects:  allegations that evidence pertaining to "Top Chef" should not have been

admitted at trial; allegations that the government misstated both the law and the facts in its

closing argument; and allegations that the government constructively amended the indictment by

trying the case on a theory akin to extortion "under color of official right," which was not

charged in any iteration of the indictment.  <u>See generally</u> <u>Doc. No. 391</u>; <u>Doc. No. 393</u>.  The

Court will address each of those issues, as well as the broader question of what the interests of

justice require in the circumstances of this case.

A.  <u>Legal Standard</u>

Rule 33 empowers the Court to "vacate any judgment and grant a new trial if the interest

of justice so requires."  Fed. R. Crim. P. 33(a).  This authority, like that contemplated by Rule

29, is properly exercised sparingly.  <u>United States v. Wilkerson</u>, 251 F.3d 273, 278 (1st Cir.

_____

[61] Though the defendants do not raise it, the Court notes that this case as charged presents a question about the "property" element of extortion.  The government identified the extorted property as the wages and benefits paid to the nine stagehands hired through Local 11.  Doc. No. 361 at 46.  But the evidence was that the defendants' September 2nd demand induced Crash Line to sign a contract with IATSE, and that the wages and benefits at issue were tallied and paid later, after the nine persons hired pursuant to the contract worked during the three-day festival.  Whether the wages paid to the nine workers (plainly transferable property) bears a sufficiently close connection either to the potentially non-transferable property of the union contract or to the defendants' conduct, <u>see</u> <u>Burhoe</u>, 871 F.3d at 30-31, is a question the Court need not resolve in light of its other rulings (and the defendants' omission of this issue from their motions).

2001); accord United States v. Veloz, --- F.3d ----, 2020 WL 401801, at *12 (1st Cir. Jan. 24, 2020).  Ordering a new trial under Rule 33 is appropriate "only where there would be a miscarriage of justice" and "where the evidence preponderates heavily against the verdict." United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979) (quotation marks omitted); accord Merlino, 592 F.3d at 32.  A new-trial motion does not invite the Court to act as "a thirteenth juror who may set aside a verdict merely because he would have reached a different result."  United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986).

The Rule 33 standard, however, does permit the Court to engage in a slightly broader evaluation of the jury's verdict than is authorized under Rule 29.  Cf. Merlino, 592 F.3d at 33 ("[A] district court has greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal." (citation omitted)).  First, a court considering such a motion may assess the weight of the evidence, in order to determine whether "the jury has reached a seriously erroneous result."  Rothrock, 806 F.2d at 322 (quotation marks omitted); accord Merlino, 592 F.3d at 32.  Second, and similarly, Rule 33 allows for some evaluation of witness credibility, though only in "exceptional circumstances" may a district court avoid the general mandate that it defer to a jury's credibility assessment.  Merlino, 592 F.3d at 32-33 (quotation marks omitted).  Finally, "in deciding a Rule 33 motion, [a] court may consider whether its evidentiary rulings at trial were correct," and may order a new trial "if an error concerning the admission of evidence was made and the error was not 'harmless.'"  United States v. DiMasi, 810 F. Supp. 2d 347, 362 (D. Mass. 2011) (citing and quoting Wilkerson, 251 F.3d at 279-80).

B.    <u>Top Chef Evidence</u>

1.    *Background*

The TSI contains eight paragraphs purporting to describe Brissette's involvement in the dispute between the Teamsters Local 25 and producers of "Top Chef" during the summer of 2014. Essentially, the TSI alleged that, upon learning in June 2014 that the Teamsters were upset "Top Chef" was filming in Boston without having hired their drivers, Brissette directed a "Top Chef" location scout to hold previously issued filming permits, and not to release them to the production company until the show resolved the problem with the union. Doc. No. 177 at 2-3. Per the TSI, Brissette allegedly "relented" and allowed the scout to release the permits after the production company "agreed to meet with representatives from the union local the following week." Id. at 4. The TSI describes conversations Brissette had with two other public officials, both of whom allegedly advised Brissette that his actions with respect to the permits had been unlawful. Id. Finally, the TSI alleges that, at a committee meeting in August 2014, Brissette took aside the representative of a different production company that was preparing to shoot a promotion for "Top Chef," "told the representative that the filming had to be 'in a union environment,'" and "indicated to the representative that in order to have success in the permitting process, there had to be a union contract." Id.

In pretrial motions, Brissette sought to preclude the government from presenting so-called "'Top Chef' evidence" at trial. Doc. No. 125. He argued that the evidence was irrelevant to the charges in this case, and its admission would risk confusing the issues, misleading the jury, wasting time, and unfairly prejudicing him. Doc. No. 126 at 5-14. Citing similar concerns and emphasizing the absence of any allegations connecting him to the "Top Chef" events, Sullivan

echoed Brissette's request and, in the alternative, sought severance of his trial from that of Brissette.  Doc. No. 118.

The government opposed both motions, urging that the "Top Chef" evidence it intended to present was limited to the specific allegations in the TSI—that is, evidence that Brissette threatened to cancel previously issued permits if the company filming "Top Chef" failed to resolve the relevant union's concerns, that he said a union contract was necessary for permitting success when promotions for the show were to be shot thereafter, and that he was told in or around the summer of 2014 that his actions were not permissible—and that such testimony would be "brief."  Doc. No. 140 at 2-3; Doc. No. 179 at 8-15.  The government also suggested it had evidence that Brissette and Sullivan "likely had conversations with each other about 'Top Chef,'" making the evidence relevant and admissible against Sullivan as well.  Doc. No. 179 at 11, 27.  In particular, the government described "circumstantial evidence that Sullivan was not entirely unaware of Brissette's actions with respect to the Top Chef incident," including: statements by both defendants to government "investigators that they may have had discussions about Top Chef," and "phone records reflect[ing] that Brissette reached out for Sullivan by phone in the midst of the Top Chef crisis."  Doc. No. 140 at 11-12.

