UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | No. 16-cr-10137-LTS |
| KENNETH BRISSETTE and TIMOTHY SULLIVAN, | ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON MOTION FOR SANCTIONS

February 12, 2020

SOROKIN, J.

Shortly before trial commenced in this case, the defendants filed a motion for sanctions for late disclosure of material, exculpatory evidence. Doc. No. 278.[1] The government opposed the motion. Doc. No. 282. The Court held a hearing, awarded some relief, and took the motion under advisement. Doc. No. 292. For the reasons that follow, the defendants' motion is ALLOWED to the extent the Court has already awarded relief and is otherwise DENIED.[2]

I.  BACKGROUND

In this prosecution of Kenneth Brissette and Timothy Sullivan for Hobbs Act conspiracy and Hobbs Act extortion, the government alleged that during a meeting on September 2, 2014, the defendants threatened Crash Line Productions, the company that produces the Boston Calling music festival. In particular, the government essentially alleged that Brissette and Sullivan

---

[1] Citations to "Doc. No. __" reference items appearing on the Court's electronic docket; pincites are to page numbers in the headers appended by CM/ECF.
[2] The filings and hearing regarding this motion were sealed so as not impair jury selection with swirling allegations of sanctions or misconduct. Now that the trial is over, the Court is unsealing all materials related to this decision via a separate order docketed concurrently with this one.

wrongfully put Crash Line to this choice: Hire some stagehands from the International Alliance of Theatrical Stage Employees, Local 11, or else you will not receive the entertainment license required for the Boston Calling festival starting in three days, you will receive unfavorable permit conditions, and/or you will be denied fair consideration in your efforts to obtain permission to use City Hall Plaza for concerts beyond 2017.

This case always concerned whether the defendants put this choice to Crash Line. Of course, if a potential witness told the government that Crash Line faced a choice meaningfully different than the one alleged—especially a choice that involved no threats to permits or to Crash Line's prospects for a lease extension—that information would have been plainly exculpatory.

The alleged victim of the charged extortion is, and has always been, Crash Line Productions—not Brian Appel, its chief executive officer, or Michael Snow, its chief operating officer. Of course, Crash Line is a company, not a person. It speaks only through its officers, directors, employees, and agents—in this case, most particularly, Appel and Snow. From the commencement of this prosecution, Appel and Snow were obvious, anticipated, and important witnesses for the government, as they were at trial. It was their testimony that formed the basis for the government's allegation that the defendants forced Crash Line to confront the extortionate choice described above.

In June 2017, a year after indicting the defendants, Doc. No. 17, and seven months before the trial was then scheduled to begin, Doc. No. 110, the FBI case agent (i.e., the lead investigator) interviewed Jesse Du Bey in the presence of the two Assistant United States Attorneys ("AUSAs") handling this case, Doc. No. 279-1 at 1-5. The agent made no recording nor any other verbatim record of this interview, apparently as a matter of standard FBI policy. Thus, there is no complete record of the interview of Du Bey. Rather, as is standard practice, the

case agent took notes, Doc. No. 283-1, which she transformed into a draft interview summary to be memorialized on an FBI form called a "302," Doc. No. 283-4.[3] The agent promptly circulated the draft 302 to the two AUSAs for their review. Id. Nearly a month later, the agent reminded one AUSA about the draft and again sought feedback. Doc. No. 283-5. This AUSA then responded, suggesting five changes or corrections to the 302:

> Sorry, just located my notes. In the first sentence of the fourth paragraph, I think he said "long term venue" instead of "long term plan." <u>I think the difference is significant to the theory of the case</u>. He also said they need long term stability, a multiple year venue with fixed rent and a known capacity.
>
> In describing the first meeting in Cook's office, I think he said Chris Cook was the key relationship Brian had with the City[.]
>
> I think he said it was not likely that Linehan was at the third meeting[.]
>
> I may have written the date down wrong but I think the email was November 9, 2014?
>
> I think he said the discussion about moving [Boston Calling] out of City Hall Plaza started well before the September 2014 concert, not that the decision was made before the concert. Again <u>I think a critical distinction</u>.

Doc. No. 283-6 (emphasis added).

