UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Case No. 16-cr-10137-LTS |
| KENNETH BRISSETTE and TIMOTHY SULLIVAN | ) ) ) ) | |

## MEMORANDUM IN SUPPORT OF TIMOTHY P. SULLIVAN'S APPLICATION FOR LEGAL FEES AND EXPENSES

Timothy P. Sullivan respectfully submits this memorandum of law in support of his application for legal fees and expenses under the Hyde Amendment. The Court should award Mr. Sullivan reasonable attorneys' fees and expenses because he is a prevailing party and the position of the government in instituting and maintaining this prosecution was vexatious, frivolous, and in bad faith.[1] *See* 18 U.S. C. § 3006A (statutory note).

### ARGUMENT

The Hyde Amendment allows a defendant who "prevails" in his criminal case to receive reimbursement for reasonable legal fees and expenses if a court finds, by a preponderance of the evidence, that "the position of the United States was vexatious, frivolous, <u>or</u> in bad faith."[2] 18 U.S. C. § 3006A (statutory note)(emphasis added).[3] An award of attorneys' fees under the Hyde

---

[1] The background of the case is detailed in the Court's Memorandum & Order on Post-Trial Motions (Dkt #414) at pages 4-8.

[2] *See United States v. Truesdale*, 211 F.3d 898, 908 (5th Cir. 2000)("We conclude that a party moving for an award of attorney's fees under the Hyde Amendment must establish by a preponderance of the evidence that the government's position was vexatious, frivolous, or in bad faith.").

[3] The law was enacted in response to the federal prosecution of Congressman Joseph McDade, who suffered under the cloud of criminal indictment for four years and spent more than $1.25 million on legal fees before he was eventually acquitted. Representative Hyde explained to Congress that the amendment was intended to offer redress to individuals unfairly subjected to criminal prosecution: "Imagine yourself getting arrested, getting indicted, what happens to your name, to your family and the Government has a case it cannot substantially justify. . .[Y]ou are charged with a criminal violation...[and] they are willfully

Amendment "provides at least a toehold for curbing and deterring costly and harmful wrongful prosecutions" and gives "individual victims of these prosecutions some redress for the monetary toll exacted upon them."[4]

The Court should award reasonable attorneys' fees and expenses to Mr. Sullivan because he was wrongfully prosecuted and has no other redress for the financial, professional, personal, and emotional harm caused to him and his family. The U.S. Attorney's prosecution of Mr. Sullivan for Hobbs Act extortion was frivolous because it had no basis to believe that he threatened Crash Line's permits or exploited its fear of economic harm. *See United States v. Heavrin*, 330 F.3d 723, 729 (6th Cir. 2003)( "A frivolous position is one lacking a reasonable legal basis or where the government lacks a reasonable expectation of attaining sufficient material evidence by the time of trial."); *United States v. Reyes-Romero*, 364 F. Supp. 3d 494, 510 (W.D. Pa. 2019)(frivolous position is "groundless with little prospect of success").

Rather than decline a high-profile prosecution, the government engaged in a pattern of grossly mischaracterizing the facts and the law in order to "win" a conviction. The government's disregard for the truth warrants a further finding of bad faith. *See United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)("'[B]ad faith. . . implies the conscious doing of a wrong because of <u>dishonest purpose</u> or moral obliquity'")(quoting Black's Law Dictionary 139 (6th ed.1990))(emphasis added); *Reyes-Romero*, 364 F.Supp.3d at 513 (the position of the United

---

wrong. . . They hide information. . . They do not disclose exculpatory information to which you are entitled. ..They can do anything. . . [W]hen something like that happens, it is doubly shocking because you have no place to turn. If the Government, your last resort, is your oppressor, you really have no place to turn. . . So this simply says to Uncle Sam, look, if you are going to sue somebody and civilly we have had that for 17 years, under my amendment criminally, and you cannot prove substantial justification after the case is over, and the verdict is not guilty, then the prosecution pays something toward the attorney's fees of the victim. That is justice. It may be rough justice, but it is substantial justice. Thank is what we are attempting to do." 143 Cong. Rec. H7786–04, H7791 (daily ed. Sept. 24 1997)(remarks of Mr. Hyde).