Relying on the allegations in the TSI and the government's representations, the Court denied both defendants' pretrial motions.  Doc. No. 192 at 9-12.  The Court accepted the government's expressly and repeatedly stated view that much of the evidence about the series of disputes between the Teamsters and "Top Chef" representatives was "entirely irrelevant to the issues in this case."  Doc. No. 140 at 2-3 & n.1; Doc. No. 179 at 9; Doc. No. 192 at 9; see also Doc. No. 309 at 43 (affirming a week before trial that the universe of "Top Chef" evidence the government intended to offer remained "exactly what we told Your Honor before").

As to the "discrete areas" identified by the government as within its intended presentation of "Top Chef" evidence, the Court ruled as follows:

> The evidence (as the government has described it) plainly is relevant to an element the government must prove as to each of the crimes charged: <u>Brissette's willfulness, knowledge, and/or intent</u>. It also is relevant to establishing and explaining <u>the government's allegation that the defendants' interactions with Crash Line conveyed implicit, rather than explicit, threats to withhold permits</u>.[62] Moreover, the government has identified uses, beyond showing mere propensity, for which Rule 404(b) allows such "other acts" evidence to be admitted: specifically, <u>Brissette's knowledge, the absence of mistake or accident, and the alleged existence of a common plan during the relevant time period to coerce companies producing events in Boston to hire union workers</u>.

Doc. No. 192 at 10 (emphasis added). The Court went on to find that the Rule 403 balancing test was satisfied "on the [then-]present record," and that there was "no basis to categorically exclude" the challenged evidence. <u>Id.</u> at 10-11.

At trial, the "Top Chef" evidence unfolded differently than the government had represented, both in scope and in substance. The differences diminished the probative value of the evidence with respect to each of the specific purposes for which the Court ruled the evidence admissible in advance of trial, and also enhanced the risk of unfair prejudice, substantially altering the balancing test required by Federal Rule of Evidence 403.

2.    *Discussion*

Six trial witnesses testified about Brissette's conduct with respect to "Top Chef": Derek Cunningham, the location scout referenced in the indictment; Elida Carbajal, a producer who worked on "Top Chef"; Lisa Strout, the director of the Massachusetts State Film Office; Steven

---

[62] Footnote 7 to the Court's Order said: "To the extent Brissette asserts that prior conduct and warnings related to permits are irrelevant here because this case involves only a threatened picket, he ignores the government's stated theory of the case and the TSI's explicit allegation that Crash Line 'was awaiting the issuance of certain permits and approvals' during the relevant time period. Whether permit-related threats were conveyed or perceived here will be resolved at trial." (citation omitted).

Oare, the owner of a production company that shot commercials for "Top Chef"; Rull; and the Special Agent assigned to investigate both the "Top Chef" events and this case. Each time "Top Chef" evidence was adduced during this trial, the Court gave a limiting instruction, to which neither party objected, emphasizing: that neither defendant had been charged with crimes arising from the "Top Chef" events; that the evidence could not be considered as showing either defendant had a bad character or a propensity to commit crimes; and that the evidence could be considered only to "assess [each defendant's] knowledge and intent with respect to the Boston Calling events" (and, as to Sullivan, only if the jury first found that he knew about the "Top Chef" events). E.g., Doc. No. 363 at 58-60.

The limiting instruction specifically flagged the first, and primary, purpose for which the government had offered, and the Court had admitted, the "Top Chef" evidence—to show Brissette had acted willfully, intentionally, and knowingly with respect to Crash Line, in light of the specific warnings he had received regarding "Top Chef."[63] The other, related, purposes the Court identified as justifying admission were to explain why the defendants did not explicitly threaten Crash Line's permits, relying instead on implicit threats in light of the prior warnings to Brissette, and to show that the defendants were engaged in a common plan to coerce businesses to hire union labor. But the Court's finding that the evidence was admissible for each of these purposes relied on the government's assurances that the two sets of events—"Top Chef" and Boston Calling—were similar. The trial evidence, however, revealed that the two scenarios were materially different.

---

[63] The government did not object to the limiting instruction describing the purpose in this way and omitting the other bases the government had cited in support of admitting this evidence (i.e., to explain the lack of an explicit threat, and to establish a common plan).

As an initial matter, the government's eleventh-hour request that the Court not instruct the jury on the NLRA and any limitations it placed on the defendants' conduct, and the Court's ruling eliminating it from the case, destroyed the primary basis for admitting the "Top Chef" evidence. In the Court's view, the "Top Chef" evidence was offered to show that Brissette knew that public officials could not condition permits on the hiring of union labor. The NLRA is the only source of law that would impose such a restriction.[64] Had the Court known the government would abandon the NLRA as a theory of wrongfulness and persuade the Court not to instruct on it, the Court would <u>not</u> have admitted the "Top Chef" evidence at all, as the strongest justification for its admission was showing that one or both defendants knew in August and September of 2014 that they could not condition permits on the use of union labor.[65]

Moreover, the differences between the "Top Chef" events, as presented at trial, and the Crash Line events undermine the probative force of the "Top Chef" evidence as to all of the purposes for which it was offered and admitted. Brissette's involvement in the "Top Chef"

---

[64] The government offered no evidence or argument about the standards for obtaining any of the permits raised in this case. The standards pertaining to the issuance of an entertainment license are referenced in Patricia Malone's April 2014 letter. Ex. 12. They contain no prohibition on considering or requiring the use of union labor, and they appear to broadly allow the "licensing authorities" to consider potential adverse impacts on "public health, safety or order." <u>Id.</u> at 1-2 (quoting Mass. Gen. Laws ch. 140, § 183A). No evidence was offered regarding the standards applicable to the "Top Chef" filming permits, and nothing in the record would have enabled the Court (or the jury) to assess whether such standards precluded demands regarding union labor or were in any respect similar to the requirements associated with the permits Crash Line required.