Thereafter, the case agent made the first three suggested changes, but did not make the final, "critical" change. The agent did, however, make a different change to the sentence that was the subject of the AUSA's fifth suggestion. That sentence had appeared this way in the draft report: "The decision to move the BOSTON CALLING concerts off of city hall plaza was made before many of the issues arose with the city." Doc. No. 283-4 at 3. Ultimately, the sentence was amended to add the following phrase at the end: "and well before the September 2014 concerts." Doc. No. 279-1 at 3. But, the 302 continued to report that Du Bey said Crash Line

---

[3] Both AUSAs also took some handwritten notes during the interview. Doc. No. 283-2; Doc. No. 283-3.

3

"decided" well before September 2014 to move the festival to another venue; it was not revised to make the materially different point recalled by the AUSA that Du Bey had actually said "discussions" to move the festival had begun before September 2014, but no decision had been made. Doc. No. 279-1 at 3.

After making the cited changes, the case agent finalized the 302. Doc. No. 279-1 at 1-5; Doc. No. 283 at 2-3. The final Du Bey 302 contains the following statements:

> The decision to move the BOSTON CALLING concerts off of city hall plaza was made before many of the issues arose with the city, and well before the September 2014 concerts. . . .
>
> DU BEY was asked about an August 21, 2014 email between himself, APPEL, and [Crash Line's consultant], where they talked about discussing the union situation. DU BEY could not recall the exact phone call that he had, but they did discuss the union situation. In general, they were being asked/requested/suggested to take union labor. What he thought would happen if they said no was that there would be a loud ugly picket and it would be bad for the brand. DU BEY wanted to know what the cost would be to say yes, and take union labor. It would not be a big number in the larger context, and they would avoid the brand problem.
>
> DU BEY probably would have been told about the September 2, 2014 meeting where APPEL and SNOW were called into BRISSETTE's office off of the plaza, but he did not have a specific recollection of it.

Doc. No. 279-1 at 3-4.

The interview of Du Bey and the drafting and finalizing of the 302 were completed by the AUSAs and the case agent by early July 2017. Trial was then slated to commence in early January 2018. The government, however, did not produce the Du Bey 302 to the defendants when it was finalized in July 2017 or at any point during the fall of 2017. On December 4, 2017, the defendants were arraigned on the Second Superseding Indictment. Doc. No. 149. Neither at nor after that arraignment did the government disclose the Du Bey 302.

Due to changes reflected by the allegations in the SSI (unrelated to Du Bey's statements that are the subject of the sanctions motion), the Court continued the trial to March 26, 2018.

4

Doc. No. 156.  On March 22, 2018, the Court dismissed this case for reasons unrelated to Du Bey's statements.  Doc. No. 220.  A year later, the United States Court of Appeals for the First Circuit reversed that decision and returned the case to this Court.  United States v. Brissette, 919 F.3d 670 (1st Cir. 2019).

After conferring with counsel, the Court scheduled trial for July 2019.  Doc. No. 237.  In the course of preparing for the July 2019 trial, the government reviewed the Du Bey 302 and "immediately" produced it to the defense.  Doc. No. 282 at 7; accord Doc. No. 314 at 29.  On June 4, 2019, the AUSAs e-mailed defense counsel, stating:

> Attached please find additional discovery and supplemental Jencks.[4]
>
> The supplemental Jencks consists of reports of interviews with [two witnesses] in March 2018. . . .
>
> The discovery consists of reports of interviews with Jesse Du Bey and [another witness].

Doc. No. 279-1 at 6.

Believing the Du Bey 302 contained exculpatory information, the defendants provided a draft of a potential motion for sanctions to the government and conferred with government counsel on June 21, 2019.  Thereafter, the defendants filed their motion, the government opposed it, the Court held a hearing at which it awarded some relief (in the form of disclosure of unredacted copies of the case agent's affidavit and the attached notes, draft report, and e-mails), and the motion otherwise remained under advisement.  Doc. No. 292; Doc. No. 314.