[4] Elkan Abramowitz & Peter Scher, *The Hyde Amendment: Congress Creates a Toehold for Curbing Wrongful Prosecution*, NEW YORK LAW JOURNAL (January 6, 1998).

States was "both frivolous and in bad faith" where "the misconduct of the United States at multiple key points before and during the criminal prosecution and of multiple key issues in this litigation was completely divorced from fact and law and demonstrated conscious wrongdoing").

As the prosecution of Mr. Sullivan was both frivolous and in bad faith, he also satisfies the "vexatious" standard. In *United States v. Knott*, 256 F.3d 20 (1st Cir. 2001), the First Circuit held that "a determination that a prosecution was 'vexatious' for the purposes of the Hyde Amendment requires both a showing that the criminal case was objectively deficient, in that it lacked either legal merit or factual foundation, and a showing that the government's conduct, when viewed objectively, manifests maliciousness or an intent to harass or annoy."[5] *Id.* at 29. As set forth below, the government initiated this prosecution based on allegations that it knew or should have known to be false, devised theories of an essential element of the crime that had no basis in fact or in law, grossly mischaracterized the facts and law to the jury, blatantly disobeyed Court orders, and failed to timely disclose exculpatory evidence to the defense. For these reasons, the criminal case against Timothy P. Sullivan was objectively deficient and the government's conduct, when viewed objectively, manifested malice.[6]

---

[5] As the First Circuit stated, the Hyde Amendment was intended to authorize a fee award for "affirmative prosecutorial misconduct." *Knott*, 256 F.3d at 30. Representative Hyde specifically identified failure to disclose exculpatory evidence as grounds for an award of attorneys' fees in his speech to Congress. *See* n.3 of this memorandum. The government's conduct throughout the course of the case—and not solely in initiating the prosecution—is therefore highly relevant to the determination of whether this standard is met. *See United States v. Adkinson*, 247 F.3d at 1289, 1293 (11th Cir. 2001)(district court abused its discretion in denying award of attorneys' fees where position of United States was foreclosed by binding precedent "not only when the government brought the indictment, but also throughout the presentation of its case-in-chief, leading this Court to overturn all of the defendants' convictions in order to serve the system which protects us all")(internal quotations and citations omitted).

[6] The First Circuit made explicit in *Knott* that "[i]n requiring that the government's conduct manifest malice or an intent to harass or annoy in order to be 'vexatious,' however, we do not intend an inquiry into subjective intent." 256 F.3d at 30.

**I.      The Government Prosecuted Mr. Sullivan Despite Having No Basis to Believe That He Knowingly and Willfully Used Economic Fear to Induce Crash Line.**

Mr. Sullivan was indicted in a First Superseding Indictment ("FSI") approximately one month after Mr. Brissette based on allegations that the government knew or should have known to be false.

First, the FSI alleged that in July and August 2014, Mr. Sullivan "repeatedly advised" Crash Line that it had to hire members of IATSE Local 11 to put on the Boston Calling festival. Mr. Sullivan had <u>no</u> contact whatsoever with Crash Line's principals in July and August 2014 and <u>never</u> told Crash Line that it could not put on the September 2014 festival unless it hired members of IATSE Local 11.  FSI, *¶ 16. See* 10 Tr. 88:10-23; 90:16-20 (testimony of Mr. Snow).[7]

Second, the FSI alleged that Mr. Sullivan and Mr. Brissette "stated" to Crash Line at the September 2nd meeting that it "would need to hire members of IATSE Local 11 to work at the festival" and "insisted" that half of its workforce consist of union members.  FSI, *¶ 16.*  Crash Line's principals testified that Crash Line was *asked* to hire some workers through IATSE Local 11 at the September 2nd meeting in order to avoid a potential labor demonstration on City Hall Plaza. *See* 5 Tr. 168:11-21; 10 Tr. 72:15-16 (testimony of Mr. Appel and Mr. Snow).  In response, Crash Line opened "a dialogue of you know, well, if we were to sort of take employees, we started talking about quantity of employees that we would take." *See* 10 Tr. 36:17-37:20 (testimony of Mr. Snow).  Either "half" or the number 30 was suggested, and Crash Line responded that "our company was thinking three or four." *See* 4 Tr. 139:19-146:22; 10 Tr. 36:17-37:20 (testimony of Mr. Appel and Mr. Snow).  The discussion ended with Mr. Brissette suggesting that he would have a conversation and get back to them on the number. *See* 4 Tr.