[65] Because the NLRA is the only source of law to potentially preclude making a union demand, the elimination of the NLRA removed any basis to use the "Top Chef" evidence to demonstrate knowledge. Moreover, a defendant can only "know" something is unlawful if that thing is, in fact, unlawful. In other words, his "knowledge" must be legally correct. Here, the government's evidence implicated the defendants' roles as both regulators and proprietors, including on September 2nd, with the latter role at issue due to the landlord-tenant relationship established in the ILA and the ongoing requests or attempts by Crash Line to negotiate a lease extension. The warnings and advice Brissette received in connection with "Top Chef" did not address conduct undertaken as a proprietor of City property and was legally incorrect insofar as that role was concerned.

events arose because a representative of the filming company contacted him for help; there was no evidence that those events involved a union seeking assistance from Brissette or the City, as did the Crash Line events. The "Top Chef" events included at least two confrontations that involved concerns or threats of violence; no such threats were present in the Crash Line events. The "Top Chef" events involved filming permits that had <u>already issued</u> and which related to the filming of episodes of a television show on <u>private property</u>; the Crash Line events involved an entertainment license <u>that had not yet issued</u> for a three-day music festival with thousands of attendees gathering on <u>public property</u>, where alcohol would be served for hours each day. There was no evidence suggesting the "Top Chef" events arose out of a contractual relationship between the parties, or revealing the specific requirements to secure a filming permit; Crash Line had a duty under the ILA to address "disturbances," and the entertainment license process allowed consideration of adverse impacts on "public health, safety or order."

These material differences between the two events substantially diminish the probative force of the "Top Chef" evidence—which, at best, showed that Brissette, weeks after assuming his position at City Hall and in the face of concerns first brought to his attention by the production company, told the company it could not use its filming permits for the following week, considered canceling the permits, then within eighteen hours, and before any scheduled filming under the permits was to occur, advised the company it could proceed on the permits—with respect to the Crash Line events at issue here.[66] Ex. 2; Ex. 5; Ex. 164.

---

[66] To the extent the "Top Chef" evidence included common themes with the evidence of Brissette's interactions with Crash Line about Local 11, those themes undermine the government's position. For example, in both instances, Brissette is portrayed as reacting to a looming problem with an angry union, not as the guiding force behind a plan to proactively compel the use of union workers. In both instances, those interacting with Brissette perceived and believed that his objective was to avoid the disruption and public embarrassment of a noisy

The testimony of Steve Oare that in August 2014, when Oare sought permits for a "Top Chef" commercial, Brissette asked him whether he was using union labor adds little to the probative mix. Oare said Brissette "alerted" when "Top Chef" was mentioned, and <u>only then</u> pulled him out of a meeting attended by a number of other permit applicants to discuss the matter. Doc. No. 367 at 13-15, 24. There was no evidence that such inquiries were made to any permit applicants other than Oare, or that Brissette made the described inquiry before learning of the "Top Chef" connection. Oare's testimony does not, as the government has urged, reveal an overriding scheme to use government power to coerce the hiring of union labor, assuming the jury could consider such a scheme, note 63, <u>supra</u>. At most, it points to a concern specific to "Top Chef," in the wake of the property damage, threats, and actual violence committed by the Teamsters members against "Top Chef."

In addition, the Court's ruling denying severance and conditionally admitting the "Top Chef" evidence against Sullivan relied on the government's proffer of evidence it would produce at trial showing that both defendants had admitted to possible discussions with one another about "Top Chef," and that Brissette had called Sullivan "in the midst of the Top Chef crisis." Doc. No. 140 at 12. At trial, the government adduced no such evidence—that is, no statements by its case agent describing such admissions by either defendant, and no phone records at all from early June 2014 when "the Top Chef crisis" unfolded—and the Court made no rulings precluding such evidence. Had the Court known that the government would not ultimately offer evidence connecting Sullivan to the "Top Chef" events, or had the government not represented it had such

protest (a concern more credible in September, given the fallout of the Teamsters' actions in June).

evidence, the Court <u>at a minimum</u> would not have permitted the jury to consider the "Top Chef" evidence against Sullivan.

Not only was the "Top Chef" evidence materially different—and significantly weaker— than the Court anticipated, its admission caused substantial unfair prejudice to both defendants, contrary to Federal Rules of Evidence 403 and 404. In the Court's judgment, the limiting instruction, despite its repetition, was insufficient to mitigate the unfair prejudice. The two primary "Top Chef" witnesses were the first witnesses called by the government during its case-in-chief, the government returned to this topic with its last witness, and the testimony of the six "Top Chef" witnesses consumed a total of at least two full trial days. Their testimony served to paint a picture of Brissette as a law violator from the outset of the trial. And, the government used the "Top Chef" evidence to continue that theme as to Brissette in its closing argument. <u>See</u> <u>Doc. No. 384 at 23</u>, 25-27, 31-32, 97 (recounting the "Top Chef" evidence and implying Brissette broke the law not "once" but "three times").

Finally, despite promising it would limit its presentation of "Top Chef" evidence and would not offer testimony regarding violent confrontations involving the Teamsters— representations upon which the Court relied, and that formed a basis for its ruling admitting the "Top Chef" evidence—the government promptly elicited evidence of such violence, including in the direct examination of the very first trial witness. <u>Compare</u> <u>Doc. No. 140 at 3</u> n.1 (arguing that Cunningham's fear of the Teamsters was "not relevant"), <u>and</u> <u>Doc. No. 309 at 43</u> (representing that "the events at the Hotel Revere . . . are not part of the Government's anticipated evidence"), <u>with</u> <u>Doc. No. 363 at 71-74</u> (reflecting testimony elicited from Cunningham on direct examination about the disruption caused by a Teamster at the Revere Hotel where "Top Chef" was filming, and that he had to quit "Top Chef" due to the Teamsters in

order to "stay safe"). The evidence of violence, coupled with the government's characterization of Brissette as a serial law-breaker associated with violent men, was particularly prejudicial in a non-violent case such as this one.