II.  DISCUSSION

The Due Process Clause of the United States Constitution requires prosecutors to disclose to the defense any evidence in the government's possession that is "favorable to an accused,"

---

[4] "Jencks" refers to a statute governing the disclosure of witness testimony in advance of trial.

where such "evidence is material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963); accord United States v. Prochilo, 629 F.3d 264, 266 (1st Cir. 2011). "[I]f there is a reasonable probability that" disclosure of the evidence would lead to a "different" outcome of the proceeding, then the evidence is "material." United States v. Bagley, 473 U.S. 667, 682 (1985); accord Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005); see also Kyles v. Whitley, 514 U.S. 419, 434 (1995) (explaining exculpatory information is "material" if its suppression would render a trial's verdict unworthy of confidence). Disclosure of such evidence is required because "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." Brady, 373 U.S. at 87.

Du Bey's statements to the government, as memorialized in the 302, were plainly favorable to the defendants in at least three material ways.[5] First, Du Bey described the choice Crash Line faced during the time the government alleged the extortion occurred. According to his statement, Crash Line could either suffer a possible "brand problem" arising from a protest by the union at the event, or it could hire some union employees at a relatively small cost. By Du Bey's description, Crash Line faced no threat to its permits, as alleged by the government. Instead, he described—at most—an "ask," not a threat or a demand. Du Bey did not say Crash Line risked denial of permits necessary for the September festival to proceed, imposition of permit conditions that would create substantial obstacles to the festival's success, or the loss of an opportunity to fairly compete for an extension of its lease agreement with the City.

---

[5] To the extent the government defended its failure to disclose Du Bey's statements based on its view that they are "hearsay," Doc. No. 282 at 3, that is immaterial to assessing the government's disclosure obligations.

6

Du Bey was not merely a passive investor, uninvolved and uninformed with respect to Crash Line's operations, as the government later argued in an effort to dismiss his statements. Doc. No. 282 at 4-5. That simply was not a reasonable view of Du Bey in 2017 following his interview, nor is it a reasonable view of him now. Du Bey and Appel are cousins who "have known each other since they were little kids." Doc. No. 279-1 at 1; Doc. No. 365 at 49-50. When Appel and Snow were developing the concept for the festival that became Boston Calling, Du Bey was a successful investor with Wall Street experience and one of the first people to whom Appel pitched the idea. Id.; Doc. No. 369 at 42.

Crash Line, formed in October 2012 by Appel, Snow, and Du Bey, is incorporated as Orkila, LLC. Doc. No. 365 at 50; Doc. No. 369 at 10. "Orkila" is no mnemonic of the founders' names, nor a title selected by Appel; it is the name of the summer camp Du Bey attended in his youth. Doc. No. 369 at 9-10. Though all three co-founders contributed money to the endeavor, Du Bey invested $400,000 of approximately $1 million in initial funding, with Du Bey's friend contributing another $400,000 to that total. Doc. No. 365 at 51, 108; Doc. No. 366 at 127-28; Doc. No. 369 at 40. Thus, Du Bey was responsible for a lion's share of the funds used to get the business off the ground. See Doc. No. 366 at 127-28 (reflecting Appel's testimony that Du Bey "represented and controlled" between eighty and eighty-five percent "of the venture"). As the endeavor proceeded, Du Bey acted as a business advisor and "sounding board" to Appel, who had no prior experience starting a company, and was Crash Line's "most active board member." Doc. No. 369 at 14; see Doc. No. 365 at 52, 172 (describing Du Bey as "an advisor" who "was

very versed in what was happening on a regular basis with the company" and was "part of [Crash Line's] strategy group").[6]

In short, Du Bey was a close relative of Appel's, an experienced business hand, Crash Line's "money guy," and Appel's primary, ongoing advisor. Du Bey's statement that Crash Line—the victim of the extortion alleged by the government—faced merely a choice between a brand problem arising from an ugly picket or hiring a few union employees for a commercially insignificant amount of money (with no concern regarding permits, leases, or the future of the company) was plainly and directly exculpatory to the defendants under the United States Constitution.