---

[7] The transcript citations refer to the partial transcripts of the trial, which exclude any discussion before the jury was seated on that particular day.

139:19-146:22 (testimony of Mr. Appel).[8]

Third, the indictment intimated that at the September 2nd meeting, Mr. Sullivan and Mr. Brissette implicitly threatened to withhold the permits and approvals that Crash Line needed to operate at the festival. FSI, ¶ 16-18. There was no evidence or any words or conduct by Mr. Sullivan or Mr. Brissette that could conceivably be perceived as a threat to Crash Line's permits. Crash Line's principals did not believe that Mr. Sullivan or Mr. Brissette had direct authority over the permits at City Hall, nor did they believe that either man was out to harm them. *See* 4 Tr. 144:8-12; 5 Tr. 117: 14-21 (testimony of Mr. Appel). Further, when Crash Line's principals were sitting at the meeting on Tuesday, September 2, 2014, they had every permit they needed to operate the festival except the entertainment license, which they had just submitted on the previous Friday, August 29, and which they knew was usually received "the day of or the day before the event." *See* 5 Tr. 74:3-5; 77:19-78:13; 84:13-16 (testimony of Mr. Appel).

Fourth, the FSI improperly attempted to connect uncharged allegations against Mr. Brissette regarding Top Chef with the events concerning Boston Calling and with Mr. Sullivan. Paragraph 16 begins, "Likewise, despite the warnings from government officials outlined above, .Brissette and Sullivan made similar demands of [Crash Line]." FSI, ¶ 16. The government had no evidence that Mr. Sullivan received any warnings and there were no "similar demands" made by Mr. Sullivan. The events at issue regarding Top Chef were "materially different" than the facts of this case and there was no "overriding scheme to use government power to coerce the hiring of union labor." Dkt #414 at 72.[9]

---

[8] The foregoing testimony is consistent with the grand jury testimony of the alleged extortion victims, which is being filed under seal as Exhibit A and B to this memorandum.

[9] Another example of a particularly striking falsehood can be found in the government's opposition to the defendants' first motion to dismiss. There, the government represented that "[i]f [Crash Line] had not received its entertainment license, it would have been a financial disaster for the company. Representatives of [Crash Line] told the defendants as much." Dkt #86 at 13. There was no evidence—in

Put simply, the government brought this prosecution despite lacking any basis to believe that it could prove that Mr. Sullivan intentionally conveyed an implicit threat to Crash Line's permits or preyed upon a fear of economic harm.  The government had "no evidence of menacing conduct by either defendant," "no evidence that Crash Line ever spoke to either defendant about any problems or concerns regarding permits," "no evidence that either defendant raised the subject of permits with anyone from Crash Line before, during, or after the September 2nd meeting," and "no evidence that either defendant created, exacerbated, or suggested they would mitigate Crash Line's fears."  Memorandum & Order On Post-Trial Motions ("Dkt #414") at 59-60.  The government's position that Mr. Sullivan extorted or conspired to extort Crash Line was therefore frivolous.[10]  *Cf. United States v. Braunstein*, 281 F.3d 982, 996 (9th Cir. 2002)(government's position in indicting defendant for wire fraud and money laundering was "so obviously wrong as to be frivolous" where no grand jury witnesses testified to misrepresentations that formed the basis for his prosecution and government had evidence negating charge of fraud).

**II.     The Government Devised Frivolous Theories of Wrongfulness and Grossly Mischaracterized the Facts and the Law to the Jury to Secure a Conviction.**

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his

---

FBI reports, witness statements, or grand jury testimony—to support this representation, and there could not have been because it never happened.