In these circumstances, which became clear only after hearing all of the government's evidence and argument at trial, the Court concludes that the "Top Chef" evidence fails the Rule 403 balancing test and should not have been admitted. Given the extent of the "Top Chef" evidence, the manner in which the government used it, and the weakness of the government's proof of multiple essential elements of the charged offenses, the Court finds that the admission of the "Top Chef" evidence was not harmless. In the Court's view, it is "highly probable that the error <u>did</u> . . . contribute to the verdict." <u>Wilkerson</u>, 251 F.3d at 279-80 (emphasis added).

Thus, the improper admission of the "Top Chef" evidence warrants VACATING the jury's guilty verdicts, ALLOWING both Defendants' Rule 33 motions and conditionally ORDERING a new trial pursuant to Rules 29(d)(1) and 33 on Count I as to both Defendants and Count II as to Brissette. Sullivan's acquittal on Count II stands.

C. Prosecutorial Misconduct

The defendants also argue that a new trial is necessary because the government misstated the law and mischaracterized the evidence in its closing argument. Doc. No. 391 at 5-11; Doc. No. 393 at 3-16. For the reasons articulated below, the Court agrees that the cumulative effect of a series of improper comments in the government's closing argument substantially undermined the fairness of the trial.

1. *Legal Standards*

The defendants' challenge to the government's closing argument requires this Court to consider whether the argument contained improper comments, and, if so, whether such

comments "so poisoned the well that a new trial is required." United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007). Improper argument can include the use of inflammatory or pejorative language, commentary likely to distract jurors from the questions properly before them, argument that disregards rulings or warnings from the court, and misstatements of law or fact. United States v. Azubike, 504 F.3d 30, 38-39 (1st Cir. 2007); United States v. Carpenter, 494 F.3d 13, 22-24 (1st Cir. 2007). If a defendant timely objects to the improper comments, a new trial is warranted where there is "resulting prejudice" such that "the trial's outcome was likely affected." Azubike, 504 F.3d at 39. The First Circuit has identified several factors bearing on this assessment: "the severity of the conduct and whether it was deliberate, the context, the presence of curative instructions and their likely effect, and the strength of the prosecution's case." United States v. French, 904 F.3d 111, 124 (1st Cir. 2018); accord Veloz, 2020 WL 401801, at *10; United States v. De La Paz-Rentas, 613 F.3d 18, 25 n.2 (1st Cir. 2010).

The government urges that a defendant's failure to timely object to improper comments in its closing means that such comments are reviewed for plain error. Doc. No. 399 at 2. Under that standard, a new trial would be warranted only if the error "was clear or obvious," "affected the defendant[s'] substantial rights," and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). Here, the defendants did timely object to some of the comments they include in their Rule 33 argument, see Doc. No. 408 at 98-99, 102 (preserving objections to the invocation of the NLRA and state ethics law), so the general standard for assessing prejudice applies as to those remarks. As to comments the defendants raise now but did not include in their objections at trial, the Court need not resolve what standard is appropriate, because the plain error standard is satisfied here. See United States v. Carpenter, 736 F.3d 619, 626 n.4 (1st Cir. 2013) (declining to resolve

whether a district court must apply the plain error standard when assessing the effect of improper comments to which the defendant had not objected).

In considering the defendants' challenges to the government's closing and applying the above standards, the Court also bears in mind the unique responsibilities of a federal prosecutor:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . [Sh]e may prosecute with earnestness and vigor—indeed, [s]he should do so.  But, while [s]he may strike hard blows, [s]he is not at liberty to strike foul ones.  It is as much h[er] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

2.    *Discussion*

Assistant United States Attorney ("AUSA") Laura Kaplan delivered the closing on behalf of the government.  Numerous statements she made constituted prosecutorial misconduct.

First, the government invited the jury to convict the defendants on an impermissible basis, willfully disregarding the Court's instructions on the law.  In its pretrial submissions, the government proposed instructing the jury that a violation of a particular state ethics rule could provide a basis for establishing wrongfulness under the Hobbs Act.  Doc. No. 267 at 28-29.  At trial, the Court allowed the government to introduce limited evidence regarding each defendant's knowledge of the relevant ethics rule but cautioned that it had not determined whether a violation of the state ethics law could legally satisfy the wrongfulness element.  Doc. No. 412 at 7-11. Thereafter, the Court determined that proof of a violation of the state ethics law could not, as a matter of law and consistent with the decisions of the Supreme Court, establish wrongfulness under the Hobbs Act and so stated in an August 5, 2019 electronic order.  See Doc. No. 349 (citing McDonnell).  Consistent with that ruling, the Court instructed the jury: "[Y]ou are not

authorized by way of federal criminal law to enforce state or local codes of conduct or ethics."

Doc. No. 348 at 14.

The Court presiding over a trial determines the law.  See United States v. Gaudin, 515

U.S. 506, 513 (1995) ("In criminal cases, . . . the judge must be permitted to instruct the jury on

the law and to insist that the jury follow his instructions.").  Nonetheless, AUSA Kaplan said in

her closing:

> Mass. General Laws 268A prohibited these defendants from discriminating against Crash Line in favor of another group.
>
> *       *       *
>
> Second, as to why the defendants had no claim of right to Crash Line's property and why their conduct was wrongful?  Because there's an ethics rule that prohibits a City employee from taking jobs away from Bill Kenney Productions and giving them to his supporters.  Both defendants took the training by the City and the State and both defendants knew this.

Doc. No. 384 at 7, 24.  In her rebuttal, AUSA Kaplan again referenced the same state law:

> The defendants also had an obligation to Crash Line, their constituent.  An obligation to be fair and allowed [sic] them to operate in accordance with their contract and Mass. State law . . . .

Id. at 93.

These arguments disregarded the Court's clear written ruling and were in direct conflict

with the Court's express jury instructions, written and delivered to the jury before AUSA

Kaplan's closing.  With these comments, AUSA Kaplan urged the jury to convict the defendants

on a theory the Court had explicitly and unambiguously ruled out as a matter of law.  This was

plainly improper.