However, the Constitution is not the only source of the government's disclosure obligations. This Court's Local Rule 116.2 imposes specific disclosure obligation on prosecutors practicing in the District of Massachusetts.[7] It requires the government to produce to the defendant "exculpatory information," which the rule defines as "information that is material and favorable to the accused and includes . . . information that tends to . . . cast doubt on [a] defendant's guilt as to any essential element in any count in the indictment or information." L.R. 116.2(a)(1). By so defining "exculpatory information," the Local Rules do not permit the withholding of "favorable" information tending to "cast doubt on" the government's ability to

---

[6] Appel also testified that he "would have" spoken with Du Bey about various events that occurred in the course of planning and preparing for the 2014 festivals. E.g., Doc. No. 365 at 98, 107, 114, 122, 146 (regarding preliminary findings by Patricia Malone in April 2014, a July 2014 meeting with Brissette and a City lawyer regarding a license extension, an August 2014 meeting with Brissette about union involvement at the festival, and the September 2nd meeting with Brissette and Sullivan).

[7] The government also has broader obligations under Federal Rule of Criminal Procedure 16(a)(1)(E)(i), which requires disclosure of information a defendant requests that is "material to preparing the defense," a standard broader than Brady's materiality standard. The defendants did not cite Rule 16 here, so the Court has not considered it in resolving the pending motion.

8

prove an element of the charged offense, simply because a trial prosecutor does not believe such information will change the outcome of the trial.[8] Rather, information fitting within any of Local Rule 116.2(a)'s enumerated categories is, by definition, "material and favorable to the accused" for purposes of that rule.

Du Bey's statement about the choice Crash Line faced in the summer of 2014 constituted "exculpatory information" under Local Rule 116.2(a)(1), in addition to being exculpatory for Brady purposes, for the reasons already cited. In the Court's view, this was a clear and obvious conclusion, not a close or ambiguous determination. Both the United States Constitution and the Local Rules required disclosure of the statement.

Next, according to the 302, Du Bey told the government that by September 2014, Crash Line already had decided to move the Boston Calling festival away from City Hall Plaza. Du Bey, obviously, was in a position to know about such a decision. Thus, his statement on this topic significantly undermined the government's allegation that, on September 2, 2014, Crash Line feared that it would not receive fair consideration of a request to the City for an extension of its existing license agreement to encompass festivals after 2017. Thus, the statement as reported in the 302 is both favorable and material and, therefore, exculpatory. The United States Constitution required its disclosure, and so did the Local Rules.

Nonetheless, in July 2017, with the completed 302 in hand, the government may well have evaluated not what the final 302 actually said, but what the case agent and AUSAs believed

---

[8] The manner in which "exculpatory information" is defined by Local Rule 116.2 avoids, to some extent, the difficulty trial courts have noted in making pretrial assessments of materiality under Brady, a concept which was crafted by appellate courts for post-trial application. E.g., United States v. Safavian, 233 F.R.D. 12, 16-17 (D.D.C. 2005) (explaining why pretrial assessments of disclosure obligations should focus only on whether information is "favorable to the accused").

Du Bey had said: that in the summer of 2014, Crash Line was "discussing" moving its festivals away from City Hall Plaza, but had not made such a decision. But that statement, too, is exculpatory, even if somewhat less so than the statement as it appears in the final 302. That in 2014 Crash Line was discussing moving away from City Hall Plaza to a larger, more profitable location materially undermines the government's allegation that Crash Line feared it would not receive fair consideration of a proposal to reserve City Hall Plaza for 2018 and beyond. Testimony that Crash Line was considering moving the event "well before" the pivotal September 2nd meeting would meaningfully weaken the government's suggestion that Crash Line "needed" an extension of its existing license agreement (pursuant to which it already had a venue secured for three more years' worth of events). So, even with the change, this statement is exculpatory as to an essential element of the charged offenses. The Constitution and the Local Rules required its disclosure.

Finally, Du Bey's statement that he probably would have been told of the September 2nd meeting, but had no specific recollection of it, also is exculpatory. The government has characterized the September 2nd meeting as "critical" and "fateful," and as the moment when Crash Line was extorted. Doc. No. 282 at 5; Doc. No. 363 at 14; Doc. No. 384 at 7. According to the government, it was at that meeting—and only at that meeting—when the defendants conveyed, and Appel and Snow subjectively perceived, an implicit threat of economic harm. Nonetheless, the government terms Du Bey's statement "neither exculpatory nor surprising," again minimizing Du Bey's role. But as explained above, and as his own statements during the interview make clear, Du Bey was much more than a silent investor in the victim company. E.g., Doc. No. 279-1 at 2 ("DU BEY was the lead investor, arranged the company, was a mentor, and board director.").