[10] Having reviewed government's *Jencks* production, which revealed no evidence to support the charges, the defendants repeatedly sought dismissal of the case.  In opposing each request for dismissal, the government vigorously asserted that the Court should not consider proffers of facts from the defendants and must confine its analysis to the four corners of the indictment, effectively shielding the case from pre-trial dismissal on multiple occasions.  *See* Dkt #164, #204, #249.  It is worth noting that the government was empowered to do so by governing case law on motions to dismiss in criminal cases, which requires only that the indictment parrot the words of the applicable criminal statute and thus "gives federal prosecutors essentially unreviewable power to subject targeted individuals to full-blown criminal trials."  Noel Francisco, *The Criminal Analogue to 12(b)(6): Judicial Power to Dismiss Indictments*, Corporate Counsel Business Journal (August 31, 2016), *available at* https://ccbjournal.com/articles/encouraging-power-dismiss-indictments-courts-should-embrace-criminal-analogue-civil-p.  The author of this article is the current Solicitor General of the United States.

6

consent, induced by <u>wrongful</u> use of actual or threatened force, violence, or fear, or under color of official right." § 1951(b)(2) (emphasis added).  Under the First Circuit's decision in *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989), "the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property."  *Id.*  And the "intent component" of the crime requires the government to "establish that the defendant knew that he had no legitimate claim of right to the property in question." *Id.* at 777.

The property at issue in this case was wages and benefits that were received by stagehands hired through IATSE Local 11.  *See* Third Superseding Indictment at ¶ 22.  Mr. Sullivan did <u>not</u> receive the property in question, did <u>not</u> receive any personal payoff or bribe, did <u>not</u> ask Crash Line to hire stagehands who were unqualified for the position, and did <u>not</u> ask Crash Line to pay wages and benefits for no-show or fictitious jobs. The government therefore had no evidence to support an allegation that Mr. Sullivan acted wrongfully within the meaning of the Hobbs Act.

From the inception of the case through responding to post-verdict motions, the prosecutors continually shifted their theory of why Mr. Sullivan acted wrongfully, raising a disturbing question of whether they were "picking the people [they] think[] [they] should get, rather than picking cases that need to be prosecuted." Robert Jackson, "The Federal Prosecutor," 24 *Journal of American Judicature Society* 18 (1940).  More egregious is the fact that none of the many theories devised by the government had any foundation in fact or in law.

Relying on a standard applied only in <u>civil</u> Hobbs Act cases (finding wrongfulness where the plaintiff possessed a "pre-existing statutory right to be free from the defendant's demand," *see Sanchez v. Triple-S Management Corp.*, 492 F.3d 1, 12 (1st Cir. 2007)), the government initially contended that Mr. Sullivan acted wrongfully because Crash Line's licensing agreement

7

with the City did not require the use of union labor or, alternatively, because the NLRA preempted his actions. *See* Government's Opposition to Defendants' Motion to Dismiss, Dkt # 86 at 16-19. These theories were doomed to fail both factually and legally. A simple breach of contract does not provide the basis for criminal prosecution under the Hobbs Act. *See* Dkt #414 at 35-36. *See also United Bhd. Of Carpenters & Joiners of Am.*, 770 F.3d 834, 840 (9th Cir. 2014)(economic pressure campaign to force carpenters union into joining labor organization not wrongful merely "because it happened to include, incidentally, tortious conduct or simple breach of contract"). Even if it could, Crash Line's licensing agreement with the City said nothing about Crash Line being free from a request to use union stagehands or any other specified individuals and, in fact, provided support for the opposite proposition.[11] *See* Dkt #414 at 30-34. As a result, the government could not—and did not—have any evidence that Mr. Sullivan knew that the licensing agreement prohibited him from asking Crash Line to use union labor.