Second, the government invited the jury to convict the defendants on a theory that had

been stricken from the case in a written Court order, at the government's own request.  The

Court "eliminat[ed]" the NLRA "as a basis upon which the government [could] seek to prove

wrongfulness," Doc. No. 349, and deleted any explanation of federal labor law from its final jury charge, Doc. No. 348 at 21. There was no need to explain to the jury the law underlying a theory the government had abandoned, and the Court had excluded, because the jury could not rely upon it in rendering a verdict. The government expressed no objection to the Court's order regarding the NLRA between its docketing on the afternoon of August 5th and resumption of trial on the morning of August 6th, including when the Court delivered its revised charge. However, in her closing argument, AUSA Kaplan said:

> And interestingly enough, there's nothing even in the RFPs which required the applicants to use union labor, if the City wanted such a requirement so badly and felt so strongly that it was necessary, why didn't they put it in the RFP, or an amendment to the licensing agreement? You know why? Because the City couldn't require it, just as you heard from almost every witness.[67]
>
> *       *       *
>
> The City could not demand that Boston Calling use union labor . . . .

Doc. No. 384 at 22-24. AUSA Kaplan reiterated these points in her rebuttal:

> You have to ask yourselves, is it right that people coming before the City of Boston to apply for a permit or an entertainment license, have to use union labor?
>
> *       *       *
>
> [Crash Line] had the right to receive permits and an entertainment license and an extension of a license . . . without regard to whether they used union labor or not.
>
> *       *       *

---

[67] The assertion that "almost every witness" testified that the City "couldn't require" union labor is neither a correct statement of the testimony nor a reasonable inference from the evidence. Numerous witnesses testified that the City had no policy requiring union labor, but such testimony—without more, and there was no more—neither proves nor supports a reasonable inference that the City could not do so. Of course, the law is otherwise. The City can and does require the use of various unionized City employees in connection with events on City Hall Plaza. And, City officials acting as proprietors of City Hall Plaza (e.g., negotiating and signing leases to use the property) have leeway to require the use of union workers. Bldg. & Constr. Trades Council, 507 U.S. at 232-33.

> [The City] didn't put [a union requirement] in [the ILA or its RFPs] because they
> knew they couldn't require that union labor be used.

Id. at 94, 96-97.

This recurring argument—that requiring union labor was prohibited and wrongful under

the Hobbs Act—disregarded the Court's clear written ruling and was in direct conflict with the

government's express renunciation of the NLRA as a theory of wrongfulness. With these

comments, AUSA Kaplan encouraged the jury to convict the defendants on a second theory the

Court had explicitly and unambiguously ruled out.[68] This, too, was plainly improper.

Third, the government diluted its burden of proof by characterizing the definition of

"wrongfulness" under the Hobbs Act—an essential element of the charged offenses—in a

manner which disregarded the Court's jury instructions. Specifically, AUSA Kaplan said:

> Finally, the Government must prove that the defendants' use of fear of economic
> harm was wrongful. And all that means is that the defendants had no lawful claim
> of right to the property he extorts for himself or for others, and that the defendants
> knew it. If the defendants had no claim of right to Crash Line's property, their
> wages and their benefits, then using threats of economic harm to take their property
> is wrongful.

Id. at 20-21.

There are two errors in this statement. Under the jury instructions, finding a defendant

had no claim of right to the property could establish a "wrongful purpose," but the wrongfulness

element also required the government to prove that the defendant used "wrongful means." Doc.

No. 348 at 21. And, simply finding a defendant had no claim of right to the property would not

establish a "wrongful purpose" under the jury instructions, if jurors found that the third party to

---

[68] The government contends that the NLRA "was not relied on as a basis for wrongfulness at
trial." Doc. No. 399 at 13. No other source of law could support the comments excerpted above
in this case. To the extent the government suggests the excerpted portions of AUSA Kaplan's
closing were based on testimony and evidence showing that the City had no policy requiring
union labor, id. at 11-12, such evidence does not reasonably suggest the categorical prohibition
AUSA Kaplan described, see note 67, supra, nor does a plain reading of the ILA.

whom the defendants directed the transfer of the property <u>did</u> have a lawful claim to that property.  <u>Id.</u> at 22.  Thus, the excerpted statement of the law was in <u>direct conflict</u> with the jury instructions, and nowhere else in her closing or rebuttal did AUSA Kaplan acknowledge the other components required by the wrongfulness element, as the Court defined it.  <u>Cf.</u> <u>United States v. Currie</u>, 911 F.3d 1047, 1055 (10th Cir. 2018) (finding "a misstatement of law has less prejudicial effect when the prosecutor correctly states the law at other points in closing argument").  This statement, therefore, also was plainly improper.[69]

 <u>Fourth</u>, this case, unlike many common extortion scenarios, involved no allegations or evidence of actual violence, threats of violence, or menacing behavior by either defendant.  Nevertheless, AUSA Kaplan invoked such themes in her closing, saying:

> You know, in a hostage situation, members of the jury, where someone is taken hostage, you may negotiate how much you'll pay in ransom, but that doesn't make it any less criminal that they took the hostage in the first place.
>
>   *   *   *
>
> It's not a negotiation when you have a gun to your head.

<u>Doc. No. 384 at 37-38</u>.  Raising the specter of violence by drawing an unwarranted and inflammatory comparison of Brissette and Sullivan to gun-wielding kidnappers was improper in the circumstances presented here.