Considering all of this, one would reasonably expect that—upon leaving a stunning meeting at which public officials extorted him to hire union personnel for a festival beginning days later by threatening that, if he failed to do so, they would prevent the festival from going forward and/or sabotage Appel's attempts to secure an extension needed to satisfy Du Bey and other investors and keep the company in business—Appel would call his cousin, business advisor, majority investor, and most active board member to discuss how best to proceed. One also would reasonably expect that Du Bey would remember learning of such an event. His failure to recall it, in these circumstances, directly undermines the government's description of the meeting as having included an unexpected and extortionate demand, and its characterization of Appel and Snow as having sincerely feared that the September 2014 concert was in jeopardy of not going forward, and that the company (along with Du Bey's substantial investment) was in peril.

Thus, Du Bey's statement about the September 2nd meeting is exculpatory under both <u>Brady</u> and the Local Rules. It casts doubt on the government's ability to prove an essential element of extortion—that on September 2nd the defendants conveyed, and the victim actually and reasonably perceived, a threat of economic harm.

Although the Constitution does not prescribe a specific date for disclosure of exculpatory material, this Court's Local Rules require the government to produce such information at the very outset of a criminal prosecution, "within 28 days of arraignment." L.R. 116.1(c)(1), 116.2(b)(1)(A). Here, the exculpatory information did not exist either at the arraignment or during the twenty-eight days thereafter, because the government had not yet interviewed Du Bey. The Local Rules, however, account for such circumstances by imposing upon all parties a continuing duty to supplement their required disclosures "promptly" upon learning "that a prior

11

disclosure was in some respect . . . incomplete." L.R. 116.7.  And so, the government was obligated to disclose the Du Bey 302 to the defendants "promptly" after its completion in July 2017.  It failed to do so.

Under the Local Rules, the government must disclose three weeks before trial any information that "tends to cast doubt on the credibility or accuracy of any witness or evidence that the government anticipates calling or offering in its case-in-chief." L.R. 116.2(b)(2)(A). Though the government now takes the position that the Du Bey 302 constitutes impeachment material within the scope of this rule, Doc. No. 282 at 1, it admittedly failed to produce the report to the defendants three weeks before the previously scheduled trial date of March 26, 2018.

Rather, the government finally produced the report in June 2019, when it was preparing for trial following the First Circuit's decision vacating this Court's dismissal order and remanding the case for further proceedings.  The government's e-mail cover letter neither identified the Du Bey 302 as containing exculpatory or potential impeachment information, nor did it notify the defense that it contained a statement that, in the government's view, incorrectly recounted what Du Bey had said on an important issue.  As noted previously, the 302 reported that Du Bey said Crash Line had made the "decision" to move away from City Hall Plaza as of September 2014.  Neither the AUSAs nor the case agent believed Du Bey had said that during the interview.  Doc. No. 283 at 2-3.  Recognizing that the final 302 contained a "critical" error, Doc. No. 283-6, which the AUSAs and the case agent apparently failed to notice before June 2019, the government "endeavored to determine why" the 302 said "decision" rather than

12

"discussion." There is no doubt that the AUSAs knew when they disclosed the 302 that it contained this error.[9] Doc. No. 282 at 7.

In other words, despite believing it contained potential impeachment information it should have disclosed previously, and despite knowing it contained a material error, the government disclosed the 302 in June 2019 in an e-mail describing it as merely "additional discovery," saying nothing more. With a federal criminal trial weeks away, the AUSAs handed over to the defendants a 302 from the most significant investor in the alleged victim company, knowing as they did so that it contained a crucial mistake, and that the error rendered the relevant statement more favorable to the defendants than what the AUSAs believed the truth to be.

Almost three weeks passed while the government stayed silent, despite knowing it had produced to the defendants a 302 that contained a "critical" error it believed warranted investigation. Defense counsel then advised the government that the defendants intended to file a motion for sanctions due to the late disclosure of the Du Bey 302, which they perceived—correctly—as containing exculpatory information, and they provided to the government a draft copy of the motion. Doc. No. 279 at 5 n.4; Doc. No. 314 at 13. Only then, on June 21, 2019, did government counsel inform the defendants of the material error in the 302. Doc. No. 287-7.