The government's theory that Mr. Sullivan acted wrongfully because his actions were preempted by the NLRA was similarly specious. The government could not cite a single case in any jurisdiction in which federal preemption established the requisite element of wrongfulness for purposes of Hobbs Act extortion. *See* Dkt #86 at 15-20. As "the preemptive scope of the NLRA can present complicated factual issues," this theory raises constitutional vagueness concerns. Dkt #414 at 50. Regardless, the government had no reasonable expectation of proving that federal preemption applied to these facts, where Mr. Sullivan was interacting with the business out of reasonable concern about a disruptive protest on City property. *See* Dkt # 414 at 20-21, 34. *See Building & Constr. Trades Council*, 507 U.S. 218, 227 (1993)(federal preemption

---

[11] The licensing agreement required Crash Line to make reasonable efforts to avoid a disruption to the area around City Hall, which would include coordinating with local stakeholders to avoid a protest. *See* Dkt #414 at 33. More tellingly, Crash Line had proposed a clause in the licensing agreement conferring upon itself a right to be free from demands to hire union labor and the City's lawyers deliberately rejected that proposed provision. *See* Dkt #414 at 31.

does not apply "[w]hen a state owns and manages property" and therefore "must interact with private participants in the marketplace"). And, of course, there was no evidence that Mr. Sullivan knew that asking Crash Line to hire stagehands through IATSE Local 11 was preempted by the NLRA. *See* Dkt #414 at 54.

In September 2017, almost two years prior to the actual trial, the First Circuit decided *United States v. Burhoe*, 871 F.3d 1 (1st Cir. 2017), holding that the district court's jury instructions on the elements of Hobbs Act extortion were erroneous because they "permitted the jury to find that the defendants pursued an illegitimate labor objective in seeking 'payment for imposed, unwanted, superfluous work' rather than 'fictitious work'" and "suggested that even peaceful picketing might constitute 'wrongful' use of fear of economic harm." *Id.* at 13-16. The Court also indicated that the government was required to prove both a "wrongful ends" and a "wrongful means" to support a Hobbs Act violation. *Id.* at 9 ("Setting aside the issue of 'wrongful' ends on which *Enmons* itself turned, there is also another principle in play—namely, that the means used to obtain the end <u>must also</u> be 'wrongful.'")(emphasis added). The defendants filed a motion to dismiss in light of the *Burhoe* decision, arguing that the FSI failed to allege the required elements of wrongful use of economic fear and obtaining property. *See* Dkt # 121, 123. The government responded to *Burhoe* by superseding the FSI and "explicitly requested that the Court limit[] its review to the four corners of the charging document and . . . declined to stipulate to a set of facts sufficient to reduce the question to a purely legal one." Dkt # 414 at 6.

In March 2019, following the Court's dismissal of the case on the basis that the government could not prove the element of obtaining property, the First Circuit decided *United States v. Brissette*, 919 F.3d 670 (1st Cir. 2019), holding that the obtaining of property may be

satisfied where the defendants merely directed the transfer of property to a third party.  Although the issue was not raised on appeal, the Court dedicated an entire section of the decision ("Part V") to discussing the required element of wrongfulness.  *See id*. at 684-686.  The Court expressed considerable skepticism about the government's ability to prove that Mr. Sullivan and Mr. Brissette acted wrongfully, noting that the charged conduct is "quite distinct from other wrongful uses of fear," and cautioning that they were "mindful, too, of the concerns expressed by the Supreme Court that an overly broad application of the Hobbs Act could unduly chill official conduct."  *Id.* at 865.

Additionally, the First Circuit further clarified the applicable legal standards for the wrongful use of economic fear.  The government had previously contended that the use of economic fear by public officials is inherently wrongful,[12] but the Court stated that "fear of economic harm may . . . be a necessary consequence of many legitimate exercises of official authority." *Id.*  (internal citations and quotations omitted).  The Court further provided that "[i]n the end, whether '[t]he use of economic fear' is 'wrongful' within the meaning of the Hobbs Act extortion provision turns, <u>at least in part</u>, on whether it was employed to achieve a wrongful purpose," thereby requiring proof of both a wrongful means and a wrongful purpose.  *Id.* (internal quotations and citations omitted)(emphasis added).