 <u>Fifth</u>, the government's closing was peppered throughout with significant misstatements of fact.  In particular, AUSA Kaplan's argument to the jury that the defendants lied about the

---

[69] AUSA Kaplan also misleadingly described the "fear of economic harm" element of extortion.  <u>Compare</u> <u>Doc. No. 384 at 15</u>, 20 (arguing "[i]t doesn't matter whether Crash Line thought the defendants were out to harm them," as long as they believed "the defendants could have harmed them economically"), <u>with</u> <u>Doc. No. 348 at 19</u> (instructing as to the second element of extortion that "the evidence must establish beyond a reasonable doubt . . . Crash Line's . . . belief that the defendants could <u>and would</u> cause [economic] harm" (emphasis added)).

possibility of a picket—a prominent plank in her discussion of the crucial "wrongfulness" element—was saturated with mischaracterizations of the evidence.[70]  For example, she argued:

> Brissette didn't call . . . his friend Lisa Strout, and say IATSE is threatening to picket, what should I do?  He didn't tell anyone . . . .
>
> \*        \*        \*
>
> And if they were afraid of the picket, why didn't the defendants call their friend former Commissioner Evans or Captain Fong?  Why not tell the police?
>
> \*        \*        \*
>
> If IATSE was really threatening to picket, why didn't [Brissette] just call them and say not to, ask them not to?  And that would have been the end of it.  But he didn't do it, because IATSE wasn't threatening to picket.
>
> And why didn't Brissette tell Mayor Walsh . . . I need help.  There's going to be a big picket, another embarrassing situation like Top Chef.  He didn't do that, either, and neither did Tim Sullivan.

Id. at 29-32.

But there was no evidence that Brissette had not called Strout; the government asked her no questions about the Crash Line events when it called her to testify.  There certainly was not sufficient proof from which to infer that Brissette "didn't tell anyone"; the government presented no evidence about what his common practice was when confronting problems, nor did it offer testimony from various people to whom he might logically have spoken (such as his direct

---

[70] In addition, this portion of the government's argument—that the defendants were not actually concerned about a picket—directly contradicts a previous written proffer by the government describing "the evidence it would offer at trial" as including proof that "[t]he defendants wanted to avoid any embarrassment that a Local 11 picket and the use of a giant inflatable rat on City Hall Plaza might cause . . . especially in light of the June 2014 actions of Teamsters . . . in connection with the filming of Top Chef . . . , which actions had garnered press attention and criticism in August 2014."  Doc. No. 214 at 2-3.  In other words, before arguing to the jury that there was no evidence that the defendants were truly worried about a picket, the government had proffered evidence that the defendants were sincerely concerned about a protest by Local 11.

supervisor or any other individual working in his department at City Hall).[71]  There was no evidence that either defendant was "friends" with Evans, Fong, or any other Boston police officials, let alone revealing whether they had spoken with Captain Fong (who was not called as a witness) or anyone else representing the police (besides Commissioner Evans).  There was no evidence that Brissette had not contacted anyone from Local 11 (let alone that he was afraid to do so); the only representative from Local 11 called at trial was Glynn.  Her testimony established that Brissette had met previously with other Local 11 officials, including the union's president, and that Sullivan was in touch with Glynn throughout the relevant time period.  In any event, there was no evidence that a call by either defendant to Glynn, Local 11's president, or anyone from Local 11, "would have been the end of it"; rather, the only relevant evidence in this regard established that Brissette's earlier attempt to avoid a demonstration by the Teamsters by speaking with that union's president had not prevented a violent protest.  And, there was no evidence that the defendants had not spoken to Mayor Walsh, who was not called to testify.

The lack of evidentiary support for these comments by AUSA Kaplan render them plainly improper as well.[72]

---

[71] There was, however, evidence that he spoke to Sullivan, whose role as the Mayor's union liaison made him arguably the most logical person to contact, as well as to Appel and (through Sullivan) to Glynn.

[72] These were not the only comments by AUSA Kaplan in which she unfairly characterized the evidence.  Compare, e.g., Doc. No. 384 at 13, 38, 95-96 (calling Brissette "the decision-maker about the RFP," saying Local 11 "was never going to picket or put up the rat," stating "[t]he only evidence before you . . . is that [BKP] did pay area standard wages," and claiming "[n]o one had ever had an issue with Bill Kenney, including the City"), with Doc. No. 370 at 125 (reflecting a City lawyer's unchallenged testimony that Brissette was "one of a number of people" on a committee that would "make a non-binding recommendation" regarding an RFP, but that "the actual decision maker" was "Mike Galvin, the chief of property and construction management"), and Exs. 158, 159 (reflecting in e-mails from Glynn in May and August of 2014 that her members were "ready to protest" and would "be preparing for an informational picket line" directed at the Boston Calling festival), and Doc. No. 368 at 17, 41 (reflecting Glynn's testimony that BKP does not follow area standards regarding wages, benefits, and conditions of

Considered together, and in the totality of the circumstances presented in this case, the improper statements identified above infected the defendants' trial with plain error. They include plainly erroneous statements of the law as established by the Court in its jury instructions, comments that blatantly disregarded written orders of the Court, and gross mischaracterizations of the evidence. AUSA Kaplan's improper comments were the last words the jury heard regarding the applicable legal standards. This was so because of the government's own decisions and arguments. At the charge conference, the government successfully opposed the defendants' request that the Court read the case-specific portions of its final charge to the jury before closing arguments. Doc. No. 411 at 59-60. Later that day, the Court provided the parties its final revised charge. Doc. No. 348. The following morning, before closing arguments, the government reversed field and assented to the defendants' request. Because of the government's assent, the Court departed from its usual practice and delivered its instructions on the law prior to closing arguments. Then, when the defendants requested post-argument curative instructions addressing two of these areas, the government successfully objected, persuading the Court not to supplement its charge. See Doc. No. 408 at 99-102 (opposing a requested supplemental charge regarding labor law, denying having implicated the NLRA in closing, and characterizing any supplemental instruction as "clearly wrong").