---

[9] At the hearing on the sanctions motion, government counsel told the Court: "Well, we found [the Du Bey 302]. We knew it wasn't right. We turned it over [on June 4th] and then we conducted our investigation to figure out – because none of us remembered this having been said. We found our notes, we found the e-mails and . . . we basically did an investigation to figure out why that statement was in there and where it came from." Doc. No. 314 at 37. The Court asked when the described "investigation" had commenced. Id. Counsel answered: "When we found the 302." Id. The Court then asked: "Not when they gave you the sanction motion [on June 21st]?" Id. Government counsel reported: "No, because when we saw that sentence, we knew it was not what any of us remembered and it didn't make any sense [to us]." Id.

13

In their motion for sanctions, the defendants asked the Court to dismiss the case, exclude evidence regarding the license extension Crash Line desired, or permit the defense to introduce into evidence the Du Bey 302. Doc. No. 279 at 9-10. In opposing the motion, government counsel took the unequivocal position in writing and in argument at the hearing that nothing in the 302 constituted exculpatory or <u>Brady</u> information. Doc. No. 282 at 1, 4-6; Doc. No. 314 at 20, 23-26, 28, 31, 53. Counsel did concede that, in the government's view, at least the third statement discussed above (about not recalling the September 2nd meeting) was potential impeachment information and, as such, should have been disclosed no later than March 5, 2018 (three weeks prior to the original trial date). Doc. No. 282 at 8; Doc. No. 314 at 28. But, for the reasons already explained, the statements were not merely potential impeachment; all three are exculpatory.

A further discussion of Du Bey's statement about the nature of Crash Line's choice is warranted. In opposing the defendants' motion at the sealed hearing held shortly before the start of the trial, the government vigorously argued that the statement was not exculpatory. Specifically, the government suggested the paragraph containing the relevant statement by Du Bey describes "what he knew in August of 2014," when Brissette's "statements were slightly more innocuous" and no extortion had yet occurred. Doc. No. 314 at 23-24, 58-59; <u>accord</u> Doc. No. 282 at 4-5. According to the government, this timing distinction renders "not exculpatory" Du Bey's statements about having been "asked/requested/suggested" (rather than "demanded" or "required") to hire workers through Local 11, and about fearing "a loud ugly picket" and resulting damage to "the brand" (rather than the denial of crucial permits or a license extension, the cancellation of the September festival, or the potential destruction of the company). Doc. No. 282 at 5.

This argument is wrong. The 302 simply does not qualify or limit the relevant statement as the government suggests. The 302 says that Du Bey, in 2017 when he was interviewed, did not specifically recall Appel's August 21, 2014 phone call, but he understood "[i]n general" during the time preceding the September festival that Crash Line had a choice to make regarding union labor. Neither available option, as Du Bey understood the choice, involved a threat to festival permits or to fair consideration of a potential lease extension. And, in contrast to the "decision"/"discussion" statement, there is nothing before the Court suggesting the 302 is inaccurate or erroneous in any way insofar as the "asked/requested/suggested" paragraph is concerned. Thus, the statement as written is plainly exculpatory.

Even if the 302 qualified that statement temporally in the manner the government urges, such a description by Du Bey of the state of affairs in August 2014 would remain exculpatory. The indictment charges a conspiracy to extort, and extortion, occurring "[b]etween on or about May 1, 2014, and continuing through September 30, 2014, both dates being approximate and inclusive." Doc. No. 177 ¶¶ 20, 22. The government has characterized the defendants' conduct throughout the summer of 2014 as "laying the foundation" for the September 2nd meeting. Doc. No. 314 at 24; see Doc. No. 363 at 13 (arguing the "defendants started working together to pressure Crash Line to enter a contract with Local 11" beginning right "after the May 2014 festival"). Information showing that Crash Line did <u>not</u> perceive a threat or did <u>not</u> fear that the defendants would cause it economic harm during the time period the <u>government charged</u> in the indictment plainly tends to negate the defendants' guilt as to elements the government was required to prove beyond a reasonable doubt.