Undaunted by the First Circuit's concerns, the government decided to continue to prosecute Mr. Sullivan and Mr. Brissette, dismissing Part V of the *Brissette* decision as "not a holding."  Sealed Motion Hearing dated 7/15/19, Dkt #310 at 16.  Nevertheless, in response to Mr. Sullivan and Mr. Brissette's joint motion to reconsider dismissal based on the "wrongful purpose" requirement under *Brissette*, the government introduced a new theory, asserting that the

---

[12] In opposing defendants' motion to dismiss in light of *Burhoe*, the government argued that "Unlike the First Circuit's description of the threats in *Burhoe*, the threats here were inherently wrongful." Dkt #142.

10

defendants acted wrongfully by violating state ethics law.[13]  See Dkt #249 at 9.

Again, the government lacked any factual or legal basis to believe that state ethics law could establish wrongfulness.  The United States Supreme Court and the First Circuit have repeatedly warned against construing federal criminal statutes "in a manner that . . . involves the Federal Government setting standards of good government for local officials."  *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (quotation marks omitted).  *See Brissette*, 919 F.3d at 685 ("We are mindful, too, of the concerns expressed by the Supreme Court that an overly broad application of the Hobbs Act could unduly chill official conduct."); *United States v. Tavares*, 844 F.3d 46, 49-54 (2016)(reversing convictions of public officials who "abused the hiring process to ensure that favored candidates were promoted or appointed in exchange for favorable budget treatment from the state legislature and increased control over the Probation Department" because "not all unappealing conduct is criminal" and "states have the prerogative to regulate the permissible interactions between state officials and their constituents").[14]

---

[13] Between the First Circuit's decision in *Brissette* and the filing of Mr. Sullivan and Mr. Brissette's joint motion to reconsider dismissal, defense counsel urged the U.S. Attorney's office to decline to further prosecute the case pursuant to U.S. Department of Justice CRM 9-27.220 since they had no reasonable expectation of proving the required element of wrongfulness and suggested a referral to the State Ethics Commission as a more fair and just course of action.  The government responded by converting the olive branch into a spear.

[14] The prosecution of Mr. Sullivan is one in a series of coordinated efforts by the U.S. Attorney's Office in Massachusetts to get around various interpretations of the Hobbs Act from the United States Supreme Court without the need to seek either clarification or amendment of the statute through Congress. Federal prosecutors apparently harbor a belief that public officials asking businessmen to share work with a specified constituency such as union workers *ipso facto* offends the extortion proscription in 18 U.S.C. §1961 and the general concept of good and honest government.  Because federal prosecutors believe the states (sovereigns themselves) are either unwilling or incapable of prosecuting supposed transgressions of public official, they have taken it upon themselves to intervene in state government and impose their unrequested interpretation of how states should conduct their government. The federal government's method of using the indictment process and the historically-noted pliability of the grand jury as a tool to negate a judicially-determined meaning of a statute or the parameters of its proscriptions is beyond the function of the Department of Justice, a perversion of our entire system of law, and patently unfair to the persons charged.  In this case, an individual was charged in a transparent effort to expand the Hobbs Act's meaning and thus the justice rendered by his acquittal benefitted the entirety of our citizens by ratifying the protections embedded in the separations of power and checks and balances of the constitution.  The

Compounding its frivolity, the government propounded this theory without any evidence that Mr. Sullivan used his official position to secure "<u>unwarranted </u>privileges or exemptions which are of substantial value and which are <u>not properly available to similarly situated individuals</u>." G.L. c. 268A, § 23(b)(2)(ii)(emphasis added).  *See* Dkt #414 at 38, n.36.  The government had <u>no evidence</u> that the individuals who received the jobs through IATSE Local 11 were unqualified to work as stagehands, which would arguably make the "privilege" of the job "unwarranted."  The government also had <u>no evidence</u> that the jobs were not available to "similarly situated individuals" because, in fact, the stagehand jobs run through Local 11's hiring hall were available to <u>all</u> takers, whether or not they were union members.  *See* 7 Tr. 26:1-3 (testimony of Ms. Glynn). And the government had <u>no evidence</u> that Mr. Sullivan knew that he might violate state ethics law by asking Crash Line to hire some workers through Local 11 to avoid a disruptive protest on City property during a festival at which alcohol would be served.