---

employment), and Doc. No. 370 at 38 (reflecting Kenney's testimony that BKP was cited for OSHA violations during a 2013 Boston Calling festival). See also, e.g., Doc. No. 384 at 17 (arguing Patricia Malone and Commissioner Evans were "checking in with" Brissette, despite the absence of such testimony from any witness); id. at 34 (characterizing Sullivan as having "obtained the contract from Colleen Glynn at IATSE . . . several weeks before he gave it to Crash Line," despite the lack of evidence Sullivan ever gave the contract to Crash Line and the fact that the contract ultimately executed by Crash Line and IATSE was not the same as the one Glynn sent to Sullivan).

Finally, the improper statements were neither minor nor unwitting. Many of the improper comments concerned whether the government had proved that the defendants' conduct was "wrongful," which was one of the most significant and disputed issues in this case—and one as to which the Court has concluded the evidence was not just weak, but insufficient, justifying entry of acquittal. The legal contours of that specific element, including whether the government could rely on the state ethics law and the relationship between the NLRA and the conduct at issue, were the dominant legal issues discussed throughout the trial, up to and including at the charging conference the day before closing arguments. AUSA Kaplan's erroneous statements parroted the very positions advanced by the government, <u>not</u> adopted by the Court in its draft written instructions, debated by the parties in writing and orally before and during the charge conference, [Doc. No. 339 at 4-6](), 8; Doc. No. 411 at 22-23, 30-31, and ultimately <u>rejected</u> by the Court during the charge conference, in its subsequent electronic order, and in the final written jury instructions. Though the government was not required to agree with the Court's statement of the law, and it appropriately preserved its objections thereto for later review by a higher court, AUSA Kaplan was duty bound to comply with the Court's rulings. Her misstatements of the law and unfair characterizations of the evidence were not off-the-cuff comments, but part of knowingly and intentionally prepared closing arguments in a case she oversaw from its inception.

With her improper comments at the close of this case, AUSA Kaplan threw the weight of the government behind legal theories ruled out by the Court and recast those theories as emotional arguments for fairness and good government, thereby diverting the jury from its task as to the pivotal issues and elements in this case. In addition, the defendants had a right to rely on the government's withdrawal of its reliance on the NLRA and the Court's written ruling, as

well as the interpretation of the law provided in the Court's final written jury instructions, as they prepared their own closing arguments. Accordingly, the Court finds that the cumulative effect of the persistent pattern of clear and obvious misconduct in closing both affected the defendants' substantial rights and seriously impaired the fairness and integrity of the trial. As the Supreme Court has warned, "the average jury" tends to trust "the prosecuting attorney," so her "pronounced and persistent" improper comments "are apt to carry much weight against the accused when they should properly carry none," making "prejudice to the cause of the accused" in a case that is "not strong . . . so highly probable" that it "cannot be disregarded as inconsequential." Berger, 295 U.S. at 88-89

Accordingly, the Court ALLOWS both defendants' Rule 33 motions on this separate and independent basis as well, VACATES the jury's guilty verdicts, and conditionally ORDERS a new trial pursuant to Rules 29(d)(1) and 33 for Brissette on both counts and for Sullivan on Count 1.

D.     Interests of Justice

Rule 33 permits this Court to order a new trial if it concludes, based on all of the circumstances presented, that "the interest of justice so requires." Fed. R. Crim. P. 33(a). Though this remedy is rarely appropriate, the unusual circumstances presented in this case warrant it, as the Court is persuaded that allowing the jury's verdict to stand would result in a miscarriage of justice. Several factors inform this judgment.

First, all of the reasons discussed above in resolving the defendants' Rule 29 motions also, alternatively, support granting a new trial in the interests of justice. In particular, the evidence that Local 11 had pursued work at Boston Calling from the festival's inception, had begun expressing its strong objections to Crash Line's labor practices by at least February 2014

(concerning the volunteer program) and continuing through the following summer (concerning BKP), and was contending with angry members who wanted to protest the event, preponderates heavily against the verdict insofar as wrongfulness is concerned.  The government's near-complete reliance on the defendants' official authority, in lieu of proving affirmative statements or conduct by either defendant intended to convey threats or exploit fear, preponderates heavily against the verdict insofar as "implicit threats" are concerned.[73]

Second, the fundamental fairness of this trial was substantially undermined by the admission of the "Top Chef" evidence and the prosecutorial misconduct in closing—both of which independently warrant a new trial, as explained above—especially when the two issues are considered together.[74]  There is a synergy between the two errors.  In the Court's view, the whole of their combined prejudicial effect is much greater than the sum of its parts, with each error magnifying the impact of the other.

Third, though sufficient to withstand a Rule 29 challenge, the Court's authority, albeit limited, to weigh evidence in the Rule 33 context causes it to conclude that the substantial weakness of the government's presentation regarding "economic harm" weighs in favor of a new trial.  In particular, the overwhelming weight of the evidence establishes that what Crash Line, in fact, feared on September 2nd was not that either defendant would cause it harm.  Indeed, both Snow and Appel conceded that they did not believe the defendants intended to harm them, nor did they think either defendant had control over their permits.  Doc. No. 366 at 160; Doc. No.

_____

[73] The Court rejects the defendants' standalone claim that the government constructively amended the indictment.  Doc. No. 391 at 5-11.

[74] Like the "Top Chef" evidence, the relevance and admissibility of evidence pertaining to state ethics laws and related training programs was also eviscerated by the Court's subsequent ruling eliminating that theory of wrongfulness.  Though the defendants have not raised this issue in their Rule 33 motions, they did object to the admission of the evidence at trial.

[371 at 80](#).  Rather, the record suggests that Crash Line desired a licensing extension outside the RFP process (or, perhaps, preferential treatment in the RFP process), something to which it was not entitled.  That is exactly what Appel raised in the course of, or after, the September 2nd meeting.[75]

Fourth, the inconsistency of the jury's verdicts as to Sullivan raises a serious concern in this case.  Where extortion was charged on both direct and aiding-and-abetting theories, and where the proof required to establish the aiding and abetting of extortion in this case was practically indistinguishable from that which was required to prove a conspiracy to extort, the jury's acquittal of Sullivan on Count 2 (extortion) coupled with its conviction of him on Count 1 (conspiracy) triggers this Court's "judicial skepticism."  United States v. Caro, 569 F.2d 411, 418 (5th Cir. 1978).  This is particularly so where the evidence of conspiracy—separate and apart from the presence of both defendants at the September 2nd meeting—was minimal.  The Court cannot posit, and the government has not advanced, a legally sound rationale for the jury's verdicts as to Sullivan, considering the Court's instructions, the trial evidence, and the verdicts rendered as to Brissette.