Moreover, the government's attempt, only weeks before trial began, to diminish the importance and exculpatory nature of this aspect of the Du Bey 302 by telling the Court Crash

15

Line feared merely a disruptive picket in August 2014 (and only later perceived threats to permits and the festival generally) is directly at odds with the argument the government made to the jury shortly thereafter. At trial, the government argued to the jury that the defendants had made up the threat of a union protest <u>and</u> that they had threatened Crash Line with the made-up protest only <u>at the September 2nd meeting</u>, when they finally "pounced" after having "laid in wait" since August. Doc. No. 363 at 13-16; <u>accord</u> Doc. No. 384 at 90.[10] The Du Bey 302, insofar as it suggests the possibility of "a loud ugly picket" was known to Crash Line in August and was not viewed as an extortionate threat of economic harm at that time, was exculpatory.

As a result of the sanctions motion and the related hearing, the Court ordered the government to disclose to the defense complete, unredacted copies of materials the government had submitted to the Court ex parte: an affidavit of the case agent, handwritten notes from the interview of Du Bey taken by the agent and the AUSAs, the draft 302, and related e-mail correspondence suggesting changes to the draft. Doc. No. 292. At that time, the Court did not grant the specific relief sought by the defendants. Thereafter, Du Bey, whose lawyer had accepted service of a trial subpoena by the government tendered only in response to the looming sanctions motion, moved to quash the subpoena for reasons unrelated to the content of the 302. Doc. No. 302; Doc. No. 303. The Court denied Du Bey's motion. Doc. No. 313. The sanctions motion remained under advisement so that the Court could hear the trial evidence to determine whether the late disclosure further implicated any of the defendants' rights.

---

[10] The government, in its direct and redirect examination of Appel, tried to elicit testimony confirming that Brissette had <u>not</u> raised the possibility of a picket in August 2014, <u>e.g.</u>, Doc. No. 365 at 122-23, Doc. No. 366 at 166, while defense counsel endeavored to establish that the subject might have come up in August, <u>e.g.</u>, Doc. No. 366 at 144-46.

This Court has supervisory, or inherent, power "to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and . . . to deter illegal conduct." United States v. Hasting, 461 U.S. 499, 505 (1983) (citations omitted); accord United States v. Horn, 29 F.3d 754, 759-60 (1st Cir. 1994). Such power may not be invoked "to redress misconduct that did not result in harm." Horn, 29 F.3d at 760.

The Court reaffirms here the following implicit rulings it made during the trial: that admitting the 302 into evidence for the jury's consideration was not a proper remedy given that Du Bey was available to (and did) testify; that the late disclosure did not then (and does not now) warrant dismissal of criminal charges in this case; and that the late disclosure also did not warrant precluding the government from offering evidence regarding Crash Line's desire for a license extension. While the late disclosure of the Du Bey 302 surely made the defendants' preparation for trial more difficult—and though such difficulty was further exacerbated by the government's even later revelation that the 302 contained a material error—neither defendant has identified sufficient prejudice to support any of the foregoing forms of relief which they requested.

III.  CONCLUSION

Under present practice, the disclosure of exculpatory information in a criminal trial is entrusted almost entirely to the prosecution. Successful discharge of this important and largely self-executing obligation requires an understanding of exculpatory information, fidelity to a prosecutor's larger responsibility to fair play, and a willingness to address forthrightly problems when they occasionally and inevitably arise. Here, the consequences of the government's improper failure to timely disclose the Du Bey 302 could have been easily resolved. Instead,

such consequences were substantially exacerbated both by: 1) the AUSAs' production of the report without identifying or correcting what they knew <u>then</u> was a material error contained within it; and 2) the AUSAs' failure to appreciate, even on reflection, the exculpatory nature of Du Bey's statements, thus rendering them unable to credibly assure the Court that no other exculpatory information had been withheld. This considered course of action in a significant prosecution seriously undermines present disclosure practice.

However, for the reasons already stated, the Motion for Sanctions (Doc. No. 278) is ALLOWED only to the extent the Court has already awarded relief pursuant to the Motion and is otherwise DENIED.

SO ORDERED.

                                                     /s/ Leo T. Sorokin
                                                    United States District Judge