Trial began in July 2019.  At the close of evidence, the government expressly abandoned the NLRA as a basis for proving the required element of wrongfulness.  *See* Dkt #414 at 52.  The Court subsequently issued an order eliminating both the NLRA and state ethics law as a basis upon which the government could seek to prove wrongfulness.  *See id.*  In an appalling display of disrespect to the Court, the government then used its closing argument to urge "the jury to convict the defendants on a theory that the Court had explicitly and unambiguously ruled out as a matter of law" and "a theory that had been stricken from the case in a written Court order, at the government's own request."  *Id.* at 71.  The government endeavored to convince the jury that it satisfied its burden of proof on wrongfulness through an argument that was "saturated with mischaracterizations of evidence" and featured erroneous statements of law that both "diluted its

---

individual selected to act as the guinea-pig for overzealous federal prosecutors should not have to suffer the burden of paying for their ill-conceived effort.

burden of proof" and disregarded the jury instructions.[15] *Id.* at 79-81. The prosecution's "misstatements of the law and unfair characterizations of the evidence were not off-the-cuff comments, but part of knowingly and intentionally prepared closing argument in a case she oversaw from its inception." *Id.* at 84. Intentional misrepresentations of fact and mischaracterizations of law go beyond frivolity and evidence bad faith on the part of the government. *See United States v. Myerson*, 18 F.3d 153, 162 n.10 (2d Cir. 1994)("[T]he prosecutor has a special duty not to mislead").

The government's disregard for the truth continued even after the verdict. In response to the defendants' respective supplemental post-verdict briefs supporting their Rule 29 motions, the government advanced yet <u>another</u> new theory of wrongfulness—one that was even more untethered from reality. The government now claimed that it had introduced sufficient evidence that Mr. Sullivan and Mr. Brissette acted wrongfully because they lied about the potential for IATSE Local 11 to protest the festival on City Hall Plaza. *See* Dkt #389 at 13. Not only was there no evidentiary support for this claim, but it was also belied by "ample evidence, including witness testimony and documents, that IATSE members were angry about Crash Line's employment practices," including an email that "Glynn wrote to Rogers about the members wanting to protest the event—making specific reference to IATSE's inflatable rat."[16] Dkt #414 at 41.

Moreover, the government had previously proffered to the Court that "the defendants wanted to avoid any embarrassment that a Local 11 picket and the use of the giant inflatable rat

---

[15] The government's closing argument "unfairly characterized the evidence" on multiple fronts. *Id.* at 82, n.72.

[16] Ms. Glynn told Mr. Rogers that "I do not want to cause any problems for our new Mayor by setting up a protest with our 15' inflatable Rat next weekend but my members are ready to protest. I will talk them down because I do have faith in Mayor Walsh and hopefully, we can work with the Mayor's office to make it right in September." *See* Dkt #414 at 14.

on City Hall might cause."[17]  Dkt #214 at 2-3.  "In other words, before arguing to the jury that there was no evidence that the defendants were truly worried about a picket, the government had proffered evidence that the defendants were sincerely concerned about a protest by Local 11."  Dkt #414 at 81, n.70.

### III. The Government Failed to Timely Disclose Exculpatory Evidence and Then Refused to Acknowledge the Incontrovertible Fact That it Was Exculpatory.

As hard as it may be to believe, there is more.  In June 2017, Crash Line principal Jesse Du Bey—who with his friend Paul Sohn owned 80% of Crash Line—was interviewed by the FBI and the AUSAs prosecuting the case and made several statements contrary to the government's allegation that Mr. Sullivan and Mr. Brissette exploited Crash Line's fear of economic harm.  *See* Order on Motion for Sanctions ("Dkt #415") at 2-3.  Mr. Du Bey told the government that he did not recall Crash Line being impliedly threatened by the defendants on September 2, 2014 or on any other date.  *See* Dkt #415 at 4.  He remembered only being "asked/requested/suggested to take union labor."  *Id.*  Nor did he fear that the defendants would "exploit their power" to Crash Line's detriment if Crash Line refused to hire union workers.  "What he thought would happen if they said no was that there would be a loud ugly picket and it would be bad for the brand.  Mr. Du Bey wanted to know what the cost would be to say yes, and take union labor.  It would not be a big number in the larger context, and they would avoid the brand problem."  *Id.*

"Information showing that Crash Line did not perceive a threat or did not fear that the defendants would cause it economic harm during the time period the government charged in the

---

[17] Additionally, the government did not have any legal basis to believe that such statement (even if a lie) would establish wrongfulness as "exaggeration, or even wholesale bluffing, is common fare in business negotiations," as well as in politics.  Cf. *United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015)(honest services fraud is not "an extreme version of truth in politics, in which a politician commits a felony unless the ostensible reason for an official act also is the real one").

14

indictment plainly tends to negate the defendants' guilt." *Id*. at 15. The government had a constitutional obligation to disclose material exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). The Local Rules of this Court also explicitly require that the government disclose any evidence that tends to cast doubt on a defendant's guilt as to any essential element within 28 days of arraignment or "promptly" upon learning that a prior disclosure was incomplete. *See* L.R. 116.2(a)(1).

Yet the government did not disclose Du Bey's statements to defense counsel when the FBI 302 report was finalized in July 2017 or at any point prior to the original trial date of March 26, 2018. *Id.* at 4. The case was then dismissed in March 2018 and revived in March 2019 with a scheduled trial date for July 2019. The government finally produced the Du Bey 302 in July 2019—almost two years <u>after</u> the interview was finalized but only one month before trial was scheduled to begin. *Id.* at 5. Making matters worse, when the government finally produced the report in an email to defense counsel, its cover letter referred to the Du Bey 302 only as "additional discovery" and did not identify the material as exculpatory or as potential impeachment information. Dkt #415 at 13.

Nor did the government "own up" to its error once defense counsel pointed it out. At the sealed hearing on defendants' motion for sanctions, the government "diminish[ed] the importance and exculpatory nature" of the Du Buy 302 by representing to the Court that "Du Bey's statements about having been 'asked/requested/suggested' (rather than 'demanded' or 'required') to hire workers through Local 11, and about hearing 'a loud ugly picket' and resulting damage to the 'brand' (rather than the denial of crucial permits or a license extension, the cancellation of the September festival, or the potential destruction of the company" were not exculpatory because they described what Du Bey knew in August 2014 when no extortion had

yet occurred. *Id.* at 15. A few weeks later, the government told the jury that "the defendants had made up the threat of a union protest and that they had threatened Crash Line with the made-up protest only at the September 2nd meeting, when they finally 'pounced' after having 'laid in wait' since August." *Id.* at 16. In short, rather than take responsibility, the government "vigorously argued that the statement was not exculpatory" and played fast and loose with the facts. Dkt #415 at 16.

## CONCLUSION

"[L]awyers representing the government in criminal cases serve truth and justice first." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). In its single-minded pursuit of convicting Mr. Sullivan, the U.S. Attorney's office disregarded the truth and subverted justice. Because the position of the United States in initiating and maintaining this prosecution was vexatious, frivolous, and in bad faith, it should be required to compensate Mr. Sullivan for his reasonable attorneys' fees and costs.

Respectfully submitted,

TIMOTHY SULLIVAN,
By his attorneys,

/s/ *Thomas R. Kiley*
/s/ *William J. Cintolo*
/s/ *Meredith G. Fierro*

Thomas R. Kiley (BBO # 271460)
William J. Cintolo (BBO # 084120)
Meredith G. Fierro (BBO # 696295)
CEK Boston, P.C.
One International Place, Suite 1820
Boston, MA 02110
617.439.7775 (tel)
617.330.8774 (fax)
tkiley@ceklaw.net
wcintolo@ceklaw.net

mfierro@ceklaw.net

Dated: April 10, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this date, April 10, 2020, a copy of the foregoing document has been served via electronic filing upon all registered parties.

*/s/ Meredith G. Fierro*
Meredith G. Fierro