Finally, the government's theories, representations, and litigation strategies in this case were subject to frequent changes before, during, and even after trial.  The three most significant examples of such shifts are:

1)      As detailed above, the NLRA was a centerpiece of the government's theory of wrongfulness in this case, from at least March 2017, [Doc. No. 86 at 17-22](#), through the July 2019

---

[75] To the extent Crash Line had any permit-related fear, it feared unfavorable hours or restrictions imposed by other City actors, and it hoped that currying favor with the defendants might result in the defendants intervening to assist them by somehow overruling unfavorable permit restrictions imposed by others.

final pretrial conference, Doc. No. 309 at 19-20. It induced the Court's decision to admit the "Top Chef" evidence. Then, on the eve of closing arguments, the government voluntarily abandoned its reliance on the NLRA and asked the Court not to instruct on it at all. Doc. No. 339 at 6; Doc. No. 411 at 7, 9-10, 12. Having persuaded the Court to eliminate its proposed instruction regarding the effect of federal labor laws, the government relied on such laws in its closing and pointed to the NLRA to support the jury's verdict in its post-trial briefing. Compare Doc. No. 339 at 8 (objecting to the Court including the NLRA in its draft instructions, saying "[t]he issue in this case is not what unions can and cannot do"), with Doc. No. 384 at 30 (arguing to the jury in closing that "Sullivan worked for the AFL-CIO for years, he knew all about unions and what they could and couldn't do"); and Doc. No. 399 at 12-13 (invoking the NLRA in post-verdict briefing as supporting the jury's finding of wrongfulness).

2) In successfully urging the Court to admit the "Top Chef" evidence, and to deny Sullivan's pretrial motion to sever, the government promised evidence showing that both defendants had admitted to investigators "that they may have had discussions about Top Chef," and that Brissette had called Sullivan "in the midst of the Top Chef crisis." Doc. No. 140 at 12. This promise induced the Court to deny the defendants' motions in limine and to permit the government to offer the evidence as to both defendants. When the time for trial came, the government offered no such evidence.

3) A week before trial began, in a discussion of evidentiary issues arising from the "Top Chef" allegations, the government represented to the Court that "the events at the Hotel Revere . . . are not part of the Government's anticipated evidence." Doc. No. 309 at 43. This was consistent with the government's statement in a 2017 brief that Cunningham's "fear of Local 25 members" and evidence about the Teamsters' "violent and threatening actions during the Top

Chef taping . . . in Milton" were "not relevant to the Boston Calling case." Doc. No. 140 at 3

n.1.  Then, on direct examination of the very first witness to testify at trial, the government

elicited testimony describing precisely those "events at the Hotel Revere."  See Doc. No. 363 at

71-74 (reflecting Cunningham's responses regarding "a teamster . . . kind of raising hell" at "the

Revere Hotel" by yelling and making threats sufficient to cause Cunningham to quit his work on

"Top Chef" due to concerns for his own safety); see also Doc. No. 365 at 51-53 (reflecting

testimony on the same topic elicited in the government's direct examination of Carbajal, the

second trial witness).

Together, the nature, timing, and significance of these shifts prejudiced the defendants

and invited a miscarriage of justice by seriously hampering the Court's management of the

trial.[76]  Specifically, the government induced the erroneous admission of evidence via promises

that went unfulfilled, and revisions to the final jury charge based on representations and requests

that were effectively and promptly rescinded.  Given the complexity of the issues the jury was

asked to resolve and the underwhelming nature of the government's evidence against the

defendants, this consideration favors granting a new trial in the interest of justice.

In sum, all of the foregoing factors, taken together and measured against the Rule 33

standard, warrant a new trial for these defendants.  In this Court's judgment after presiding over

these proceedings, "letting [the] guilty verdict[s] stand would be a manifest injustice" in this

---

[76] The government has neither acknowledged nor explained these changes.  In its post-trial
briefing, it continued to reshape its positions.  For example, having consistently characterized
this case as one in which the defendants had conveyed only implicit threats that exploited Crash
Line's preexisting fears about their permits and a license extension, e.g., Doc. No. 179 at 13-14
(arguing that the "Top Chef" evidence would "explain[] why there's no direct threat" by the
defendants here, and why they instead "relied on atmospherics and timing" to "exploit [Crash
Line's] fear"), the government now declares that it proved an explicit threat of economic harm,
Doc. No. 398 at 15-16, and claims that exploitation of an existing fear "was not the theory
presented here," id. at 20 n.4.

case.  <u>Veloz</u>, 2020 WL 401801, at *12 (quoting <u>United States v. Gramins</u>, 939 F.3d 429, 444 (2d Cir. 2019)).  Accordingly, the Court ALLOWS both defendants' Rule 33 motions in the interest of justice, VACATES the jury's guilty verdicts, and conditionally ORDERS a new trial pursuant to Rules 29(d)(1) and 33.

IV.     <u>CONCLUSION</u>

In light of the foregoing discussion, the defendants' Motions for Judgment of Acquittal (Doc. Nos. 334, 335, and 346) are ALLOWED, the jury's guilty verdicts are VACATED, and the Clerk shall enter Judgment ACQUITTING Kenneth Brissette and Timothy Sullivan of all charges.  In the alternative, and pursuant to Federal Rules of Criminal Procedure 29(d)(1) and 33, the defendants' Motions for a New Trial (Doc. Nos. 390, 392) are conditionally ALLOWED.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge